**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-30168 |
| Stark Energy, Inc., | ) | Chapter 11, Subchapter V |
| | ) | |
| Debtor. | ) | |

---

**DEBTOR'S OBJECTION TO GATE CITY BANK'S MOTION TO LIFT
AUTOMATIC STAY**

---

Stark Energy, Inc. (the "Debtor") objects to the Motion for Relief from Automatic Stay (the "Motion") filed by Gate City Bank (the "Bank"). The Bank requests relief from the automatic stay to retain possession of and continue forward with the auction of eighteen (18) titled vehicles that are described in detail in the Bank's motion (the "Vehicles"). For purposes of addressing the Bank's motion, the Debtor states as follows:

1. The Debtor filed its bankruptcy petition in good faith, with the intent to continue its business and to repay its debts to the best of its ability as required by the Bankruptcy Code.

2. The Debtor agrees that there is no equity in the Vehicles. Both the Debtor and the Bank agree that, in their present condition, the Vehicles are worth approximately $150,000. The Bank alleges that it is owed in excess of $400,000. [Doc. 16; para. 22]. While the Debtor has not had an opportunity to review the Bank's alleged debt, it agrees that it owes more than $150,000 to the Bank.

3.  The Vehicles are necessary for an effective reorganization. Without the Vehicles, the Debtor will not be able to produce sufficient revenue to fund an effective plan of reorganization or pay back his creditors.

4.  The Debtor has the ability to, and hereby offers to, pay the Bank $2,500 per month as "adequate protection" payments. Vehicles are ordinarily subject to 5-year (60 month) straight line depreciation. Accordingly, the offer of $2,500 per month reflects the ordinary, expected depreciation of the Vehicles ($150,000 divided by 60). In addition to these monthly payments, the Debtor will insure and maintain the Vehicles. To the extent the Vehicles are in disrepair, as alleged by the Bank, the improvements made to the Vehicles to make the Vehicles road-worthy will add to the protection of the Bank by increasing the value of the Vehicles.

As will be discussed in greater detail below, there is no "cause" to terminate or otherwise modify the automatic stay, and the Vehicles are necessary for an effective reorganization. Accordingly, the Court should deny the Bank's motion.

## BACKGROUND

In 2017, the Debtor began operating as a hauling company. *See* Declaration of Robert Fettig ("Fettig Dec."), ¶ 2. To purchase some of the equipment needed to operate, the Debtor took out loans from various sources including the Bank. *(*Fettig Dec., ¶ 3). The vast majority of the Debtor's business centered on the North Dakota oil fields. (Fettig Dec., ¶ 2). The Debtor initially operated smoothly, having good cashflow and meeting the payments on its loans. *(*Fettig Dec., ¶ 4).

2

Then in 2019, the Debtor's principal, Robert Fettig, bought out his partner for $150,000. *(Fettig Dec., ¶ 5)*. In ordinary circumstances, the Debtor would have been able to handle the debt service caused by the buy-out. *(Fettig Dec., ¶ 5)*. Unfortunately, Mr. Fettig was not able to foresee the instability that would be caused by the COVID pandemic in 2020.

As a result of the pandemic, there was a worldwide slump in the demand for oil. *(Fettig Dec., ¶ 6)*. The Court may recall news reports of smog clearing so that the Taj Mahal could be viewed without this impediment and even, for a short time, the negative price of oil. As a result of the downturn in the oil business, North Dakota oil fields were being pulled out of production and the Debtor was forced to look for other industries to ply its trade. *(Fettig Dec., ¶ 8)*. The Debtor was also required to take on additional debt and receive funds from government programs enacted to retain employees and assist small businesses through the ongoing COVID pandemic. *(Fettig Dec., ¶ 8)*.

Following the pandemic, the Debtor's business began to recover. *(Fettig Dec., ¶ 9)*. However, due to the Debtor's inexperience in these new industries and the large amount of debt it had accrued, any recovery the Debtor experienced was insufficient in the face of rising expenditures and a falling workforce. *(Fettig Dec., ¶ 9)*.

In 2023, the Bank began foreclosure proceedings on the Vehicles. *(Fettig Dec., ¶ 10)*. The Debtor's other creditors learned of this and began demanding and in some cases taking the Debtor's assets that they felt they were entitled to. *(Fettig Dec., ¶ 11)*.

Due to this, the Debtor lost possession of the majority of its assets including the Vehicles. (Fettig Dec., ¶ 12).

## **LEGAL ARGUMENT**

### I.    THE DEBTOR FILED FOR BANKRUPTCY IN GOOD FAITH.

Under the Bankruptcy Code, the filing of a petition automatically stays most judicial actions against the debtor. 11 U.S.C. § 362(a)(1). This provision exists to give the debtor a respite to marshal their resources so that they may satisfy outstanding obligations. *In re Vierkant*, 240 B.R. 317, 320 (B.A.P. 8th Cir. 1999).

In rare circumstances, a creditor is entitled to relief from this automatic stay "for cause." 11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define the term "cause." Instead, the courts must determine whether the stay is to be lifted on a case-by-case basis. *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994). It is generally accepted that a debtor's lack of good faith may be the basis for lifting the automatic stay. *See*, *Matter of United Imports, Inc.*, 203 B.R. 162, (Bankr.D.Neb. 1996); *In re Knight* Jewelry, 168 B.R. 199 (Bankr.W.D.Mo. 1994); *In re Laguna*; *Carolin Corp v. Miller*, 886 F.2d 693 (4th Cir. 1989); *In re Arnold*, 806 F.2d 937 (9th Cir. 1986); *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986). While no single fact is dispositive, courts consider the following factors when evaluating an organizational debtor's good faith:

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been

unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court

litigation, and the debtor has lost or has been required to post a bond which it

cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business employees; and

(8) the lack of possibility of reorganization.

*In re Laguna*, 30 F.3d at 738. However, these indicia are not an exhaustive list of relevant

factors and courts must consider the totality of circumstances when determining a

debtor's good faith. *Id.* Relief from stay should not be granted lightly and should only

be applied in "extreme circumstances." *In re Kissinger*, 72 F.3d 107, 109 (9th Cir. 1995).

In this case, by applying these factors, the Court should conclude that the Debtor

filed its petition in good faith. Regarding the first factor, the Debtor has multiple assets.

(Fettig Dec., ¶ 15). In addition to the Vehicles and the real property in Stark County,

North Dakota the Bank has pointed out in its motion, the Debtor owns other vehicles

and equipment as will be shown in the Debtor's schedules anticipated to be filed

following the deadline to submit this response. (Fettig Dec., ¶ 15).

Regarding the second factor, the Debtor's prepetition conduct has not been

improper. In its motion, the Bank alleges that the Debtor refused to turn over the

Vehicles in defiance of court orders. (Doc. 16, ¶ 8). However, the Bank fails to mention

that at the time those orders were issued another creditor had taken the Vehicles and

5

the Debtor could not turn them over. (Fettig Dec., ¶ 16). As the Debtor's business began to wane and its debts began to grow, the Debtor, burdened by the pressures of navigating through this rough period and placating its various creditors, was unable to monitor and protect all its assets. Sometime in 2023, the Vehicles were taken from the Debtor's possession by various bad actors. The Bank states in its own motion that the Stark County Sheriff's Office located the Vehicles on the property of Yuker Towing, another creditor of the Debtor. (Doc. 16, ¶ 11). The Bank also accuses Robert Fetting, the Debtor's principal, of criminal conduct. (Doc. 16, ¶ 19(b)). These cases are currently pending and Mr. Fettig should be presumed innocent until proven guilty. *See* Case No. 45-2024-CR-157 and Case No. 45-2024-CR-277. The Bank is free to force these cases through the judicial system, however, a pending charge is not equivalent to criminal conduct.

Regarding the third factor, the Debtor expects to list the Bank and numerous other creditors in its schedules, which will be filed following the deadline to file this response. (Fettig Dec., ¶ 15).

Regarding the fourth factor, while the Vehicles have been foreclosed upon, the Debtor possesses other property which has not been posted for foreclosure. (Fettig Dec., ¶ 15). This is not unusual in a bankruptcy. The Bank wishes to paint the Debtor as a one-asset entity with the Bank as its lone creditor, however, that is simply not the case. The Debtor has multiple obligations to multiple different creditors and has declared bankruptcy in an attempt to seek relief and to repay his creditors to the best of its ability, as required by the Bankruptcy Code. (Fettig Dec., ¶¶ 14, 15).

6

Regarding the fifth factor, the Bank has been granted judgments against the Debtor, however, no single factor is determinative, and those obligations are not an insurmountable debt. The Debtor, if allowed to continue its business under a plan of reorganization, should have the means to propose and confirm an effective plan to repay its creditors. (Fettig Dec., ¶ 22).

Regarding the sixth factor, the Debtor is not evading any court orders within the meaning of this case law. The Bank recovered the Vehicles – from another creditor who had taken the Vehicles. Through the current bankruptcy proceeding, the Debtor is seeking the ability to continue its business so that it can develop a plan of reorganization that will benefit all its creditors.

Regarding the seventh factor, the Debtor does have an ongoing business. (Fettig Dec., ¶ 19). It is currently operating on a limited basis and producing revenues. (Fettig Dec., ¶ 19). While the Debtor will require the return of the Vehicles to fund its anticipated plan of reorganization, it currently has an on-going business. (Fettig Dec., ¶ 21).

Regarding the eighth factor, the Debtor has a high likelihood of reorganization. This factor will be discussed in greater detail below.

Finally, it is important to reiterate that while these factors are useful the Court must consider the totality of the circumstances. The Debtor has been in business since 2017 and was operating successfully until a series of unfortunate events occurred. The Debtor expended a large amount of capital buying out his partner in 2019, then in 2020 the entire world changed with the pandemic. The oilfields and all related industries,

7

including the Debtor's business, experienced a severe contraction. The Debtor was forced to find alternate sources of revenue, borrow money and obtain government assistance from programs enacted to assist small businesses damaged by the COVID pandemic. While business eventually started to recover, the Debtor was overwhelmed with debt. Then in 2023, the Bank commenced foreclosure, and other creditors, quickly learning of this, began demanding and in some instances taking whatever piece of the Debtor they felt entitled to. The Debtor, simply, was overwhelmed. The Debtor is not a dishonest debtor and this case does not meet the extreme standards required to lift the automatic stay under 11 U.S.C. § 362(d)(1).

## II.    THE VEHICLES ARE NECESSARY FOR AN EFFECTIVE REORGANIZATION

Relief from the automatic stay granted debtors under 11 U.S.C. § 362(a)(1) may also be lifted if the debtor has no equity in the property and the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2). The Debtor does not dispute that it lacks equity in the Vehicles. Both the Debtor and the Bank agree that, in their present condition, the Vehicles are worth approximately $150,000 and that the debt owed to the Bank is in excess of $150,000. (Fettig Dec., ¶ 20). Here, however, Section 362(d)(2) does not allow relief from the automatic stay because the Vehicles are necessary for an effective reorganization.

Once a creditor has established that a debtor lacks equity in some property, the burden shifts to the debtor to prove that the property at issue is necessary for an effective reorganization. *Bowman v. Bond (In re Bowman)*, 253 B.R. 233, 238 (B.A.P. 2000).

The debtor must show that there is a "reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988). In the Eighth Circuit, the "feasibility test" applies. *In re Bowman*, 253 B.R. at 238. Under the feasibility test, a court must determine "whether things which are to be done after confirmation can be done as a practical matter under the facts." *Id*. at 239.

As noted by the Bank in its briefing, the "Debtor has not yet put forth a plan; so the Bank cannot respond to whether the plan would be feasible, or whether the Recovered Vehicle Collateral would be truly necessary to the plan". *See* Doc. 16, ¶ 25. In fact, as of the date this response is filed, the Debtor has not yet filed its schedules. The Bank is simply too early in the case to allege that an effective reorganization is untenable. In applying the "effective reorganization" standard, courts commonly allow the Debtor the opportunity to first submit a plan. See *In re W.S. Sheppley & Co.*, 45 B.R. 473, 481 (Bankr.N.D.Iowa 1984)(the court denied relief from stay noting that the creditor's motion was filed less than two months after filing the initial petition and that granting the motion would essentially eliminate any possibility of an effective reorganization).

In this case, the Vehicles are central to the Debtor's operations, and the loss of the Vehicles would undermine any chance of a successful reorganization. The Debtor's ability to develop an effective plan of reorganization is underscored by reviewing the pre-COVID Debtor. Robert Fettig, the principal of Debtor, started the company in April of 2017 with one truck and a trailer. Prior to this, he worked in the oil and gas industry

9

for 5 and a half years. (Fettig Dec., ¶ 22). In 2017, its first year of operation, the company grossed $176,000. In late 2017 and through 2018, the Debtor acquired additional trucks for hauling aggregate, a flatbed truck for heavy hauling, a hydrovac, and other equipment for drilling services. (Fettig Dec., ¶ 22). The Debtor ended 2018 with gross revenues of $1.65 million. (Fettig Dec., ¶ 22). Staying on this trajectory, Stark grossed $4.85 million in 2019 with the full utilization of the vehicles it is now seeking to recover. (Fettig Dec., ¶ 22). The past doesn't predict the future; however, this history demonstrates that the Debtor has the experience, ability, and commitment to produce a successful outcome.  It also demonstrates the value of the Vehicles, when put to use, will provide a better outcome for the creditors when compared to liquidation or disposal.

To conclude, without the Vehicles, the Debtor will not be able to produce sufficient revenue to fund an effective plan of reorganization or pay back his creditors. As a business that hauls water and aggregate, the Vehicles are clearly necessary for an effective reorganization, and the Debtor's history demonstrates that an effective reorganization is possible.

### III.    THE DEBTOR IS WILLING AND ABLE TO PROVIDE ADEQUATE PROTECTION PAYMENTS TO THE BANK TO OBTAIN A RETURN OF THE VEHICLES.

Because the Vehicles are currently sitting unused in the possession of the Bank, the Bank is not presently entitled to adequate protection payments with respect to the Vehicles. Nonetheless, to obtain a return of the Vehicles, the Debtor understands that it will need to provide adequate protection of the Bank's interest in the Vehicles. (Fettig

Dec., ¶ 23). To this end, the Debtor hereby offers $2,500 per month to obtain a return of the Vehicles. (Fettig Dec., ¶ 23). In addition to these monthly payments, the Debtor will insure and maintain the Vehicles. (Fettig Dec., ¶ 23). To the extent the Vehicles are in disrepair, as alleged by the Bank, the Debtor will by necessity repair the Vehicles to make them road-worthy and these improvements will add to the protection of the Bank by increasing the value of the Vehicles. (Fettig Dec., ¶ 24).

The offered payment of $2,500 per month will fully compensate the Bank for the depreciation of equipment that occurs as it is used. Adequate protection payments are intended to reflect the depreciation or decline in value that occurs as an asset is used. The general rule is that, in order to obtain adequate protection payments, ". . . the moving party must provide evidence that the value of the collateralized property is declining, or at least threatened, as a result of the automatic stay." *In re Panther Mountain Land Dev., LLC,* 438 B.R. 169, 189 (Bankr. E.D. Ark. 2010). When arguing that the value of collateral is depreciating, the creditor must provide evidence of actual or expected depreciation or some other decline in value from the petition date to the date of the filing of the motion. *Id.* ("The most direct and convincing proof that the value is 'declining, or at least threatened' comes from a comparison of the property value at the time of the hearing to the property value on the date of filing.").

Here, the Bank provides no evidence of depreciation or decline in value because the equipment is currently sitting unused. When put in use, vehicles are ordinarily subject to 5-year (60 month) straight line depreciation. *See* Declaration of Nicole Wald, ¶ 3.  In the present case, both the Bank and Debtor agree that the Vehicles are presently

worth approximately $150,000. Accordingly, the Debtor's offer of $2,500 per month reflects the ordinary, expected depreciation of the Vehicles ($150,000 divided by 60).

The Bank raises the concern that "the Debtor and its principal Robert Fettig would again hide the Recovered Vehicle Collateral and/or continue selling it for parts in the event the Debtor was allowed to recover possession". *See* Doc. 16, ¶ 26. It must be emphasized that the Bank recovered the Vehicles from another creditor that had taken the Vehicles. There is no evidence that the Debtor or Mr. Fettig hid the Vehicles. Moreover, while the Bank implies that the Debtor sold parts off the Vehicles, Mr. Fettig would testify that he did not sell parts off the Vehicles and that there were not parts missing from the Vehicles when they were taken from his possession. (Fettig Dec., ¶ 18). Again, it must be emphasized that the Bank recovered the Vehicles from another creditor – not from the Debtor – and the Bank cannot hold the Debtor responsible for parts missing from the Vehicles to the extent they were removed by the creditor that had originally taken the Vehicles from the Debtor.

WHEREFORE, for the foregoing reasons, the Debtor respectfully requests entry of an order denying the Bank's motion and allowing the court to hear his plan of reorganization.

Ahlgren Law Office, PLLC

Dated: May 15, 2024                    /s/Erik A. Ahlgren

Attorney #09561 (ND)
220 West Washington Ave, Ste 105
Fergus Falls, MN 56537
Office: 218-998-2775
Fax: 218-998-6404
erik@ahlgrenlawoffice.net

ATTORNEY FOR DEBTOR

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-30168 |
| Stark Energy, Inc., | ) | Chapter 11, Subchapter V |
| | ) | |
| Debtor. | ) | |

---

**DECLARATION OF ROBERT FETTIG IN SUPPORT OF DEBTOR'S**
**OBJECTION TO GATE CITY BANK'S MOTION**
**TO LIFT AUTOMATIC STAY**

---

I, Robert Fettig, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the president and sole shareholder of the Debtor in the above captioned case and am personally familiar with the facts as stated herein.

2.      In 2017, I along with my partner, Mathew J. Barrett, organized the Debtor and operated it as a business whose primary purpose was hauling water and supplies to and from the oil fields located in North Dakota.

3.      The Debtor took out numerous loans from various different institutions, including Gate City Bank, to acquire the initial funding required to purchase the equipment necessary to operate in the hauling industry. To secure these loans, security interests in the equipment were granted to the lenders.

4.      From 2017 to 2019, the Debtor had good cashflow and made timely payments on its loans.

1

5.      In 2019, I bought out Mathew J. Barrett's interest in the Debtor for $150,000, which at the time seemed a reasonable expense given the revenue being generated by the Debtor.

6.      In 2020, the COVID pandemic began and as a result of the pandemic there was a worldwide slump in the demand for oil and an increase in the expenses of oil drilling companies. This caused an economic downturn for the oil industry including the oil fields in North Dakota.

7.      This economic downturn for the oil companies in North Dakota resulted in a sharp decline of business for the Debtor.

8.      Due to this sharp decline in revenue, the Debtor was forced to begin hauling for the aggregate industry, which I lacked experience in, and to take out further loans and receive funds from government programs enacted to retain employees and assist small businesses through the ongoing COVID pandemic.

9.      Following the pandemic, the Debtor's business began to recover. However, due to my inexperience in the aggregate industry and the large amount of debt accrued throughout the pandemic, the recovery was insufficient in the face of rising expenditures and a falling workforce.

10.      In 2023, Gate City Bank (the "Bank") began foreclosure proceedings on the equipment it held security interests in.

11.      Shortly after the Bank began foreclosure proceedings, many other creditors of the Debtor learned of these proceedings and began demanding and pressuring the Debtor to turn over money and assets that they held security interests in.

2

12.     Sometime in 2023, due to the constant demands from creditors creating pressure and distractions, the Debtor lost possession of the vast majority of its assets due to bad actors including the Recovered Vehicle Collateral as defined in the Bank's motion (the "Vehicles").

13.     On April 23, 2024, the Debtor filed its petition for bankruptcy under Chapter 11, Subchapter V of the Bankruptcy Code.

14.     I caused the Debtor to file bankruptcy in good faith, for the purpose of developing a plan of reorganization that will benefit all its creditors.

15.     As will be shown on the schedules filed in support of the Debtor's bankruptcy petition, the Debtor has multiple assets other than the assets secured by the Bank and multiple creditors other than the Bank.

16.     At the time the Debtor was served with the Order for Prejudgment Seizure that was entered on October 11, 2023 most of the equipment the Bank held a security interest in had been taken by another creditor and the Debtor could not turn them over.

17.     It is my understanding that the Bank recovered the assets that are the subject of their motion from Yuker Towing. It is my further understanding that Yuker Towing took the assets because they were a creditor of the Debtor and wished to use these assets to repay the debt owed to them.

18.     While the Bank implies that I or others on behalf of the Debtor sold parts off the vehicles and trailers that are subject to the Bank's security interest, but that is not

3

true. I am not aware of parts missing from the equipment while the equipment was in the Debtor's possession.

19.     The Debtor is currently operating and producing revenues, though on a limited basis. My focus is to obtain a return of the Gate City collateral so that we can expand our business. I have people ready, willing and able to work for me and I am confident that I can bring in profitable work orders and contracts.

20.     Attached as Exhibit A is a list of equipment that is currently in the possession of the Bank, along with my valuations of the equipment based on the auction pricing. The total valuation of the equipment, based on auction pricing, is approximately $150,000. I understand and agree that the Debtor owes the Bank in excess of $150,000, so there is no equity in the equipment.

21.     The equipment held by the Bank is necessary for an effective reorganization of the Debtor. The vehicles, trailers and tankers in their possession are central to the Debtor's operations, and the loss of this equipment would undermine any chance of a successful reorganization.

22.     I am confident that I can develop an effective plan of reorganization for the Debtor. I started the company in April of 2017 with one truck and a trailer. Prior to this, I worked in the oil and gas industry for 5.5 years. In 2017, the Debtor's first year of operation, the company grossed $176,000. The Debtor acquired a flatbed trailer for hauling pipe/materials in 2018, additional trailers in 2019 for hauling aggregate, and a hydrovac in 2022 for spill cleanups and tank cleanings, and other equipment for drilling services. The Debtor ended 2018 with gross revenues of $1.65 million. In 2019, the

4

Debtor grossed $4.85 million with the full utilization of the vehicles now in the possession of the Bank. I believe that, over time, I can return the company to these levels of revenues and that I can operate the company profitably.

23.    I am asking the Bank to return the equipment in its possession, and I understand the need to provide adequate protection of its security interest in the equipment. To this end, the Debtor is offering to pay the Bank $2,500 per month to obtain a return of the Vehicles. This sum will protect the Bank against a devaluation of the equipment based on depreciation or normal "wear and tear". In addition to these monthly payments, the Debtor will insure and maintain the Vehicles.

24.    The Bank alleges that the equipment is in disrepair. If that is the case, I agree to make the equipment road-worthy and these improvements will add to the protection of the Bank by increasing the value of the equipment.

25.    I am confident that the Debtor, if allowed to continue its business under a plan of reorganization, will have the means to propose and confirm an effective plan to repay its creditors.

26.    I have reviewed the response to the Bank's motion to lift the automatic stay and believe that the facts as stated therein are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 15, 2024

_____
Robert Fettig

5

## Belly Dump - Trailers

| | Unit # | Year | Make | Model | Vin # | Plate | Auction Value |
|---|---|---|---|---|---|---|---|
| 1 | BD - 001 | 1999 | Midland | 3 axle | 2MFB2S4D4XR000542 | T998661 | 9,800.00 |
| 2 | BD - 002 | 2000 | Midland | 3 axle | 2MFB2S3D3YR000650 | T998663 | 10,500.00 |
| 3 | BD - 003 | 2000 | Midland | 3 axle | 2MFB2S3D7YR000652 | T998664 | 10,500.00 |
| 4 | BD - 004 | 2000 | Midland | 3 axle | 2MFB2S4D3YR001148 | T998662 | 4,200.00 |
| 5 | BD - 005 | 2000 | Midland | 3 axle | 2MFB2S3D5YR000651 | T998665 | 10,500.00 |
| 6 | BD - 006 | 2013 | Dakota | 3 axle | 1D9SH4339DY554348 | T998666 | 12,250.00 |

## Side Dump - Trailers

| | Unit # | Year | Make | Model | Vin # | Plate | Auction Value |
|---|---|---|---|---|---|---|---|
| 1 | SD - 001 | 2016 | Side Dumper | SDR 342-49 | 1D9FS44430G C688099 | T998370 | 25,250.00 |
| 2 | SD - 002 | 2016 | Side Dumper | SDR 342-49 | 1D9FS44437GC688018 | T998369 | 18,250.00 |

## Trailers - Vacuum Tankers

| | Unit # | Year | Make | Model | Vin # | Plate | Auction Value |
|---|---|---|---|---|---|---|---|
| 1 | T-021 | 2013 | Dragon | 200 BBl , 4 axel Spread | 1UNST5348DS128118 | T997319 | 1,800.00 |
| 2 | T-101 | 2013 | Dragon | 200 BBL , 4 axel Spread | 1UNST5341DS128154 | T997311 | 1,500.00 |
| 3 | T-103 | 2014 | Dragon | 200 BBL , 4 axel Spread | 1UNST5340ES128552 | T997318 | 1,500.00 |
| 4 | T-104 | 2014 | Dragon | 200 BBL , 4 axel Spread | 1UNST5346ES140026 | T995516 | 1,800.00 |
| 5 | T-105 | 2013 | Dragon | 200 BBL , 4 axel Spread | 1UNST5340DS128291 | T995515 | 3,100.00 |
| 6 | T-106 | 2013 | Dragon | 200 BBL , 4 axel Spread | 1UNST5343DS128172 | T997312 | 1,300.00 |
| 7 | T-107 | 2012 | Dragon | 150 BBL, 3 axel | 1UNST4223CL109253 | T997317 | 3,000.00 |
| 8 | T-113 | 2013 | Dragon | 200 BBl , 4 axel Spread | 1UNST5340DS128162 | T997313 | 1,500.00 |

## Flat Bed - Trailers

| | Unit # | Year | Make | Model | Vin # | Plate | Auction Value |
|---|---|---|---|---|---|---|---|
| 1 | FB- 001 | 2007 | Reitnoeur | 48' Flat Bed | 1RNF48A247R019280 | T997321 | 4,500.00 |

## Tractors

| | Unit # | Year | Make | Model | Vin # | Plate | Auction Value |
|---|---|---|---|---|---|---|---|
| 1 | S-209 | 2012 | Kenworth | W900 | 1XKWP4TX8CJ335970 | 243CMM | 4,600.00 |
| 2 | S-208 | 2007 | Kenworth | T800 | 1XKDP40X07R197151 | 579CJS | 1,000.00 |
| 3 | S-207 | 2014 | Kenworth | W900 | 1XKWD49X1EJ413380 | 33581P | 15,250.00 |
| 4 | S-206 | 2014 | Kenworth | T800 | 1NKDX4TX3EJ403810 | | 9,000.00 |

$    151,100.00

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-30168 |
| Stark Energy, Inc., | ) | Chapter 11, Subchapter V |
| | ) | |
| Debtor. | ) | |

---

**DECLARATION OF NICOLE WALD IN SUPPORT OF DEBTOR'S**
**OBJECTION TO GATE CITY BANK'S MOTION**
**TO LIFT AUTOMATIC STAY**

---

I, Nicole Wald, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a Certified Public Accountant. I have worked for two regional public accounting firms and have my own public practice. I am a member of the North Dakota Society of CPAs where I serve on the Next Gen Committee, the North Dakota CPA Society Foundation, where I serve as a Trustee, the American Accounting Association, the Magic City CPAs where I serve as co-chair as well as serving on the Supervisory Committee of Aspire Credit Union and the Society of St. Vincent De Paul.

2.      I have reviewed a list of the equipment that comprises the collateral securing the Gate City Bank Claim. The collateral consists of Kenworth tractors, and a variety of belly dump, side dump, and flatbed trailers, as well as vacuum tankers. All of the tractors, trailers and tankers are used equipment with model years ranging from 1999 to 2016.

3.      Depreciation is intended to reflect a reasonable estimate of the useful life of the equipment. It is ordinary to apply a seven-year depreciation schedule to most types of

1

equipment. A five-year depreciation schedule is often justified for vehicles and assets used in the construction industry. Based on my experience, I believe a 5-year (60 months) straight line depreciation schedule would be appropriate for the tractors, trailers and tankers of the sort that are included on the list of Gate City Bank collateral I reviewed.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 13th, 2024


_Nicole Wald CPA_____
Nicole Wald

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In re:

Stark Energy, Inc.                                             Bky. Case No. 24-30168
                                                              Chapter 11 Subchapter V

              Debtor.

## CERTIFICATE OF SERVICE

    I, Lisa Ahlgren certify, that on May 15, 2024, the following document:

**Debtor's Objection to Gate City Bank's Motion to Lift Automatic Stay**

was filed electronically with the Clerk of Court through CM/ECF and that those parties

requesting electronic service were served by CM/ECF.

Executed: May 15, 2024                        /s/Lisa Ahlgren
                                              Lisa Ahlgren