1

```
 1              UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF NORTH DAKOTA
 2       _____

 3    In Re:                      Case No.: 24-30168

 4    Stark Energy, Inc.,         Chapter 11, Subchapter V

 5              Debtor.

 6       _____

 7

 8                 VIDEOCONFERENCE DEPOSITION

 9                          of

10                   ROBERT G. FETTIG

11                   June 28, 2024

12                    8:33 a.m.

13

14

15

16

17

18

19    LOCATION:
        All parties appearing via Zoom.
20

21

22

23

24    COURT REPORTER:  CAROLYN TAYLOR PEKAS, RPR

25
```

2

```
 1                    A P P E A R A N C E S

 2        On Behalf of the Debtor:

 3        Maurice VerStandig, Esq.
            THE DAKOTA BANKRUPTCY FIRM
 4          1630 First Avenue North, Suite B
            Fargo, North Dakota 58102
 5          701.394.3215
            mac@dakotabankruptcy.com

 6

 7        On Behalf of Creditor Gate City Bank:

 8        Caren W. Stanley, Esq.
            VOGEL LAW FIRM
 9          218 NP Avenue
            PO Box 1389
10          Fargo, North Dakota 58107-1389
            701.237.6983
11          cstanley@vogellaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                        I N D E X

 2   WITNESS:                               PAGE NO.

 3      ROBERT G. FETTIG

 4   EXAMINATION:

 5   By Ms. Stanley.........................    5

 6   Deposition Correction Sheet...............  185

 7   Notary Reporter's Certificate............  186

 8                                            FIRST
 9   EXHIBITS:                     MARKED  REFERENCE

10   (Premarked Exhibits)

11   No. 1...................................   24
        Stark Energy Asset List
12
     No. 2...................................   46
13      Stark Energy, Inc., Schedules

14   No. 3...................................   68
        Stark Energy, Inc., Balance Sheet
15      as of March 31, 2021

16   No. 4...................................   77
        Certificate of Liability Insurance
17
     No. 5...................................   81
18      Picture Report from Location Services
        1 - 18
19
     No. 6...................................   96
20      Amended Order for Prejudgment Seizure of
        Collateral dated July 21, 2023, and
21      Judgment dated August 30, 223; Midland
        States Bank v. Stark Energy, Inc., and
22      Robert Gene Fettig

23   No. 10..................................  119
        Exhibit 1 - Robert Fettig Texts 2023;
24      1 - 5

25
```

4

|  | | FIRST |
|---|---|---|
| **EXHIBITS:** | **MARKED** | **REFERENCE** |

(<u>Premarked Exhibits - Continued</u>)

No. 11.................................... 157
  Exhibit 2 - Robert Fettig Texts, 2024

No. 12.................................... 163
  Exhibit 4 - Invoices with Summary Sheet

No. 13.................................... 178
  Exhibit 5 - Outside Pictures

No. 14.................................... 148
  Exhibit 3 - Delete Fettig Texts


**DOCUMENT/INFORMATION REQUESTS:**

No. 1..................................... 113
  Invoice from Yuker Towing

Robert G. Fettig

5

1         - - - - -
2              ROBERT G. FETTIG,
3    having been first duly sworn to tell the truth,
4        the whole truth, and nothing but the truth,
5              testified as follows:
6         - - - - -
7              EXAMINATION
8    BY MS. STANLEY:
9    Q.    Mr. Fettig, can you tell me -- spell your --
10   tell us your name, and spell your last name, please.
11   A.    My name is Robert, R-O-B-E-R-T; and my last
12   name is Fettig, F-E-T-T-I-G.
13   Q.    And what's your business address, sir?
14   A.    My business address is -- well, I guess it's
15   4090 130 C Avenue. I'd have to look it up. I'm
16   sorry. The shop address, that is. The -- the
17   address, you're wanting to know, for the shop?
18   Q.    Yeah, what you consider your business
19   address.
20   A.    Yeah. So it's going to be 4090
21   130th C Avenue Southwest, Belfield, North Dakota
22   58622.
23   Q.    And other than this bankruptcy case, have
24   you ever testified in court before?
25   A.    Have I what? Sorry.

6

1    Q.    Testified in court before?
2    A.    Have I testified in court? No. About this
3    case, or -- I mean --
4    Q.    Other than -- other than this case, like --
5    I know you did the State court cases and then now the
6    Bankruptcy Court case, but anything other than that?
7    A.    No. I've never testified, I don't -- I
8    mean -- I haven't -- like for -- for Stark Energy or
9    any other thing or -- I mean --
10   Q.    Anything.
11   A.    Have I testified? No, I haven't testified
12   in court. I know that I had some cases with you with
13   the civil case or whatever, but I didn't -- no, I
14   didn't testify to any other cases or anything, no.
15   Q.    What's your educational background?
16   A.    I went to college. I went to McNally Smith
17   College of Music in St. Paul, Minnesota. I almost
18   graduated with a -- what is it? -- associate's of
19   applied science in music management. I was in the
20   music industry thing early on in my early years, and
21   I went into -- after high school, I went into -- and
22   then in college I went into real estate for --
23   full-time, when I was in my late teens, early 20s,
24   and then ended up getting in the oil field, so ...
25   Q.    Okay.

7

1    A.    I didn't finish the college degree, though.
2    I'm not claiming I did. I just had a couple credits
3    to finish. I just didn't see the value in it.
4    Q.    When did you move to North Dakota?
5    A.    In 2011, summer of 2011. Was it April --
6    April -- it was in Minot -- of 20- -- 2012.
7    Q.    And what prompted the move? You were in
8    Michigan before. Right?
9    A.    Yeah, I was in Michigan when I was a child,
10   like a baby, like when I was -- up until middle
11   school.
12   Q.    Okay. And then did you move to Minnesota
13   after that?
14   A.    Yeah.
15   Q.    Okay. So you were in -- lived in Minnesota
16   from, like, middle school until college?
17   A.    Yeah, a little bit after college quite a
18   bit. I think I was 27 when I moved here, 26,
19   something like that.
20   Q.    And what prompted the move to North Dakota
21   in 2011?
22   A.    Change of scenery. Different opportunities.
23   The opportunity with the oil field. The oil and gas
24   industry was really busy, and a lot of people told me
25   about the industry, so...

8

1    Q.    Have you ever been convicted of a crime?
2    A.    Yeah. I was convicted of, I believe,
3    narcotics, or they said it was possession with the
4    intent, whatever. Yep. That's when I was 20 and a
5    half, and then they sentenced me when I was 21.
6    Q.    Did you serve time?
7    A.    Yes, ma'am. I went to Duluth federal
8    prison, the federal prison camp.
9    Q.    How long were you there?
10   A.    About four-plus years. It was like --
11   like -- it was, like, wrapped up, I guess, the total
12   of -- like, basically, I got -- went to court when I
13   was 20 and a half or 21, and then I went in, and I
14   did my time for being dumb, hanging out with the
15   wrong people.
16   Q.    And then it was right after you got out of
17   prison that you went to North Dakota?
18   A.    I was released here, yeah. They did a
19   transfer and then they did a permission and then I
20   was released here.
21   Q.    Okay. Have you been charged with any other
22   crimes other than the two cases that we're looking at
23   in North Dakota right now?
24   A.    No. I've never --
25        MR. VERSTANDIG: Hold on. Hold on.

Robert G. Fettig

9

1      Rob, every now and then I'm going to object.
2      THE WITNESS:  I --
3      MR. VERSTANDIG:  When I -- just let me
4  explain my objection.
5      THE WITNESS:  I got you.  Thank you, sir.
6      MR. VERSTANDIG:  Hold on.  You're going to
7  answer anyway, unless I very clearly tell you not to
8  answer.  There will be no ambiguity if I tell you not
9  to answer, but let me get my objections on the
10  record.
11      So object to form.
12      Rob, you can give an answer.
13      THE WITNESS:  Okay.
14      Q.    (BY MS. STANLEY)  The question was:  Have
15  you been charged with any other crimes?
16      A.    I think the State of North Dakota.
17  Dickinson PD pulled me over, and I got a DUI, but I
18  beat that case because I didn't -- I blew -- I was on
19  the side of the road, and I blew zero, and I -- and I
20  was just getting frustrated because I was doing the
21  roadside, and I put my foot down because my legs were
22  just sore because I was tired from working out and
23  working and trying to work out while I was working.
24      And then I went through all the court cases
25  and everything, and they proved that I blew zero at

10

1  the roadside, blew zero at the police station and
2  everything, so I they dropped the case.
3      Q.    Any others?
4      A.    No.  I mean, I got -- I'm on probation for,
5  like, a traffic thing, I think, with the tint on the
6  vehicle.  I didn't know about the tint, you know.  I
7  thought it was just a ticket.  I said:  Sir, I'll
8  just take it off, the tint off the ticket.  It's
9  just -- you know, it's very minor.  It's just a
10  ticket for a traffic offense.
11      Q.    So just the two traffic ones and then the --
12      A.    Yeah, I -- yeah.  I've been good for like
13  19 years, man.  19, 20 years, I've been -- I turned
14  my life around, so...
15      Q.    Stark Energy was formed in 19- -- or --
16  19- -- 2018.  Is that right?
17      A.    No.  2017.  April of 2017.
18      Q.    Okay.  And when it was formed, were you the
19  50 percent owner?
20      A.    No.  60 percent.  Majority owner.
21      Q.    Okay.  And the other owner was Matthew
22  Barrett?
23      A.    On paper.  He didn't do anything.
24      Q.    And then at what point did you become the
25  100 percent owner?

11

1      A.    March of 27- -- March of 20- -- 2019.  March
2  of 2019.
3      Q.    Okay.  Who are the officers of the company?
4      A.    I believe I am the only -- I am the sole
5  shareholder.  I'm an officer.  I'm a secretary.  It's
6  a single member S corporation, so...
7      Q.    So you're the president, vice president,
8  secretary, treasurer, all those offices?
9      A.    Yeah, I believe so.  I mean, I'm not trying
10  to testify to anything incorrectly, but I'm pretty
11  sure when we did the documentation where I had to
12  sign it with the lawyers and stuff they told me to,
13  you know, sign for all these different positions.
14  Not trying to talk disrespectfully or say things
15  incorrectly.  I'm just telling the truth.
16      Q.    Who was the lawyer that assisted with
17  forming the company?
18      A.    It was a law firm out of Minneapolis.  I
19  don't recall the name right now.  It's a long time
20  ago.  It was like 2019, 2017 I did business with
21  them.
22      Q.    What does Delene Fettig, your mother, do for
23  Stark Energy?
24      A.    She just helps me keep in touch with the
25  customers, like, you know, so I can get invoices

12

1  submitted.  And I'm working a lot, so she has to do
2  that, you know.  I mean, I can't, you know -- even
3  supervising, when I supervise a driver or I supervise
4  a couple drivers or a bunch of drivers -- I was
5  supervising up to 36 trucks in COVID time, 18 and 18,
6  18 on day shift, 18 on night shift, and I was trying
7  to have her help me process paperwork, you know,
8  because it's, like, hard, you know, to keep up with
9  customers and tell them, "Hey, I need you to pay me,"
10  so...
11      Q.    Does she handle the money for the
12  corporation?
13      A.    No, but she's mainly like -- just somebody
14  to lean on, somebody to ask help from, because when
15  you run a business, you can't do it all yourself.  I
16  actually was doing everything myself.  It was all
17  myself, me and my mom, in 2019, and we did $4.89
18  million.  That's a lot of people with a lot of
19  paperwork -- I mean a lot of revenue with a lot of
20  paperwork.  Sorry.
21      Q.    Who made the decisions on what would get
22  paid in the 2020/2021 timeframe?
23      A.    I believe that would be me.  I would make
24  the decisions on what gets paid.
25      Q.    Okay.  Who would write the checks?

Robert G. Fettig

13

1    **A.**    I would write a check, or sometimes she
2    would write a check because I couldn't -- I couldn't
3    be available, so I would make it so she was
4    authorized to sign it. "Hey, I need you to go pay
5    this customer; I need you to this bill," you know.
6    **Q.**    So she was an authorized signatory, is the
7    term we use, on the -- on the bank account?  She
8    could write checks, tell them what to pay, tell the
9    bank?
10    **A.**    Yeah.  If I -- if I told her, because she --
11    she went into Gate City, I don't know, a hundred
12    times with Ms. Stepheny Reger, so...
13    **Q.**    Okay.  Was she paid a salary?
14    **A.**    She was paid at periods of time, but then it
15    got tough, you know, so that we were trying to
16    conserve, because I was trying to pay down the debt,
17    so I was paying like two and a half times payment in
18    the early part of 20- -- 2023 I was paying two and a
19    half times the payment, trying to catch up, and then
20    in the middle part of 2023 I was paying two and a
21    half times the payment, or increased payments, you
22    know.  According to Greg Ellwein or whatever, the
23    Gate City people, their legal people, they said:
24    Hey, you need to pay double or triple or whatever,
25    you know, you need to pay this much right now.  And I

14

1    was trying to stave off the whole, you know, slide of
2    the company, because I was overleveraged.
3    **Q.**    Okay.  But when was the last time she got
4    paid a salary?
5    **A.**    She's supposed to get a check this next
6    week.  Pretty soon she's starting up, I believe.
7    **Q.**    What is the salary that she's supposed to
8    get?
9    **A.**    Right now it's just conservative.  It's like
10    700 bucks, a thousand bucks, you know, like two,
11    three thousand.  What the company can support, you
12    know?  Like admin -- admin cost, you know, so...
13    **Q.**    So like $2,000 a month, or --
14    **A.**    Yeah, roughly.  And then it's supposed to
15    scale up once we can afford to pay more, but you
16    can't pay more if you can't pay more, you know?
17    You've got to pay your creditors, and you've got to
18    pay your people, and you've got to be right.
19    **Q.**    How much are you taking for salary in the
20    last year?
21    **A.**    This year I didn't take anything up until
22    recently.  I took a thousand-dollar payment because I
23    was told I can't take any draws or anything like
24    that, and I was hoping to eventually take a draw, you
25    know, to pay me for my time, but I can't do that now,

15

1    so I have to pay myself a salary.  So I have a pay
2    stub, I can send it over to my law firm, a thousand
3    dollars to pay myself.
4    **Q.**    So you get a paycheck every two weeks?
5    **A.**    Yeah, every two weeks, roughly.  Yes, ma'am.
6    **Q.**    And how much is it?
7    **A.**    Right now it's a thousand dollars.
8    **Q.**    And when did you start doing this?
9    **A.**    I started doing it because I have to do it
10    for the right of the law.  I mean, I can't do it --
11    **Q.**    The question was when?
12    **A.**    Well, I just got paid last week.  I think it
13    was last week.
14    **Q.**    When did you start getting the paychecks for
15    a thousand dollars a week?
16    **A.**    I got a paycheck, my first paycheck, last
17    week due to the fact of my -- held up on this whole
18    factoring thing, you know?  I've got invoices in the
19    queue.  I can't be not paying myself, you know?
20    **Q.**    So prior to last week, you did not get a
21    thousand-dollar-a-week paycheck.  This is the first
22    one?
23    **A.**    It's not a week, ma'am.  It's a thousand
24    dollars.  Yeah, that's -- yeah, and it can vary on --
25    you know, on the revenue stream for the company and

16

1    stuff, you know, so...
2    **Q.**    So prior to you getting the paycheck, how
3    did you get paid?  Did you just decide to take money,
4    or --
5    **A.**    No, I didn't decide to take money.  I just
6    was -- I was -- I was really living on borrowed time.
7    I was -- I've sacrificed my pay to keep my company
8    going, so...
9    **Q.**    Are you trying -- are you saying that you
10    did not get paid prior to this one paycheck that
11    you're getting --
12    **A.**    I took a draw --
13    **Q.**    -- in the last six months?
14    **A.**    I took a draw, I believe -- I said that in
15    the courtroom -- for $5,000 over a course of time,
16    so...
17    **Q.**    That was -- a $5,000 draw is all that you've
18    been paid in the last six months?
19    **A.**    Yes, ma'am.  That's actually -- if you say
20    the last six months, it would be $6,000, so -- if
21    that makes any sense.  You have a $5,000 draw, and
22    that would be the $1,000 check.
23    **Q.**    Can you tell me a bit about Fettig
24    Enterprise, Inc.?  When did you form this one?
25    **A.**    I believe I took it over in 2020.

17

1    Q.    Who did you take it over from?

2    A.    Or 2020 or 2021.  Sorry.  I have paperwork

3  somewhere.

4        My uncle.  My uncle had a trucking business

5  over the road, and I did the blood law relative with

6  the DOT/MC law so I could assume his DOT and MC

7  number.

8    Q.    So this was previously your uncle's company?

9    A.    In the year of 2020 or 2021, thereabouts, I

10  had to go over the road.  I didn't have a DOT number

11  like -- so I had to assume a DOT number.  The process

12  of getting a DOT number is just cumbersome, and my

13  uncle had a DOT number that was registered from 1996,

14  so I assumed his company.

15    Q.    Why couldn't Stark Energy get a DOT number?

16    A.    Why would I?  It would be fiduciarily --

17  respectfully, I don't mean to say this wrong, but

18  very stupid.  I've been held to a higher standard

19  with DOT regulations and laws.  The State of North

20  Dakota allows you to haul water and sand aggregate

21  without a DOT or MC number, so why would I create

22  more cumbersome costs and regulations that would be

23  more preventative in nature for the company to do

24  that?  It's not smart.  It's not a smart business

25  move.

18

1    Q.    So who assisted you with taking over or

2  assuming this business?

3    A.    A lawyer.

4    Q.    A lawyer from Minnesota?

5    A.    Yes, ma'am.

6    Q.    Are you sure that the business was already

7  existing, or --

8    A.    Yeah.  Yeah.  The company on paper was -- is

9  a paper corporation.  It was still existing.  He

10  didn't defunct the business.  Yeah, that's correct.

11    Q.    Okay.  Why is there -- why do the records

12  show that it was incorporated in Michigan on May 15,

13  2020?

14    A.    That's what I said to you, ma'am.

15    Q.    No.  You said you took over your uncle's

16  existing business.

17    A.    Yeah, well, I'm not a lawyer, so I don't

18  want to argue with you, but my uncle had a business,

19  and he had it, like, not operational at the time, and

20  he did all the paperwork for the DOT number, to keep

21  his DOT number active, because he eventually wanted

22  to start his business back up in 1996 or help me get

23  into the over-the-road trucking business, because

24  I've been talking to him since I was a little kid

25  about trucks, you know?

19

1        And so I called him up, and I said: Hey, do

2  you still have your DOT number active?  I think I

3  need to go over the road.  There's a lot less money

4  coming in the oil field.  The oil field has stopped.

5  From March to September, we stopped working in the

6  oil field.  It was impossible.  Nobody really was

7  working.

8    Q.    So you didn't answer my question.  Did your

9  uncle actually do paperwork that says, "I transfer

10  the stock in this company to you"?

11    A.    Yes, ma'am.  It's a -- it's a -- it's a

12  purchase agreement, yes.

13    Q.    Okay.  And is it -- when did he form his

14  Fettig Enterprise, Inc.?

15    A.    1996, ma'am.

16    Q.    And you're saying that that's when he

17  transferred that company's DOT number and that

18  company's, you know, federal tax ID number to you?

19    A.    No.  I believe I had to assume a new federal

20  tax ID number.  I don't know.  But I don't understand

21  the particulars of it, either, because this is --

22    Q.    It's not your position to argue the

23  relevancy of this.  That's your attorney, and Judge

24  Hastings will decide, so --

25    A.    I'm not arguing.  I'm just asking.  I don't

20

1  understand the relevance.  I'm just asking.  I'm

2  trying to understand.

3    Q.    Well, I'm trying to understand how there's a

4  brand-new Fettig Enterprise, Inc., Incorporated, in

5  2020, but you're saying that it was a 1996 entity.

6    A.    I -- you can look on the DOT website, so --

7  it says 1996.

8    Q.    Did you have -- did you ever apply for your

9  own DOT license?

10    A.    Why would I?

11    Q.    I don't know.  That's why I'm asking you.

12  Did you ever do that?  Yes or no?

13    A.    My lawyer did paperwork with the DOT and did

14  the blood law relative where you can assume, through

15  a family member, a DOT and MC number.

16    Q.    So that was, again, a yes-or-no question.

17  Did you apply for a DOT number for Stark Energy?  Yes

18  or no?

19    A.    No.  Again --

20        MR. VERSTANDIG:  Whoa, whoa, whoa, whoa,

21  whoa.

22        Rob, I get to object.  Someone's paying me

23  to be here.  If I don't object, I'm not earning my

24  money.

25        THE WITNESS:  I apologize.

21

1      MR. VERSTANDIG:  You're good.

2      Object to the question.

3      Mr. Fettig, you may answer.

4      A.    I think it's already been answered and

5  asked.  If you rewind the tape, I answered the DOT

6  number is not associated with Stark Energy, and I did

7  not apply for a DOT number for Stark Energy because

8  doing so would be more cumbersome, more costly, more

9  regulatory, and it wouldn't be a smart, prudent,

10  financial decision for a company that's --

11      Q.    (BY MS. STANLEY)  I'm asking you --

12      (Simultaneous, indiscernible crosstalk

13  interrupted by the court reporter.  A discussion was

14  held off the record.)

15      Q.    (BY MS. STANLEY)  Has Fettig Enterprise ever

16  made a loan to Stark Energy?

17      A.    Not to my knowledge.  I mean, not that I can

18  recollect.  I don't know.

19      Q.    Has Stark Energy ever made a loan to Fettig

20  Enterprise?

21      A.    Not that I can recollect.  Sorry to say the

22  same thing, but it's the same answer.

23      Q.    Have you ever personally made loans to Stark

24  Energy?

25      A.    I think in the year of 2017, I donated all

22

1  of my salary to the company.  I think I did similar

2  in 2018.  That's why my business partner got mad at

3  me, because I was just wanting the company to

4  succeed.  I mean, as long as I had enough money to

5  eat from, you know, I didn't care, you know?

6      Q.    So it was the donation of your not taking a

7  salary that was --

8      A.    Well, no.  I took a -- I took a salary.  I

9  paid W-2, and I just -- I bought parts and just --

10  you know, and the lawyer people and the CPA people

11  said, "Oh, you can get that back later.  We'll keep a

12  documentation of it," you know?

13      MR. VERSTANDIG:  Okay.  Hold on.  Hold on.

14      Mr. Fettig, you're going to hear a lot of

15  things today that make you passionate, and you're

16  going to want to quickly correct them, answer them,

17  address them, but when you talk over Ms. Stanley, it

18  makes the court reporter's life really difficult, to

19  say the least, and it makes for a bad transcript.

20      I promise you someone is going to read the

21  transcript from today.  There is no chance this

22  deposition is never being looked at again.

23      So wait for Ms. Stanley to finish her

24  questions before you answer.

25      And, Ms. Stanley, please wait for Mr. Fettig

23

1  to finish his answers before you ask the next

2  questions.

3      I've got all day.  We can go as long as

4  necessary.  We're not going to run out of time.  I

5  promise.  Thank you.

6      THE WITNESS:  I'd just like to go to work.

7      Q.    (BY MS. STANLEY)  Does Stark Energy put

8  identifying numbers on its equipment, a unit number?

9      A.    Yeah.  I -- I think it has, yes.  If that's

10  what you're saying, like the VIN numbers and stuff?

11      Q.    No, not the VIN numbers; like an internal

12  number that you -- you give a number to this piece of

13  equipment.

14      A.    Yeah.  I had done that before, yeah.

15  Uh-huh.

16      Q.    Okay.  Did you start that right at the

17  beginning?

18      A.    Yeah.  I believe so, yeah.

19      Q.    Okay.  Do you have a list of the equipment?

20      A.    A list of the equipment?

21      Q.    Right.  Like -- and the unit numbers?

22      A.    I don't know.  I could look.

23      Q.    Sort of a master list?

24      A.    I have the VIN numbers and the make and

25  model of the truck, so I don't know.  I have that

24

1  with the loan numbers and stuff, like I had to have

2  that.

3      Q.    Yeah, but what about one that also

4  incorporates how you internally number them?  So,

5  like, I think you talked earlier about -- I believe

6  it's S-11 or --

7      A.    S-211.

8      Q.    It's the one that the -- the Kenworth that

9  you're driving the most.  Is that right?

10      A.    No.  No.  That's a Peterbilt.

11      Q.    I'm sorry.  So do you have a list that

12  identifies these unit numbers?

13      A.    I -- I don't know.  I can look.  I don't

14  know.  I mean, I -- I can't ask relevance, but I

15  don't know.  Sorry.

16      I hear talking.  I can't hear you, just so

17  you know.

18      Q.    I'm pulling up, hopefully, these exhibits

19  here.  Let me see if I can share-screen.

20      Are you able to see this document?

21      A.    Yes.

22      Q.    Are you familiar with this document?

23      A.    It looks like the equipment list, yes.

24      Q.    And are you familiar with it?  Have you seen

25  it before?

**25**

1    A.    I believe so, yes.  Thank you.

2    Q.    Who created this?

3    A.    I -- I may have, or I may have had, like, an

4  office person do it.  Like, there was office people

5  that worked here before.

6    Q.    Okay.  Is this your master list?

7    A.    I wouldn't say a master list.  I have a list

8  somewhat similar to this with the VIN number and

9  the -- the year and model.

10    Q.    Okay.  So does this show the VIN number, the

11  year, and --

12    A.    Yeah, but I -- I don't think I have one with

13  the -- the unit numbers, but I might have it.  I

14  don't know.  I know that I have one with the year,

15  make, and the VIN number.

16          MR. VERSTANDIG:  Mr. Fettig --

17    Q.    (BY MS. STANLEY)  Unit numbers?

18          MR. VERSTANDIG:  Mr. Fettig, don't cut

19  Ms. Stanley off.  I know it's human nature.  I know

20  we're used to talking over each other.  Just try not

21  to do it.

22          Ms. Stanley, you'll have to ask the question

23  again.  I didn't hear it, to be honest.

24    Q.    (BY MS. STANLEY)  Do you see the unit

25  numbers?

**26**

1    A.    I'm sorry.  What about -- I see the unit

2  number, yes, ma'am.

3    Q.    Does this correspond with your equipment --

4  when I say "your," I'm -- sorry.  I should say Stark

5  Energy's equipment?

6    A.    I mean, if you have the list, and it was

7  created, I mean, and if someone in my company did it,

8  it's possible.  I mean, I know I was trying to get

9  more organized over the years.  I mean, getting

10  organized is the key to this, so...

11    Q.    Mr. Fettig, I'm just going to also show

12  you -- hang on.  I'm trying to find something.

13    A.    It's painful looking at those side dumps.  I

14  can put them to work.  They're right there in front

15  of me.

16          I think somebody did this incorrectly,

17  though, because I think the reefer trailers aren't

18  Stark Energy's, I think, on the record, so...

19    Q.    I'm sorry.  Which ones?

20    A.    The reefer trailers.

21    Q.    Okay.  So who would have done this

22  incorrectly?

23    A.    I don't know, ma'am.  I've had a whirlwind

24  of seven years of running this business.  People are

25  human.  I mean, my QuickBooks, as an example, is

**27**

1  erratic at best, you know.  I mean, I had people put

2  receipts in the wrong categories, and I'm working on

3  getting that caught up.  Trying to work with that CPA

4  firm out of Minneapolis.

5    I can't hear you.

6    Q.    So would you have ever given -- provided a

7  list like this to Matthew Barrett?

8    A.    I don't know.  I may or may not have.  I

9  don't know.  I don't recall.

10    Q.    When was this list created?

11    A.    I -- I don't know, because I don't recall

12  this exact list.  I mean, I -- I don't recall it.  I

13  mean, I may have given it to him.  I may have asked

14  somebody:  Hey, someone needs a list of equipment,

15  you know, get it to them, you know, so...

16    Q.    So you mentioned one of the reefer trailers

17  you don't believe belonged to Stark Energy.  Which

18  one?

19    A.    Can I say anything, or no?  Sorry.  I --

20  I -- I don't know because I don't think they're

21  titled for Stark Energy.  I don't think they are.

22    Q.    Wasn't one of them repossessed by a Stark

23  Energy creditor?

24    A.    No, ma'am.

25    Q.    No?  So you have both of these trailers in

**28**

1  your possession?

2    A.    Correct.

3    Q.    Okay.  How would you find out if they're

4  titled in Stark Energy's name or another name?

5    A.    Well, go to the DMV and show them the VIN

6  number, like I did the other day about that truck,

7  the S-205 that you said was titled in somebody's

8  name, and it's still titled in my name, and it's

9  still reported stolen.

10          It's frustrating because the -- the Stark

11  County Sheriff's Office -- I reported it stolen on

12  the 16th of March, they closed it on the 21st of

13  March, and they didn't pursue anybody.  And I already

14  know -- I feel strongly that someone took it.

15    Q.    Okay.  Thank you, but I didn't -- let's go

16  back to the questions.

17          There are -- let's see.  There's a 2018

18  Great Dane reefer listed on here, so can we assume

19  that this was created after -- either in 2018 or

20  later?

21    A.    I can think that you can assume anything,

22  ma'am.  I don't know what you -- I can't venture to

23  say what you assume.  Sorry.

24    Q.    The reefer trailer, that's RT-001, the 2015

25  one, is that the one -- you previously testified

29

1   that's in Florida?
2       A.    Both of the reefer trailers are in Florida.
3       Q.    Oh, both of them are in Florida.  Who has
4   possession of them in Florida?
5       A.    I do.
6       Q.    Do you own a property down in Florida?
7       A.    No.
8       Q.    Then where are they?  Are they sitting on
9   someone else's property?
10      A.    They're in a rental yacht -- or yard.
11  They're in a rental yard.  And that information was
12  given to my lawyer, so I don't know if that...
13      Q.    What about this -- down here, the 2010
14  Haulmark enclosed trailer?  Can you see that one?  I
15  can make it --
16      A.    Yep.
17      Q.    Sorry.  Do you still have possession of that
18  one?
19      A.    Yeah.  And that trailer was bought pre the
20  company starting when I was on a workover rig.  I
21  bought that trailer from a gentleman in Dickinson who
22  I worked on the rigs with and used it personally.  It
23  has nothing to do with this business.  I don't even
24  know why it's on there.  Maybe a miscellaneous
25  trailer.  Someone said, "Hey, I told them to make a

30

1   list of equipment," they make a list of equipment.
2           You know, I can't really, you know, account
3   for why a -- an 18- or $20-an-hour employee does what
4   they do, you know?  I mean, I try to.  I try to tell
5   everybody to do things the right way.
6           And if you got this from Matthew Barrett and
7   he got this from you, and he didn't have a problem
8   with it then, the only reason why he's having a
9   problem with it now is because me and him have a
10  dispute about a debt.
11      Q.    Let's look at S-210 right here, the 2017
12  International 9900i Eagle.
13      A.    Uh-huh.
14      Q.    Your schedules indicate this one is missing.
15      A.    Uh-huh.
16      Q.    Is it still missing?
17      A.    Yeah.  I don't know where it's at.  I think
18  Andy Yuker's got it, though.
19      Q.    Have you checked?
20      A.    I ran into him.  He said he couldn't talk to
21  me, said he wasn't willing to talk to me.  I said, "I
22  want to know where my equipment's at."
23      Q.    How would he have gotten possession of it?
24      A.    He's got a tow truck, ma'am.
25      Q.    Are you saying he just picked it up off the

31

1   street?
2       A.    No.  I'm saying he would have removed it
3   from my property.
4       Q.    Would he have done that with your
5   permission?
6       A.    No.
7       Q.    Why would he do that?
8       A.    Because I owe him money and he's a criminal.
9       Q.    So did you report it to the sheriff as
10  stolen?
11      A.    No.  I hadn't yet because I was only
12  assuming at the time that he has it, and when I went
13  ahead and I reached out to him by way of driving
14  around town and getting parts, "Hey, I see you.  I
15  want to talk to you.  I would like to talk to you.  I
16  want to know where my equipment's at," he said,
17  "Well, you know, you know, I can't talk to you."
18  "Well, you know, you know, I can't talk to you."
19          And I said, "Dude, I think you've got
20  S-210," you know?
21      Q.    Is this after -- the rest of the
22  equipment -- this conversation you had with him, was
23  this after the rest of the equipment was recovered in
24  March of 2024?
25      A.    This conversation happened in the last three

32

1   to seven weeks, in the last -- since -- since I filed
2   bankruptcy, I ran into him, and he said he couldn't
3   talk to me.
4       Q.    Did you report it to your insurance company
5   as stolen?
6       A.    No, ma'am.  It's free and clear, and I don't
7   think it's stolen.  If I think Andy Yuker's got it,
8   I'm going to ask my lawyer to write like one of those
9   fancy orders to compel him to give me my --
10          MR. VERSTANDIG:  Whoa, whoa, whoa, whoa,
11  whoa.
12          Mr. Fettig, you can talk about what you
13  might ask a lawyer to do in the future, but just be
14  very careful not to talk about what you have
15  communicated to lawyers in the past or lawyers in --
16          THE WITNESS:  (Indiscernible.)
17          MR. VERSTANDIG:  Whoa.  -- or what lawyers
18  have communicated to you in the past.
19          THE WITNESS:  Yeah.  Yeah.
20          MR. VERSTANDIG:  Does that make sense?
21          THE WITNESS:  It does, yeah.  And I
22  wasn't -- I wasn't saying that.  I was saying I can
23  ask my lawyer to write up a letter to ask him for my
24  equipment back.  And I plan to do that.  I want my
25  equipment so I can work.

33

1 **Q.** (BY MS. STANLEY)  When is the last time you
2 think you saw this one, S-210?
3 **A.** The latter part of 2023.
4 **Q.** Was it working at the time, functioning?
5 **A.** It was at my shop.  I think we had an issue
6 with the motor and we were diagnosing it, because,
7 you know, you run a truck that you buy -- I don't
8 know what year I bought that.  I think I bought that
9 truck in 20- -- 2018, so from 2018 until now, I mean,
10 every once in a while you have issues with a truck,
11 but it was at my shop, and it was parked, and we were
12 trying to diagnose the motor with a mechanic because
13 it, you know, just had a weird code on the -- on
14 the -- the reading, you know?
15 **Q.** So S-205 on here, 2014 Kenworth T800, is
16 this the one that you're indicating you reported to
17 the Stark County Sheriff as being missing?
18 **A.** Yep.  And it's oddly enough that it went
19 missing I believe on March 15th or March 16th, the
20 same day that you went to that criminal's property
21 and took property, both mine and yours or whatever,
22 your bank's, and I think he got frustrated because he
23 says I owe him $70,000, and I think the individual
24 went to my shop with his tow truck, which I'm going
25 to go up and down -- which I've been going up and

34

1 down the highway asking clerks at the gas stations,
2 and I'm going to try to ask the North Dakota State
3 Trooper to see the video surveillance of the March --
4 March 15th and March 16th of that highway, because
5 he's got a very bright red and distinguished tow
6 truck, and I think he came and towed that truck
7 figuring, "I'm going to get paid regardless," so...
8 **Q.** So that's just a suspicion.  Do you have any
9 evidence to --
10 **A.** I -- I told you where to get the evidence,
11 and if somebody could actually do it and help me out,
12 because I went to the Stark County sheriffs like I
13 was supposed to, according to you and according to
14 the Judge, and they said, "Hey, listen.  If -- once
15 you really feel strongly in your gut that something's
16 missing, you come on your property and you come
17 back" -- because I went on my property.  I got parts.
18 And I got in my shop and I got some parts, and I was
19 going back to a job site, and I was -- I didn't know
20 anything about nothing.  I really didn't.  I was
21 never notified of anything, and I was just going
22 about my business.  And I go, "What the heck?"
23 And I drove back, and I was late to the job
24 because I drove back, because I wanted to make sure
25 that I saw with my own eyes what I saw, and I saw

35

1 that my truck was missing.  And I was beyond
2 frustrated because I was torn.  I had to go look for
3 my truck, but I had to go to work.
4 So I called the police.  I made a report.
5 And the Stark County Sheriff listened to me, or
6 begrudgingly, on March 16th, and on March 21st, they
7 closed the case.  No investigation, no nothing.  No
8 further investigation or anything, which really
9 frustrates me because I tried to do what I'm supposed
10 to do.  I think something goes missing, I did that.
11 Now I go out in the community, and I go
12 driving around, and I start thinking and deducing,
13 and I go, "Hey, a guy that I owed money to is upset
14 about me owing him money.  He's got a tow truck.
15 He's a criminal; he's done it before.  I bet you he
16 took my -- my truck."  I think -- I think that's
17 true.
18 **Q.** Mr. Fettig, if you were this worried about
19 this one truck, why didn't you report the other 21,
20 23 pieces of collateral that were missing --
21 allegedly missing before?
22 **A.** Because I was dealing with a thousand phone
23 calls from repo people, and I didn't know anything of
24 anything, and I'm not going to make a false police
25 report.

36

1 And I asked the police when I went and got
2 the police report, I said, "I want to" -- I went to
3 the DMV, even, the other day.  I went to the DMV.
4 Because you said -- in a cryptic conversation in the
5 law room, in the courtroom, you side, "You know,
6 Mr. Fettig, do you know a Rodney with R & R Towing?"
7 And I said, "Well, yeah, I do.  He" --
8 **Q.** Mr. Fettig, I'm asking you, in November
9 of 2024, you testified under oath you had no idea
10 where -- what happened to this equipment.  Why --
11 MR. VERSTANDIG:  Hold on.  Hold on.
12 Object to the question.
13 You may answer.
14 **A.** What was your question, ma'am?
15 **Q.** (BY MS. STANLEY)  November 2024 you
16 testified under oath that you did not know where
17 Gate City's 21 pieces of equipment were.  Is that
18 correct?
19 **A.** No, I --
20 MR. VERSTANDIG:  Ms. Stanley -- hold on,
21 hold on.  Ms. Stanley, respectfully, today's June 28,
22 2024.  I don't think Mr. Fettig testified to anything
23 in November 2024.
24 MS. STANLEY:  Apologies.  Thank you for
25 correcting me.  2023.

37

1    Q.    (BY MS. STANLEY)  November 14, 2023, we had
2    two contempt hearings.  Is that -- do you recall
3    those?
4    A.    Yeah, where the Judge said that you guys
5    have a battle of creditors, and it seems like a
6    creditor may have taken this equipment.  He said that
7    on the record, and you know that to be true.
8    Q.    I'm asking you, what did you testify?  Did
9    you not testify that you did not know where this
10    equipment was?
11    A.    I did testify that I didn't know where it
12    was at, and I said that I don't know.  I think maybe
13    a repo company took it.  That's what I said.
14    Q.    And it would have been Gate City's repo
15    company that would have tried to take Gate City's
16    equipment.  Right?
17    A.    At this point, I don't know.  I mean, you
18    guys found property on another person's property, and
19    he's got a repo license, and he lies under oath,
20    saying that he didn't know that my stuff was up for
21    repo, but, yet, that same person contacted me and
22    said my stuff's up for repo.
23    Q.    I'm asking, do you recall you testifying --
24    did you testify that you did not know where
25    Gate City's equipment was?

38

1    A.    Ma'am, I testified to that effect.  It's on
2    the record.
3    Q.    Okay.  Then --
4    A.    It's on the record me stating that I feel
5    that another creditor took my equipment.  It's on the
6    record.  It's on the record with the Judge even
7    saying that.  The Judge, the Judge, the person that's
8    really smart, he said:  I believe you have an issue
9    with this guy owing this person and owing this person
10    and owing this person and owing that person, and
11    that's why I've asked for the equipment back to put
12    tracking devices on it.
13    Q.    Mr. Fettig, didn't he actually put in an
14    order that he did not find your testimony to be
15    credible?
16    MR. VERSTANDIG:  Object to the question.
17    But you may answer.
18    A.    I don't know, ma'am.  He -- he said a lot of
19    things.  He also told me I should get a lawyer, and I
20    didn't have a lawyer at the time, and I was being
21    railroaded, and he said I had rights.
22    Q.    (BY MS. STANLEY)  You previously, I think,
23    indicated that there's a 2022 Dodge Ram vehicle that
24    is owned by Stark Energy.  Is that right?
25    A.    That is correct.

39

1    Q.    When did that one get purchased?
2    A.    I don't know.  In 2022?
3    Q.    On here is -- going back to Exhibit 1, F-001
4    is a 2018 Volvo.  What happened to that piece of
5    equipment?  Do you still have it?
6    A.    I have the two Volvos, and they're in
7    Florida, and they're not, possibly, owned by Stark
8    Energy.  Like I said, if someone created this list
9    and gave it to Matthew Barrett, it probably was
10    created in error, you know, with -- I said -- I said
11    many times, "I need a list of all of my equipment."
12    We need to be very, you know, organized.  We need to
13    get things organized.  Organization is the key to
14    life.  And I've told that to many people, Person 1,
15    Person 2, Person 3, Person 4, people that worked for
16    me over the years, you know?
17    Q.    Who created this list?
18    A.    I don't know.  I can't testify to that.  I'm
19    under oath.  I can't lie.
20    Q.    So you're saying both the -- both the 2018
21    and the 2017 Volvos are not -- are they or are they
22    not Stark Energy property?
23    A.    If we take that VIN number, and we go down
24    to the DMV, we can get that answer.
25    Q.    So you don't know?

40

1    A.    I don't know where they are titled in right
2    now.  No, I don't, ma'am.  I don't know exactly right
3    this exact second.
4    Q.    Okay.  And the Volvos are also in Florida?
5    A.    Yes.  Mentioned a couple times, yeah.
6    Q.    Are they in the same location as the two
7    reefer trucks?
8    A.    Yes.  They're attached to them, yeah.
9    Q.    How long have they been down there?
10    A.    Huh?
11    Q.    How long have they been down there in
12    Florida?
13    A.    I believe in December of 2022, or even
14    November, I think it was more early December, I got a
15    phone call from a person that I was trying to employ
16    as a manager of sorts, and I said:  Man, since I've
17    employed you, I've had -- I have now less workers.  I
18    have jobs that I can get even being 1,300 miles away
19    from my business.  I make a phone call:  I get a job.
20    I make a phone call:  I get a job.  Send a truck.
21    Yep, we like your work.  And you can't perform.
22    I said:  I'm chasing this stuff on the East
23    Coast, this up-and-down reefer stuff.  I'm trying to
24    get that going so we can keep the drivers happy and
25    everybody happy.  I can't do this.  I'm parking them.

41

1    I'm coming home.  I'm getting on a flight.  I'm
2    saving my company.  When I get there, if you don't
3    have two trucks working or three trucks working or
4    four or whatever the number was, I don't remember, I
5    said you're fired.  I said I'm done.  I'm starting to
6    fire people.  I can't put up with this.  You people
7    are bleeding me.
8        Q.    Okay.  So the question was:  When did this
9    equipment arrive in Florida?  And I believe -- did
10   you say December of '22?
11       A.    I believe so.  Yes, ma'am.  I said the early
12   part of December, if not the latter part of November,
13   somewhere thereabouts.  Yes, ma'am.
14       Q.    And have they been used at all in that time
15   period?
16       A.    No.  Like I stated on the record, Fettig
17   Equipment or Fettig Enterprise has been kind of a
18   dormant and side company in a project for shop
19   services to help fix my equipment right now, and I've
20   not been utilizing that company, and I have to
21   utilize that company.  And I've made phone calls to
22   get people working and doing that stuff with Fettig
23   Enterprise, but I haven't done that because I've been
24   focused on trying to get the Stark Energy thing
25   going, just like I got it going in October of last

42

1    year.  I was working, everything was going good, cash
2    is coming in, and then "boop."
3        Q.    Okay.  So were these Fettig Enterprise's
4    equipment?
5        A.    Yes, ma'am, I believe so.
6        Q.    So they were primarily used for Fettig
7    Enterprise.  Is that correct?
8        A.    I believe so, yes, ma'am.  I think I used
9    them a little bit for some belly dumping, you know,
10   like belly dumping or frac sand hauling, but yes.
11       Q.    You also list down here -- under "Crew
12   Trucks" there's a 2015 Ford F-350.  Do you still have
13   possession of that one?
14       A.    Yep.  And it's not in Stark Energy's name.
15   Again, the -- you can look at -- you can, like, look
16   the VIN number up.  I mean, I'm not trying to be
17   rude, but if you go to the DMV like I did and type
18   that VIN number in, it tells you where it's
19   registered to.  And you asked me this when I was on
20   tape with you guys last time.  I was in the truck.
21       Q.    Who is it registered to?
22       A.    Currently, I believe myself, Robert Gene
23   Fettig.
24       Q.    Okay.  So you don't know how it would have
25   gotten on this list?

43

1        A.    Again, like I said, this list was given to
2    somebody that asked for it, a person that is now
3    dealing with a financial hardship, according to him,
4    even though he's got 750 grand in his personal
5    checking account, and he wants to persecute me and
6    say lies, so I don't know if he created this list.  I
7    don't know if I employed somebody to create this
8    list.  I don't know where this list came from, but
9    it -- again, we're talking about something that
10   happened many years ago.  I'm a human being.  I don't
11   recall.
12            Sorry to be passionate.  I'm not trying to
13   be rude.  You're not -- you're just doing your job.
14   I'm sorry.
15            MR. VERSTANDIG:  Off the record for a
16   second.
17            (A discussion was held off the record.)
18            MR. VERSTANDIG:  All right.  Back on the
19   record.
20       Q.    (BY MS. STANLEY)  Let's look at CT-004, a
21   2013 Ford F-150.  Do you still have possession of
22   this one?
23       A.    I don't think so.
24       Q.    What about the 2010 Ford F-150?
25       A.    Yeah.  I believe it's red.  Yeah, I believe

44

1    that.  It's at the shop.
2        Q.    Okay.  And is that Stark Energy's equipment?
3        A.    I believe so.  The 2010, yep.
4        Q.    Okay.  What about the 2000 Ford -- sorry --
5    2004 Ford F-150?
6        A.    What about it?  Sorry.
7        Q.    Is that Stark Energy's equipment?
8        A.    I believe so, yes.  We -- yep.
9        Q.    And do you still have possession of it?
10       A.    It's at the shop.  It's parked out back.
11       Q.    Okay.  Do you see below in this section
12   where it talks about miscellaneous shop equipment?
13       A.    Yeah.  That's not Stark Energy's.  I believe
14   that's Fettig Equipment's equipment.  I don't know
15   why it's listed there.
16            But the Cat -- oh, sorry.  I'm sorry.  I'm
17   reading this while you're talking to me.  The Cat
18   one, the Cat one, I got that from Falcon Leasing out
19   of Minnesota, and I paid them off.  That's at the
20   shop, and it's Stark Energy's.  It's got a logo on
21   the side of it.  Sorry.
22       Q.    So the skid-steer?
23       A.    Yeah, the skid-steer.  Yes, ma'am.
24       Q.    What about all the other stuff you're saying
25   is not Stark Energy's?

45

1      A.      Yeah, I believe it's Fettig Equipment, like
2   when I'm in a shop, you know, like do shop services.
3   I fix people's stuff, like I fix Stark Energy's
4   stuff.
5      Q.      How would you -- what records do you have to
6   show who paid for this, if it was Stark Energy or if
7   it was Fettig Equipment?
8      A.      I could -- I don't know.  This is personal
9   stuff.  I mean, it's like equipment I've boughten
10  over the time.  It's like being, like, an adult male,
11  I guess.  Sorry.  I'm not trying to be rude.  I'm not
12  trying to be sexist or anything.
13     Q.      Why is it -- why are you saying it's Fettig
14  Enterprise's stuff or --
15     A.      Well, Fettig -- Fettig Equipment.  Like,
16  Fettig Equipment, like, it does, like, shop services,
17  like it fixes stuff.  Stark Energy has nothing to do
18  with fixing anything.  Right?  If that makes any
19  sense?
20     Q.      Who originally bought it?  Whose money was
21  used to originally buy it?
22     A.      My personal money?
23     Q.      I'm asking you.
24     A.      I would assume my personal money.  I mean --
25     Q.      But you don't know for sure?

46

1      A.      I -- I mean, there's -- there's no way of
2   certainty there.  I would assume that.  I would say I
3   would -- yeah, it would be my personal money.  I
4   mean, I've made money over the years.  I mean, a
5   welder's like two, three, four grand, you know.  I
6   mean, I don't...
7      Q.      Let's look at Exhibit --
8      A.      I mean, you can buy -- you can buy them
9   used, like two grand or whatever.  Sorry.  I'm not
10  trying to -- go ahead.
11     Q.      Let's look at Exhibit 2, which is your
12  schedules.  You're familiar with these.  Correct?
13     A.      Yeah.
14             I like the screen-sharing.  This helps.
15     Q.      Did you provide the information to create
16  the list of equipment that's in here?
17     A.      Yes.
18     Q.      Okay.  I note that the 2017 Volvo is
19  identified on here.
20     A.      Uh-huh.
21     Q.      Is that Stark Energy's equipment or Fettig
22  Enterprise?
23     A.      Well, then we checked the title on that one.
24  Like I said, some of them I had to check the title,
25  so I don't recall that, but if it's on here for Stark

47

1   Energy, everything on here I double- and
2   triple-checked because I have to be very truthful.
3      Q.      So did you double- and triple-check the 2018
4   Volvo?
5      A.      I would assume so because it's not on the
6   list.  I mean, I'm not trying to be rude, but I can
7   go do that again.  I mean, I -- I'm not withholding
8   anything from the list.  I don't gain from that.
9      Q.      So you do have the Ford F-1 -- or the 2004
10  and the 2010 that are on here?
11     A.      Correct.  They're at the shop.  The 2010 is
12  red, and the 2004 is white.
13             Okay.  And did you double- and triple-check
14  that those were titled in the name of Stark Energy?
15     A.      I'm pretty certain.  I mean, that's why I
16  listed them on here.
17     Q.      Well, where did you get the -- did you have
18  a master list that you pulled this information from,
19  or where did you get the information?
20     A.      I'd have a title, ma'am.  I believe I have
21  the titles of those.
22     Q.      So you think you have the titles for all of
23  these in your possession, the actual paper title?
24     A.      I have a paper title, I believe, for the
25  2004 and a 2010, and I believe a 2017, I think I have

48

1   a copy of it somewhere, that 2017 Volvo you spoke
2   about.
3      Q.      Uh-huh.
4      A.      Because I wouldn't have a physical copy of
5   that because that's, like, got a loan on it still.
6   Right?  So...
7      Q.      Which one?
8      A.      The 2017.
9      Q.      Who has the loan on that?
10     A.      I don't know.  Ally Pacific Lending, or --
11  Ally Pacific Lending I think it's called.  Not "Ali,"
12  like the -- the Dodge.
13     Q.      Do they also have a lien on the 2018 Volvo?
14     A.      No.  No.  That's free and clear, to my
15  knowledge.
16     Q.      I note in looking through this that the 2015
17  Ford F-350 is not on here.
18     A.      That's because it's not titled in Stark
19  Energy's name, ma'am.  It's my personal truck, bought
20  when I worked on a workover rig.
21     Q.      What about the 2013 Ford F-350?
22     A.      What about it, ma'am?
23     Q.      It's not on here either.  That's because you
24  think it's titled in your name?
25     A.      I believe so, yes, ma'am.

49

1    Q.    Okay.  What about the 2022 Dodge Ram?

2    A.    Should be listed on there.

3    Q.    I don't see it.  Do you?

4    A.    You're scrolling pretty quick back and

5 forth, but I can look at the updated list that I gave

6 him on the 17th, and I'm pretty certain I have it on

7 there listed.

8    Can I scroll this thing, too, or no?  Just

9 you?  Sorry.  I see the mouse, but...

10    It's right there.  Dodge Ram.  Right there.

11 47.8.

12    Q.    Okay.  Thank you.

13    A.    Yeah.

14    Q.    All the miscellaneous equipment that we

15 looked at (Zoom audio distortion) that's not (Zoom

16 audio distortion) is that because you --

17    THE COURT REPORTER:  Ms. Stanley, your

18 question broke up.  Can you repeat it, please?

19    Q.    (BY MS. STANLEY)  The miscellaneous

20 equipment, like the skid-steer and the --

21    A.    The skid-steer is listed on there; you just

22 didn't see it.

23    Q.    Where would the skid-steer have been listed?

24 Wouldn't that be --

25    A.    I don't know.  I gave it to the -- that's

50

1 not -- go down more, maybe, or up.  I don't know

2 why -- I don't know why it's not listed on there.  If

3 you scroll up?  I don't see it.  I need to be amended,

4 ma'am.  I don't know why.  Might need to be amended.

5 But I know for a fact I gave that information,

6 because I had to give the values to my...

7    Q.    How many Dragon water trailer haulers did

8 Stark Energy have?

9    A.    I believe seven or eight, I believe.

10    Q.    Okay.  If we go back to this -- and you see

11 the unit numbers on Exhibit 1?

12    A.    Correct.

13    Q.    Can you tell me if any are missing or you

14 have eight of them?

15    A.    I think -- let's see here.  The VIN number

16 400 -- so 4 and two zeroes -- 26, I think I indicated

17 on my schedule it's missing.

18    Q.    Okay.  The 2014 T-104?

19    A.    The 40026?

20    Q.    Yes.  That looks like T-104.  Is that the

21 one that's missing?

22    A.    I believe so.  If you scroll down on the

23 schedule, you'll see it's missing, I think, listed

24 missing.

25    Q.    What about the other one?

51

1    A.    What other one, ma'am?

2    Q.    T-113, I believe.

3    A.    That's in Steele, North Dakota, at your

4 auction house.  Unless you guys moved them, but I

5 don't think you can move them.  I think they're all

6 at that Steele location.

7    Q.    And you believe T-113 -- or, I'm sorry.

8 107.  What about T-107?

9    A.    What about it?

10    Q.    Is that one missing?

11    A.    No.  It's at my shop.  It's on the schedule.

12    Q.    Okay.  And so, Mr. Fettig, when we -- going

13 back to November 2023 when you testified you didn't

14 know where any of this was and you hadn't seen it,

15 when did you come back into possession of T-107?

16    A.    I don't recall, but I was able to find it,

17 and I've used it for work.

18    Q.    Where did you find it?

19    A.    At a truck stop.

20    Q.    At a truck stop where?

21    A.    In the Bakken.  Like a driver, they, like,

22 leave stuff, and they, like, walk off jobs, you know?

23    Q.    When was that?

24    A.    I don't recall, but it was in the last six

25 months, probably.  I've been looking for my stuff,

52

1 ma'am.  I've been looking for my stuff pretty

2 heavily.

3    Q.    Mr. Fettig, I find it hard to understand how

4 you can be so emphatic about you reporting to the

5 police on March 16th, and you know --

6    A.    Can I -- can I testify to that emphaticness?

7 I was told by this Judge, he said:  Listen, dude.  I

8 get it.  You need a lawyer.  You don't have a lawyer.

9 You've got all these people coming at you, you've got

10 creditors from everywhere, but you need to start

11 paying attention.  You're overwhelmed.

12    So I was overwhelmed.  And when -- I

13 remember going back there clearly, clear as day, and

14 I went and got some parts, and I was like:  What the

15 frick?  This is no way.  This is no way.  That truck

16 is free and clear.  I was like -- I was screaming.  I

17 was frustrated.  I was so frustrated.

18    Q.    Which truck was free and clear?

19    A.    S-205, 2014.

20    Q.    Let's go back to T-107.

21    A.    Yes.

22    Q.    When did you find -- recover possession of

23 this?

24    A.    I believe I -- I -- I don't recall the exact

25 date and time, but I happened on it.  I was, like,

53

1 frustrated that, like, somebody was going to try to
2 steal it. I was like: This is crazy.
3         But, I mean, the whole thing about my
4 equipment and stuff, I've got a pending criminal
5 case, too, so, like, I don't want to say anything
6 where you're going to be, like, warping it and saying
7 things the wrong way and then I'm persecuted for
8 doing something wrong, because I don't want to do
9 that. My lawyer's not even here today. I mean --
10     Q.   Mr. Fettig, are you trying to assert your
11 Fifth Amendment right to not answer that question, or
12 are you just avoiding answering the question? I want
13 to know when --
14     A.   I'm not avoiding answering the question
15 except for if I have to, I'll have to assert my Fifth
16 Amendment, because what you're doing is you're trying
17 to portray me as this criminal, and I'm not, and I
18 don't want to be portrayed as a criminal.
19     Q.   I want to know when you allegedly got
20 possession of T-107 back. If you don't want to
21 answer that question, you can assert your Fifth
22 Amendment right, but I would like to know.
23     A.   (No audible response.)
24     Q.   Did you always have possession of T-107
25 from --

54

1     A.   You know, I think -- I think these questions
2 are leading in -- into an area where I need to assert
3 my Fifth, because if I don't assert my Fifth on a
4 personal level, you're going to try to persecute me
5 for something that's untrue, so I'm going to assert
6 my Fifth.
7     Q.   Okay. So --
8     A.   Not trying to be rude, but I don't want to
9 be persecuted --
10     Q.   To be clear, you're asserting your Fifth
11 Amendment right to not answer the question as to when
12 you found T-107. Is that right?
13     A.   Yeah, because I don't recall, and you're not
14 accepting that answer, and it's like you're trying to
15 paint a picture, and I don't think that's fair, so
16 I'm asserting my Fifth.
17         MR. VERSTANDIG: All right. Hold on. Hold
18 on.
19         I'd like to take a five-minute recess.
20         Ms. Stanley, I'm not going to speak to
21 Mr. Fettig during the recess.
22         MS. STANLEY: Okay.
23         MR. VERSTANDIG: But if it's okay, let's
24 come back at 9:42 Central, 8:42 Mountain.
25         THE WITNESS: 8:42 Mountain?

55

1         MS. STANLEY: Five minutes?
2         MR. VERSTANDIG: Five minutes from now. If
3 you want to make it 8:45 -- it's Ms. Stanley's
4 deposition, I don't really get to pick, but I suggest
5 8:45, if you want.
6         MS. STANLEY: Thank you for reminding me
7 that the court reporter could probably use a
8 five-minute break. I appreciate that.
9         MR. VERSTANDIG: Okay.
10         (Recess taken from 9:37 a.m. to 9:47 a.m.)
11         MR. VERSTANDIG: Mr. Fettig, I do not
12 represent you in your individual capacity, which
13 you're aware of.
14         THE WITNESS: Yeah.
15         MR. VERSTANDIG: I represent Stark Energy.
16 Whether or not to invoke your Fifth
17 Amendment right is your decision. The company cannot
18 and will not force you to answer questions, nor will
19 Ms. Stanley.
20         You've had an opportunity to confer with
21 personal counsel in advance of the deposition today.
22 I'm not going to get into what I do or do not know
23 about how those efforts have ensued.
24         I want to make sure that you understand a
25 few things before we move forward. One: When a

56

1 witness invokes the Fifth Amendment in a civil
2 proceeding, and a bankruptcy is considered civil, the
3 Court can, but is not necessarily bound to, draw what
4 is known as a negative inference from the Fifth
5 Amendment invocation, meaning a Court can infer that
6 if the answer -- if the question had been answered,
7 the facts would have been detrimental or deleterious
8 to the witness's interests.
9         Two: In order to invoke the Fifth
10 Amendment, under Eighth Circuit precedent, there must
11 be some danger of self-incrimination that is real and
12 appreciable. Now, there's a lot of latitude that
13 goes with that, but I want to really stress and
14 emphasize, I'm here to object to questions that are
15 improper, that aren't relevant, that are harassing,
16 that are compounding, and that meet any other number
17 of criteria. That's my job. Those are not reasons
18 to invoke the Fifth Amendment: You don't like a
19 question, you're not having a good time, you think
20 it's an annoyance, you think it's harassing.
21         The Fifth Amendment, however, should be
22 invoked -- and this is generic, I am not giving you
23 personal advice -- when there's a fear that is real
24 and appreciable of incrimination.
25         I just want you to acknowledge that you've

57

1  heard what I've said, and I want you to acknowledge
2  that you understand that I'm not your lawyer and that
3  I'm the company's lawyer, and then we're going to
4  proceed.
5        THE WITNESS:  I understand.  I just don't
6  want anything to be misconstrued, you know?
7        MR. VERSTANDIG:  Perfect.
8        Ms. Stanley, thank you for the recess, and
9  let's pick back up.
10     Q.    (BY MS. STANLEY)  I think we were at -- we
11  were talking about the Dragon water trailers and
12  T-104 and T-107.  You have both of these in your
13  possession currently.  Correct?
14     A.    No.  That's incorrect.  I said I have T-107
15  at my shop, and I said that T-104 is missing.
16     Q.    Okay.  So T-104 is missing.  And when is the
17  last time you saw T-104?
18     A.    I'd say the earlier part of -- not earlier.
19  Sorry.  But the early -- what did he say?  Like
20  November or Decemberish of 20- -- 20- -- 2023.  Is
21  that -- sorry.
22     Q.    And you did not submit a police report or
23  insurance report for T-104.  Is that correct?
24     A.    Correct.
25     Q.    What did you do to try to find it?

58

1  A.    I've been driving around looking at
2  wellsites.  I've been going to people's tow yards.
3  I've been asking people in the community, people that
4  work in the community if they knew of anybody that
5  had it, if anybody was trying to sell it, you know,
6  so...
7        I've been pulling up on vehicles and trucks
8  when i see them at a truck stop.  I did that
9  yesterday.  There's a Reitnouer trailer that's
10  missing, too, and I -- I feel strongly that that
11  trailer's being used by Andy Yuker, and he -- he
12  hauls rods and stuff.
13     Q.    Let's go back to T-107.
14     A.    Uh-huh.
15     Q.    Was it ever out of your possession and
16  missing?
17     A.    Yeah.  I was -- I was looking for it, and
18  the driver said he was going to park my truck
19  somewhere, and I was really pissed off because he:
20  Ah, I'm going to -- I'm going to quit.  I heard your
21  company's failing, and screw you, you know, so...
22     Q.    So -- okay.  My question was:  It was
23  missing, or you're -- you previously testified it was
24  missing at that hearing in November.  Correct?
25     A.    That's what I'm saying, that it was missing,

59

1  and then I was looking for it, and I was able to find
2  it.  I found it at a truck stop.
3     Q.    Okay.  And when did you find it at the truck
4  stop?
5     A.    I think it was in, like, latter December or
6  first part of January, somewhere in there.
7     Q.    And you understood, if you -- if that's when
8  you found it, that it was still -- the motion to --
9  requiring you to turn that over to Gate City was
10  already in effect at that point.  Correct?
11     A.    I don't understand law.  I'm not a lawyer,
12  so I don't understand what you're saying.  Sorry.
13     Q.    Well, the hearings in November were --
14  occurred because none of this collateral owned by
15  Gate City had been returned to Gate City.  Correct?
16     A.    Yeah.  Again, I -- I don't -- I don't want
17  to infer or make the Court mad or anything like that,
18  but I do have a pending criminal case, and I -- I'm
19  not a criminal.  I was just trying to keep my
20  business afloat.  Do you know what I'm saying?  And I
21  wasn't trying to hide or be disrespectful to anybody,
22  so I want to invoke the Fifth on any questions
23  related to equipment because I feel that that's not
24  smart for me, because, like, what you're doing right
25  now is you're trying to say that I was doing

60

1  something criminal, and I wasn't.  I was just trying
2  to run my business, so...
3     Q.    So --
4     A.    I mean, I was able to find T-10 -- T-107,
5  and I feel strongly that S-205 is stolen and S-210 is
6  stolen from Andy Yuker, and I feel strongly that the
7  Reitnouer trailer is in Andy Yuker's possession, but
8  I'll bring this up to you.
9        And I'm going to have to go push the
10  charges.  I'm going to have to call an attorney,
11  Mr. Erik, when I get off this.  I'm going to have to
12  ask him to send that letter and try to compel him to
13  give me my equipment back or open an actual formal
14  investigation, because nobody seems to do it.
15       I even filed a police report, and it was
16  opened on the 16th, like I was supposed to, but it
17  was closed, it was closed in five days.  And I have
18  the paperwork from the Stark County Sheriff's Office
19  about that.
20       It really frustrates me when I do what I'm
21  supposed to do, I do this report, and I say something
22  is stolen, but nobody cares.  They just don't -- they
23  don't pursue it.
24       I'm a financial entity, too.  I mean, I'm a
25  person.  I care about this business.  I've -- I've

61

1   bled for this business.  I work hard every day for
2   this business.
3       Q.    So are you refusing to answer any more
4   questions about T-107?
5       A.    Yeah, because I told you it's at my shop,
6   and I don't think it's -- I don't think it's relevant
7   anymore, and I'm not a lawyer, so I can't be
8   relevant, I can't say what's relevant or not, but my
9   criminal defense attorney is not next to me, and
10  anything in dealing with equipment, I'd like to
11  invoke my Fifth Amendment right because everybody is
12  portraying me out to be the criminal when, in fact,
13  the equipment was found not on my property, but it
14  was found on an actual known criminal's property who
15  has stolen equipment before, who has changed titles
16  before.  I don't -- I don't want any part of that.  I
17  don't want no part of no crimes.  I don't want any
18  part of any criminal case.  I don't want any part of
19  anything wrong.  I just want to work.
20          I can put those side dumps to work right
21  now, ma'am, but you won't give them back to me.  And
22  I'll put tracking devices on them so nobody will lose
23  them.  I'm not going to lose your stuff.  I get a
24  minimum of five years, five years in prison if I do
25  anything wrong right now.  This is a case, and I get

62

1   five years minimum.  This isn't zero to five.  This
2   isn't probation.  This is a very serious matter, and
3   I take this company very serious.
4           I'm sorry to get emotional.  Sorry.
5       Q.    Mr. Fettig, in preparing for these
6   depositions today, I realized that Gate City did not
7   actually recover one of the belly dump trailers,
8   BD-001.  Is that one in your --
9       A.    Yes.
10      Q.    -- your possession?
11      A.    Yes.  And I found that at the Cenex in
12  Watford City as well, and I've got the pictures to
13  prove it.  I've got the pictures to prove that I
14  found that underneath a guy's trailer --
15      Q.    When did you find it --
16      A.    -- and I -- what?  Sorry.  I'm sorry.  I
17  can't hear you.
18      Q.    When did you find it at the Cenex?
19      A.    I've got to -- I've got to go back, and I've
20  got to -- I've got to think, but I -- I found it with
21  my mechanic right now, so I can get that exact date
22  and time.
23          And the Cenex -- I called the individual,
24  and he said that the truck -- the trailer had been
25  abandoned for six or seven months, and it was parked

63

1   there, and he just hooked into it.  This guy says
2   this.  It's, like, Beam Trucking or something out of
3   Watford City.  And I contacted him, and I contacted
4   him and I said:  Hey, man.  This is my truck -- this
5   is my trailer.  I've been looking for some of my
6   equipment.  Do you know what I'm saying?  I need -- I
7   need to get -- find my equipment.  Do you know what
8   I'm saying?  And you can't be stealing my stuff.  I'm
9   not trying to say swear words.  Sorry.
10          And I said:  I'm not playing with you, man.
11  Like, I want to make sure that, you know, you
12  understand that this is my trailer and, like, this is
13  not going to be happening.
14          And he said:  Well, I was just going to hook
15  into it because the people at the Cenex said it was
16  parked there for months, like months, and nobody came
17  and got it for six or seven months, and he was just
18  going to hook into it.
19          And I was lucky.  I was lucky to find it,
20  because he said in another week or so he was going to
21  figure it was his.  Like, this guy was basically
22  going to steal it.  It's called Beam Trucking, I
23  think.
24      Q.    When?
25      A.    Ma'am, right this exact second, I don't

64

1   know, but I can call up Erik the minute we get off
2   this deposition.  If you can give me five minutes,
3   I'll get the exact date.  I -- I -- I can call my
4   mechanic.
5       Q.    What does Mr. Ahlgren know?
6       A.    What?
7       Q.    You said you would call up Erik.  Are you
8   talking about Mr. Ahlgren?
9       A.    Yeah.  It's on the schedule.  I've been
10  telling him that it's at my -- yeah --
11          MR. VERSTANDIG:  Whoa, whoa, whoa, whoa.
12  You're not going to testify about what
13  you've told Mr. Ahlgren.
14          THE WITNESS:  Well, I'm not talking -- I'm
15  not saying that.  I'm saying I was going to call him
16  and tell him when I found it.
17          MR. VERSTANDIG:  Okay.
18      Q.    (BY MS. STANLEY)  Why can't you call him --
19  or why can't you tell me right now when you found it?
20      A.    I can't recall, ma'am.  I have a learning
21  disability.  I'm not trying to be rude to you, but I
22  really do have a documented learning disability.  I'm
23  underneath a lot of stress.  I'm going to keep
24  talking because you asked me a question, and I'm not
25  trying to be rude to you, but you're going to treat

65

1  me with respect like I'm going to treat you with
2  respect, because right now you're not understanding
3  something.
4      I'm a hardworking person, and I found two
5  items that the Stark County sheriffs could not find,
6  and I'm trying to find two to four more items, and
7  I've identified the suspect, and nobody wants to
8  pursue that suspect. And all they want to do is
9  listen to his lies under oath about me when he's
10 trying to commit crime and I'm not. I'm trying to
11 run my business. He's trying to acquire my assets,
12 "he" being Andy Yuker.
13     And what I'm trying to ask you is if you'd
14 give me a few minutes, I can get the exact date and
15 time for when I found that, but it was in the last
16 three to four months I found the trailer. I -- I
17 mean, that's -- that's the timeframe. I was out
18 looking for it, and I found it.
19   Q.   But what I'm asking you is if you don't --
20 why would Erik Ahlgren know?
21   A.   I would tell him. I have to tell him to
22 tell you because I can't call you. I said I would
23 have to call him to tell you, ma'am.
24   Q.   Does he have certain paperwork that he could
25 look at that would tell him when you found it?

66

1   A.   No. I don't --
2        MR. VERSTANDIG: Whoa, whoa, whoa.
3   A.   No, he does not.
4        MR. VERSTANDIG: Hold on.
5        Mr. Fettig, you're not going to answer that
6  question.
7        Objection. To the extent the question seeks
8  attorney work product, that is privileged and outside
9  the permissible scope of discovery.
10       There are probably ways that question can be
11 reworded, and you're certainly welcome to do so,
12 Ms. Stanley, but I'm going to direct the witness not
13 to answer the question as currently posed.
14   Q.   (BY MS. STANLEY) Do you have documentation
15 that would show when you found BD-001?
16   A.   No, ma'am.
17   Q.   You said you took pictures.
18   A.   Yes. I have to find the picture.
19   Q.   Okay. Did you take it on your phone?
20   A.   No.
21   Q.   You took it --
22   A.   My mechanic took a picture of it, and he
23 said he found it, and I'll get the picture from him.
24 I'm not -- oh.
25       I found the trailer. It's at my shop. I'm

67

1  not hiding assets. I'm doing what I'm supposed to
2  do. I'm in bankruptcy. I don't understand this.
3    Q.   So do you think you found it in 2024? Can
4  we at least narrow --
5    A.   I know I found it in 2024. I already
6  narrowed it down, ma'am. I said I found it in the
7  last two to four months.
8    Q.   What's the name of the mechanic that found
9  it?
10   A.   Shannon Brock. Me and him found it
11 together. He was looking; I'm looking. We both go
12 out and look for the stuff. I pay for fuel in his
13 vehicle. I pay for fuel in my vehicle. We go look.
14       And I just turned down a job just now being
15 in this deposition. I'm really trying to work. I
16 just -- I asked them if I could go at 1:00 or 2:00
17 because I don't know how long this is going to take.
18       MR. VERSTANDIG: Mr. Fettig, look at your
19 screen. Do you see The Brady Bunch box with the four
20 people?
21       THE WITNESS: Yeah.
22       MR. VERSTANDIG: Okay. All four of us are
23 just here to do our job. Ms. Stanley is representing
24 the bank; I'm representing your company; the court
25 reporter is here to take down everything that's said;

68

1  and you're here to advance your company's
2  reorganization.
3        I appreciate that you're passionate, but try
4  to just answer the questions, and this will go
5  quicker and it will be a lot easier.
6        THE WITNESS: If she wants the bank to win,
7  why doesn't she give me the equipment so I can make
8  money so I can pay the creditors? I don't understand
9  this.
10       MR. VERSTANDIG: I'm not going to discuss
11 that with you on the record, but I hear and
12 appreciate what you're saying.
13   Q.   (BY MS. STANLEY) I would like to look at
14 Exhibit 3.
15   A.   Exhibit 3.
16   Q.   You are you able to see this?
17   A.   Yes, ma'am.
18   Q.   Okay. Did you provide -- first of all, are
19 you familiar with this balance sheet from March 31,
20 2021?
21   A.   Yeah. I got it out of the QuickBooks.
22   Q.   Okay. So did you provide this to Gate City?
23   A.   I don't know if I provided it with
24 Gate City. I mean, I thought this was something that
25 you had for the schedules, because you're supposed to

Robert G. Fettig

69

1  provide this -- I had to get the balance sheets for
2  the -- was it -- the profit and losses for the last X
3  amount of years.  But can you just tell me if I gave
4  this to Gate City or not?  Because I don't understand
5  the question.  I mean, do you understand what you did
6  17 months ago or 37 months ago on the 3rd of August?
7  You won't.  Just keep this real and respectful.  I'll
8  respect you if you respect me.
9      Q.      This is in Gate City's file, and you said
10  that you got this out of the QuickBooks.  Is that
11  correct?
12     A.      I believe so, yes, ma'am.
13     Q.      Okay.  Who enters the information in the
14  QuickBooks?
15     A.      People that I hire, and then the CPA people
16  go over it.  And it's 2021, so this is an incorrect
17  statement because 2021 is not updated, like we told
18  the Court, and the Court even agreed, the Trustee
19  agreed that I have to get my books in order, so I
20  have to work with a CPA firm.
21     Q.      Okay.  But was it correct in 2021?
22     A.      I don't know if it was or not, ma'am, to be
23  honest with you.  I think that I pay people to do a
24  service.  I say:  Hey, listen.  I need you to do your
25  job.  I need you to put the stuff in the QuickBooks.

70

1  Oh, you went to DSU for accounting.  Oh, you have a
2  degree.  Oh, I can hire you for X per hour, you know?
3      Q.      So are you trying to say that this -- you
4  have no idea if this is -- the information in the
5  March --
6      A.      (Indiscernible.)
7      Q.      -- 2021 --
8      A.      (Indiscernible.)
9      Q.      -- balance --
10             (Simultaneous, indiscernible crosstalk
11  interrupted by the court reporter.  A discussion was
12  held off the record.)
13     Q.      (BY MS. STANLEY)  Are you trying to say that
14  you have no idea if this balance sheet is accurate?
15     A.      I'm not trying to say.  I'm telling you that
16  I don't know if it's been factually double-checked
17  with the CPA firm for any inaccuracies.  That's what
18  I'm telling you.  Sometimes there can be
19  inaccuracies.  People type things in the wrong thing.
20  I'm told that it's done correctly.  I'm not trying to
21  say anything except for that because that's the
22  truth.
23     Q.      Looking at Exhibit 3 --
24     A.      Is this the same exhibit or a different one?
25     Q.      It's just a couple pages down.

71

1             This indicates private loan, Robert Fettig,
2  $18,646.59.  Do you know what that means?
3      A.      Private loan, Robert Fettig, 18 -- yeah.  I
4  probably lent the company $18,646.59.  That's
5  probably what that means.
6      Q.      Okay.  What about Allen Allcorn?  Who is he?
7      A.      It shows zero.  I bought equipment before
8  through him, like I bought a trailer.  Like, when I
9  go buy a trailer, back when I was buying trailers and
10  stuff.  Like, this is old.  Right?  So it shows zero.
11  Right?  So it's zeroed out.  So someone took an old
12  thing from 2018 or 2019 or 2017.  And at one point in
13  time I went and I bought a trailer, like the Dragon
14  trailer, 2014 or whatever the years were.  Right?
15  Those big $200 trailers.  And I went, and I was on
16  the side of the road, and I was like:  Hey, man.  I
17  want to buy this trailer.
18             Oh, I got someone to come here on Thursday.
19             Well, Thursday?  I can get a loan.  I've got
20  a bank, you know?
21             Well, that's going to take a week.  I need a
22  guy that really wants to buy it, you know?  I'm going
23  to sell it to this guy for $48,000 cash.
24             Oh, I can give it to you for 50.
25             You can give me 50 right now.

72

1             And so I remember at one point in time I had
2  boughten a trailer from -- bought a trailer by going:
3  Hey, Allen, I've got this trailer to buy.  It's a
4  really good value.  I think it's roughly 60 grand at
5  the time or 52 grand or 37 grand, whatever the number
6  was, and he would lend me the money, and then I could
7  get it right away, and then he would make a little
8  bit of money on it, like I'd mark it up.  Like,
9  I'll -- I'll let you hold onto the note, and I'm
10  going to get it taken care of with the bank for, say,
11  20 -- for $2,000 profit for you.
12             And then he would:  Oh, why do you have to
13  do that?
14             Because this guy's going to sell this
15  trailer out from underneath me, and I have to beat
16  him out.  I have to bring him cash right now.
17     Q.      So Allen Allcorn made a loan to Stark
18  Energy, and it was paid back.  Is that what you're
19  trying to say?
20     A.      I did that, yeah, in the year of like 2017
21  or 2018 when I bought a trailer.
22     Q.      Okay.  What about Daniel Gerstberger?
23     A.      What about him?  I think he's on my
24  schedule, ma'am.  He lent me money.  He's lent me
25  money before to buy equipment, and then he lent me

73

1  money, too, when I was dealing with tough times,
2  like -- like Matt Barrett did, too.
3      Q.   Okay.  So that's why he shows up here as
4  zero, is your assumption?
5      A.   At -- at -- that's a -- that's a very --
6  that's a very true statement there.  That's got to be
7  that, because I know that I've boughten a trailer
8  through him before, and I've paid him back, but I
9  know he's on my schedule because I had to declare him
10  because I had owed him money, and I owed him money
11  because he lent me money during my turbulent times,
12  and I wasn't able to fulfill that, and since I can't
13  pay past debits [sic], I have to -- I have to, like,
14  write that down.
15      Q.   Okay.  Any other -- so subsequent to
16  March 31, 2021, are there any other private loans,
17  that you're aware of, that Stark Energy took out from
18  individuals, not a bank or a financial institution?
19      A.   Oh, like Matthew Barrett, like I said.  I
20  don't --
21      Q.   Okay.
22      A.   His was 2021, after that, I think.  I don't
23  know.
24      Q.   Anyone else?
25      A.   Not that I can recall, no.  I mean, I've put

74

1  my own money into the business over the time, but...
2      Q.   Yuker Towing?
3      A.   Yeah, I borrowed some money from him.  I
4  borrowed money from him, and then I paid him back on
5  my money that was coming into the company.
6      Q.   Anyone else?
7      A.   Honestly, no.  Not that I can recall.  I
8  mean...
9      Q.   Jacob Cullip?
10      A.   I borrowed money from him for, like, 2017 or
11  2018, pre, I think, but I paid him back.  I borrowed
12  like 10 grand from him, and I paid him back like 11
13  or something.
14      Q.   Anyone else?
15      A.   No.
16      Q.   Cody Clanton?
17      A.   Cody Clanton?
18      Q.   Yeah.
19      A.   I've borrowed money from him in the past.  I
20  don't think I currently have a loan from him.  I can
21  check, but I don't -- I would think he would tell me.
22      Q.   I mean, I'm asking you to tell me.  So this
23  is three that I've brought up, asking if you had
24  borrowed money from a third party that's not a bank,
25  and you told me yes to all three.

75

1  I paid him back.  Cody Clanton, I paid him back.
2      Q.   Okay.  Are there any other third parties
3  you're aware of that Stark Energy borrowed money from
4  and paid back?
5      A.   No.  I'm really not trying to be deceitful
6  or whatever.  I don't -- I don't recall.  I mean,
7  I -- I -- I run this business.  I actually run it.
8  Like, I'm out in a truck.  I'm negotiating deals.
9  I'm finding trucks.  I'm finding drivers.  I'm doing
10  everything.  So, like, what I was trying to do there
11  is recall, but, I mean, I don't have a problem being
12  very truthful with you.
13      But, yeah, I borrowed money from Allen
14  Allcorn, and I bought a trailer, and then I paid him
15  back.
16      I borrowed money.  I think $10,000 was the
17  money from Jacob Cullip.  I paid him back.
18      I borrowed a hundred thousand dollars from
19  Andy Yuker, and I paid him back.  So, yeah.
20      Q.   And Cody Clanton?
21      A.   Yes.  I don't recall the dollar amount.
22      Q.   But anybody else?  I mean, you know the
23  amounts that you borrowed from these people.  Do you
24  remember any other third parties that may have
25  borrowed money?

76

1      A.   Not currently, coming to my recollection,
2  no, ma'am.
3      Q.   What about Fettig Enterprise?
4      A.   No.  I don't think I borrowed any money from
5  Fettig.  I mean, I -- I -- I don't think -- I'll have
6  to check with my CPA.  I don't really think I did do
7  anything like that.  I mean, I know that I asked the
8  CPA that if I owned both companies could I do that,
9  and they said since I own both companies, I could,
10  but I don't recall lending either company any money,
11  no.
12      Q.   Between the companies you're talking about,
13  not you lending the company money?  Like, are you
14  talking about each company lending the other one
15  money?
16      A.   Yeah, that's what I'm talking about.  That's
17  what you asked, if I had lent any money to Fettig
18  Enterprise or if I lent any monies from Fettig
19  Enterprise to Stark.
20      Q.   You're saying "I."  Are you talking about
21  Stark Energy?
22      A.   Stark Energy, yes, ma'am.  Sorry.  I just --
23  this is my kid.  I don't have kids.  This is my kid.
24  I believe in this business.
25      Q.   So you talked to the CPA about Stark Energy

77

1 loaning money to Fettig Enterprise --
2     A.    I asked -- I asked them if that was a
3 possibility, if I could do that.
4     Q.    Okay.
5     A.    And they said:  Yeah.  Once you get it up
6 and running and everything's running smooth, you can
7 do that, but it's got to be documentated.
8     Q.    It's got to be what?
9     A.    It's got to be documentated.  Documentated.
10     Q.    Okay.  And did you -- did either of the
11 companies do that, lend money to the other?
12     A.    Not that I can recall, ma'am.
13     Q.    Would you have documented it if that had
14 occurred?
15     A.    Well, yeah, because that's, like, illegal.
16 Like, you have to do that.  You're supposed to do
17 things the right way.  I think it's illegal.  I don't
18 know, but the lady said that you have to document it
19 on the CPA paperwork, so...
20     Q.    So you can't think of any other third
21 parties, outside of banks or financial institutions,
22 that have loaned money to Stark Energy.  Is that
23 correct?
24     A.    I can't -- I can't recall at this time, no.
25     Q.    Let's take a look at Exhibit 4.

78

1     A.    Okay.
2     Q.    Is this the Certificate of Liability
3 Insurance that you provided to the U.S. Trustee for
4 Stark Energy?
5     A.    I don't know if you can scroll down so I can
6 see if it says.  It says at the bottom where it goes
7 to.
8           That's correct.
9     Q.    Okay.  And this --
10     A.    Scroll down, please.  Sorry.  Yeah, that's
11 correct.  I want to make sure it's my new policy,
12 yeah.
13     Q.    Okay.  And it says the effective date,
14 1/23/2024.  Is that right?
15     A.    Uh-huh.
16     Q.    Okay.  And are these the only pieces of
17 collateral -- or not collateral, but, like, there's
18 five -- one, two, three, four -- five pieces of
19 equipment that are identified on this?
20           MR. VERSTANDIG:  Object to the form of the
21 question.
22     Q.    (BY MS. STANLEY)  Is that right, that
23 there's only five pieces of equipment, titled
24 equipment, vehicles, that are listed on this
25 insurance certificate?

79

1           MS. STANLEY:  And, I'm sorry.  This part
2 over here on the right, those are my notes.
3           MR. VERSTANDIG:  Got it.
4           MS. STANLEY:  I should not have -- this one
5 should not have been on here.  There should have been
6 a cleaner one, so...
7           If you'll allow, I'll get a different page.
8           THE WITNESS:  How was BD-001 recovered?
9     Q.    (BY MS. STANLEY)  That's why I'm saying
10 these are my notes.  Please ignore them.
11     A.    I'm just trying to understand, because it's
12 at my shop.
13     Q.    Yeah.  And we talked about that, and I told
14 you initially that I -- in looking through the
15 documents, it appears that BD-001 was in use and not
16 recovered by Gate City.
17           But my question is:  The five pieces of
18 equipment listed on the left, are those the only ones
19 being used in the business right now?
20     A.    This exact second, yes.
21     Q.    What about the 2022 Dodge Ram?  Is that
22 being used in the business?
23     A.    Yes, and I have an updated insurance for
24 that.
25     Q.    Any others?

80

1     A.    No.  No, ma'am.  But if you guys can compel
2 Andy Yuker to give me S-205 back and S-210, I can put
3 them to use.  Is that something that you're willing
4 to help me do, or no, since he's stolen my equipment
5 and the flatbed?
6           MR. VERSTANDIG:  Mr. Fettig, let's limit it
7 to Ms. Stanley's questions and your answers.
8           THE WITNESS:  Okay.  Just trying to work
9 together.
10           MR. VERSTANDIG:  I know.
11     Q.    (BY MS. STANLEY)  I believe earlier you
12 talked, too, about a -- let's see -- 2014 Ford F-350.
13 Is that being used in the business?
14     A.    No.
15     Q.    No?
16     A.    Correct.  No.
17     Q.    Is it at the shop?
18     A.    No.
19     Q.    Where is it?
20     A.    I don't know.  I've been looking for a lot
21 of my stuff that's missing.
22     Q.    Okay.  That one's not identified on your
23 schedules as missing, I believe.  Is it missing?
24     A.    It's titled in my personal name, ma'am.  We
25 already went over the 2013 F-150.

Robert G. Fettig

81

1 **Q.** But it was --

2 **A.** It's not on the schedules. It doesn't have

3 anything to do with Stark Energy. We used -- like a

4 sales guy used it before to, like, do sales calls

5 back in the day; or when we switch out drivers and we

6 had 24-hour trucks, you know, you use pickup trucks

7 for that, but...

8 **Q.** Okay. These are Exhibit 5?

9 **A.** Exhibit 5. Okay.

10 **Q.** Okay. These are -- I'm just going to tell

11 you, from the company that actually towed the

12 equipment when it was repossessed, these are

13 photographs that they took of the equipment when they

14 towed it, so I just want to make sure that I'm

15 getting the unit numbers correct, so I'm hoping you

16 can help me with this and verify.

17 So this is Gate City -- down here at the

18 bottom you can see that there's -- we call this a

19 Bates numbering. Do you see 0515? So I'm just

20 saying this for the record so the court reporter can

21 understand what I'm looking at.

22 This indicates it's a 2016 Sidump'r dump,

23 and you had two of those. Correct?

24 **A.** Yep.

25 **Q.** And this first one here, can you see that?

82

1 I think it says SD-002. Is that right?

2 **A.** Sure. Correct. Yep. It's in the picture,

3 ma'am.

4 **Q.** Okay. And so this first one that we're

5 looking at is SD-002. Is that right?

6 **A.** I'm -- I'm guessing. I don't understand the

7 relevance of this.

8 My name's not Fetting. It's Fettig,

9 F-E-T-T-I-G.

10 **Q.** This next one is -- the second one is GC,

11 Gate City, 516. This is a 2016 Sidump'r, and can you

12 see the number on that one? Whoops. Sorry. SD-001?

13 **A.** Sure. Why -- can I -- can I ask you a

14 question?

15 **Q.** I'm just going through these to confirm that

16 they're the -- those are the numbers, and also --

17 **A.** Why can't I just assume that they are? I

18 mean, they're on the -- the stickers are on there.

19 The paperwork says it. I mean, I don't understand

20 the relevance here.

21 **Q.** Okay. Well, are you going to agree with me,

22 then, that these numbers should match what is on

23 Exhibit 1?

24 **A.** I don't know. I mean, certain things aren't

25 in my vehicle, but if they match, they match. I

83

1 mean, I don't understand why I, respectfully, have to

2 do -- I don't know, do this, like tell you: Oh, that

3 matches this: yep, that matches there, when you can

4 see it clear as day in the paperwork in the exhibit,

5 and that's taking away from time from going to make

6 money. I mean, I have a job I can go do, so...

7 I don't understand the relevance.

8 **Q.** Mr. Fettig, you were very evasive as to

9 whether Exhibit 1 is -- you didn't know who created

10 it, where it came from, so I --

11 **A.** Yeah, because I have people that I've hired

12 to --

13 MR. VERSTANDIG: Whoa, whoa, whoa.

14 Mr. Fettig, let Ms. Stanley finish the

15 question, and I'll give you a hint. I'm going to

16 object.

17 But, Ms. Stanley, please finish the

18 question.

19 **Q.** (BY MS. STANLEY) So if you want to avoid

20 going through these, we can -- we could agree that

21 the information on Exhibit 1 as to the unit numbers

22 is accurate.

23 MR. VERSTANDIG: Object to the question.

24 Mr. Fettig, to the extent that is a

25 question, you may answer, notwithstanding my

84

1 objection.

2 **A.** I just don't understand the relevance of

3 this. I'm not evasive. I don't know who created

4 that document. I've employed people that create

5 documents. I asked them to get a list. Somebody

6 says: Hey, I need a list of equipment.

7 I say: Hey, get a list of equipment, you

8 know?

9 What is the relevance here?

10 **Q.** (BY MS. STANLEY) That's for the Judge to

11 decide.

12 **A.** So I just -- I don't understand the

13 relevance, though. What's the relevance?

14 Someone took my equipment. They took my

15 equipment. The pictures are in the -- in the -- in

16 this showing my equipment. It's my equipment. I'm

17 asking for it back so I can go to work. What's the

18 relevance?

19 **Q.** The relevance is that I believe you hid this

20 equipment, so we're trying to track down what

21 happened to the equipment and what the numbers are.

22 **A.** Well, I didn't hide --

23 **Q.** You did -- let's stop arguing and --

24 **A.** I'm not arguing. I'm saying that I did not

25 hide the equipment. I had a creditor that I owed

85

1  money to.  He took my equipment --
2          MR. VERSTANDIG:  Whoa, whoa, whoa, whoa.
3  Two things.  Ms. Stanley, I'm not making a
4  relevance objection.  My objection was as to the way
5  certain things were characterized.  I didn't want it
6  to be a speaking objection.
7          Mr. Fettig, I promise you, this is going to
8  go much easier if you just answer the question.  Your
9  answers can be short.
10          THE WITNESS:  Okay.
11          MR. VERSTANDIG:  We can supplement them in
12  the record later.
13          Also, unrelated to all of this, I'm going to
14  need five minutes at some point in the rather near
15  future, for which I apologize to everyone on this
16  call, and it's related to a personal matter that has
17  nothing to do with this case, but I'll defer to
18  Ms. Stanley as to when we do that.
19      Q.    (BY MS. STANLEY)  Mr. Fettig, are you aware
20  of a master list of equipment?
21      A.    The one that you presented?
22      Q.    I'm asking you.  Does Stark Equipment have a
23  master, if you will, comprehensive list of its
24  equipment?
25      A.    I have a list of VIN numbers and truck

86

1  numbers.
2      Q.    And is it Exhibit 1 or is it something else?
3      A.    I don't know.  I don't know what Exhibit 1
4  is.  If Exhibit 1 is what you sent me, I don't know
5  where that was created or who created that.  I don't
6  know if Matthew Barrett created that.  I don't know
7  if somebody in my office created that.  I don't
8  understand the relevance of that.
9      Q.    Do you currently have a master list?
10      A.    No.  I don't currently have a master list.
11  I have a list of all the Gate City loans, equipment
12  with the VIN numbers, and the trucks, the make, the
13  model.
14      Q.    So you're absolutely positive there's no
15  master list of equipment for Stark Energy?
16      A.    No, I'm not sure of that, because like I
17  said -- I've said more than once, I'm not trying to
18  be evasive.  I've tried to get organized over the
19  years, so I know of most of my equipment.  Yep, there
20  are eight tankers.  Oh, there's six belly dumps.
21  There's a few trucks.  You know, like, I'm trying to
22  get more organized.  I've had to do that since day
23  one.  Since 2017 until now, I've tried to get more
24  organized.  So the relevance, I -- I just don't see
25  it.  I don't understand it.  It's for the Judge to

87

1  understand, but it's not for me?
2          But, again, I've already asked and answered
3  your question, so I don't want to be badgered, and
4  I'll stick up for myself if I have to.  I personally
5  don't want to be badgered.
6      Q.    What do you currently have for a list of
7  equipment?  Does it look like Exhibit 1, or is it
8  different?
9      A.    I don't have a -- I -- I -- I can look.  I
10  can find something.  I don't know at this time.  I
11  don't know.  I don't see the relevance here.  It
12  really makes no point.  There's no point of relevance
13  here.
14      Q.    Mr. Fettig, do you recall when you were
15  incarcerated in October 2020 to 2023, those dates
16  in 20- -- I'm sorry -- October 20th through the 23rd
17  of 2023 in the Stark County Correctional Facility?
18  Do you recall?
19      A.    Yeah.  I was locked up.  Yep.
20      Q.    Okay.  And do you recall that you made
21  numerous phone calls to your mother?
22      A.    Sure.  Yeah.  I called her.  She was worried
23  about me.
24      Q.    And do you recall that every time during
25  those phone calls it indicated that these phone calls

88

1  were being recorded?
2      A.    Yeah.  Sure.  That's fine.  What?  I didn't
3  say anything wrong, so...
4      Q.    Have you seen the transcripts from those
5  phone calls that have been filed in this case?
6      A.    No.
7      Q.    Have you looked at them?
8      A.    No.  I haven't looked at anything.  What do
9  you mean?
10      Q.    Okay.  Let's look at -- I'm just going to
11  show you -- I believe this has been filed in the
12  bankruptcy case, Docket Number 45.  This is page 14
13  of 45.  I will share a screen on this.  Are you able
14  to see this, Mr. Fettig?
15      A.    Yes, I can see the screen.
16      Q.    Okay.  This is a transcription of an
17  audiotape, a jailhouse phone call which was obtained
18  from the Stark County Correctional Facility pursuant
19  to subpoena.  This is a phone call between you and
20  your mother.
21      A.    Uh-huh.
22      Q.    And it says, "Black Beauty is good to, you
23  know, sit, and the rest is on the move, hopefully.
24  Yeah."
25          Do you see that?

89

1    A.    Okay.

2    Q.    Do you recall having this conversation with
3    your mother?

4    A.    I'm reading it in front of you, so...

5    Q.    Do you recall having this conversation with
6    your mother?

7    A.    Sure.  Yep.

8    Q.    Okay.  And you said, "Black Beauty is not
9    good to sit."

10        Do you recall that?

11    A.    Yeah.

12    Q.    Okay.  "Why?"

13        "Because Black Beauty's on the list."

14    A.    What list?

15    Q.    I don't know.  You said it, so tell me.
16    What list?

17    A.    I don't recall.  I was going through so much
18    shit.

19    Q.    Okay.  "Delene Fettig:  I didn't see it on a
20    list."

21    A.    Okay.

22    Q.    "Yeah" --

23        "Robert Fettig:  Yeah, it's on the big one,
24    the master.  Yeah."

25        Do you recall making that statement?

90

1    A.    Ma'am, I'd have to be the dumbest person in
2    America to sit here and say that I didn't make a
3    statement of this effect when I'm incarcerated, I'm
4    on a recorded call, so what is the relevance?

5    Q.    So what is the master list?  I've been
6    asking for the master list.  Tell me what the master
7    list is, please.

8    A.    I don't know.  I've had lists like job sites
9    and stuff, like where I wanted to keep trucks working
10    on the job, and I've asked people to work.  I don't
11    understand.  I don't understand.

12    Q.    So you don't know if there's a master list?

13    A.    I don't understand the relevance.  A master
14    list.  It's like you're looking for this big key of
15    something that's there.  There's nothing there.  I
16    don't do anything wrong.

17        MR. VERSTANDIG:  Mr. Fettig, try to answer
18    the question, and I promise you if it's not relevant,
19    I'm going to object.  I'm not shy.  But try to answer
20    the question.

21    Q.    (BY MS. STANLEY)  So you were referring to
22    "the big one, the master" in this conversation.  Do
23    you have a copy of that right now?

24    A.    No.  I don't understand what you're saying.
25    It doesn't make any sense.

91

1    Q.    Are you refusing to answer?

2    A.    I've already answered your question.  I
3    don't understand what you're referring to, and I'm
4    not refusing to answer your question.  I said there's
5    no master list.  I don't know of a master list.  I
6    answered the question.  I said --

7    Q.    Why did you say "the big one, the master,"
8    in this conversation?

9    A.    I don't know.  I've been -- I'm
10    incarcerated.  I'm trying to get out of jail.  I'm
11    trying to find a bail bondsperson.  I'm working, and
12    you folks locked me up.  I mean, I don't understand
13    this.

14    Q.    Mr. Fettig, what's Black Beauty?

15    A.    I have a cat.

16    Q.    "Black Beauty is good to, you know, sit, and
17    the rest is on the move, hopefully."

18        What's Black Beauty?

19    A.    I have a cat named Black Beauty, and I have
20    a nickname for S-205.

21    Q.    Is your cat on the master list?

22    A.    No.  I don't know anything about a master
23    list, and I don't know anything about a list for what
24    you're trying to have relevance.

25        I'm answering your questions, and you're

92

1    just really -- respectfully, I can say on the record,
2    you're irritating me, because all you're trying to do
3    is to say something that's incorrect, and I don't
4    understand it.

5    Q.    Is Black Beauty S-205, did you say, or
6    S-206?

7    A.    S-205, ma'am.

8    Q.    Is that Black Beauty?

9    A.    That's my nickname for the truck.  It was
10    doing a good job.  It was kicking butt.

11        Had a job going on, and the company man
12    wanted trucks, and my mom fucked up because the
13    company man said that she couldn't get a truck when
14    he called, and then I was frustrated because I was
15    locked up, and it just -- the job fell apart.

16        And then I got back out on the job site, and
17    he said:  Hey, man.  Your guy that was driving the
18    truck, the nice black dude that was doing a good job,
19    you know, like what's going on?  Like -- like, what
20    is happening?  Like, what's going on with your
21    company?

22        I said:  I'm dealing with financial
23    troubles.  I'm good.

24        He's like:  I've got another company out
25    here.  We'll use you on the next job.

93

1    Q.    Okay. So Black Beauty, just to clarify, is
2  S-205. Is that correct?
3    A.    It's a nickname I have for the truck, yeah.
4  I mean, truck drivers generally have nicknames for
5  their trucks, I mean...
6    Q.    Let's go back to -- I'm going to go back to
7  Exhibit 5. Let's look at page Gate City 528. Okay.
8  This one. 2007 Kenworth. I believe the photographs
9  show this is S-208. Does that look --
10   A.    Uh-huh.
11   Q.    -- familiar?
12   A.    S-208 is okay, yeah. 2007, yep.
13   Q.    Okay. Can you look inside here? Do you see
14 this picture on the bottom right corner?
15   A.    Yes. It's sick. It's sickening.
16   Q.    So, to me, it looks like the innards
17 basically are ripped out of this vehicle. Is that
18 right?
19   A.    It's looking like that. Yes, ma'am.
20   Q.    And was it -- when was the last time you
21 recall seeing this?
22   A.    The latter part of 2023 when the creditor
23 took the property, obviously. Right?
24   Q.    So did Stark Energy take out the parts that
25 are -- appear to be missing in this picture?

94

1    A.    No.
2    Q.    Okay. Do you recall when -- so you think
3  this was the latter part of 2023, you said?
4    A.    Correct.
5    Q.    And it was not in this condition, you're
6  saying?
7    A.    The parts were not taken out of it, no.
8    Q.    So you have no idea how it got into this
9  condition?
10   A.    The parts missing?
11   Q.    Right. That's what I'm asking.
12   A.    I can just assume or defer that you had a
13 tow company be found with this equipment, and he
14 sells parts regularly. You can ask anybody. You can
15 get an undercover person to call Andy Yuker right now
16 and call him up and ask him: Hey, do you got a part
17 for this truck?
18         Oh, I probably do. Let me go check one in
19 my yard.
20         The dude sells parts. He's a tow -- tow
21 recovery place.
22   Q.    Let's look at -- this one is 529, Gate City
23 529, and this is one of the Dragon trailers, water
24 haulers.
25   A.    Okay.

95

1    Q.    And it looks like -- this is in the corner.
2  I believe it's 101, T-101 right there. Can you see
3  that?
4    A.    Yes, ma'am.
5    Q.    Any idea where the tires are for this?
6    A.    I don't know. I mean, they could have been
7  taken off, put on a different trailer. They could
8  have been ready to go. Could be sitting at my shop.
9  They could be at that tow yard. I don't know.
10 There's a number of things.
11         I mean, I have spare tires at my shop that
12 I've had ready to go when trucks go down, but I don't
13 know where these trailer tires are. I would assume
14 and defer, again, that you found the items on a tow
15 yard. Nine out of ten, you know, percentage of the
16 law, you know. Possession is nine out of ten. The
17 intent, this guy was trying to steal my equipment
18 because I owed him money, and he's selling parts, you
19 know? So...
20   Q.    Okay. I'm looking at Gate City 532. This
21 one is a 2012 Kenworth?
22   A.    Uh-huh.
23   Q.    I believe the picture will show that this is
24 S-209.
25   A.    Correct.

96

1    Q.    Sorry. I need a bigger screen.
2         Does that look like S-209 to you?
3    A.    Yeah. It's got the logo on there, yeah.
4    Q.    Okay. It also looks like parts are missing
5  from inside this one as well; does it not?
6    A.    That's correct. I can see the picture
7  there, ma'am.
8    Q.    Okay. Any idea what happened to those
9  parts?
10   A.    Again, like I said, I'm pretty sure that
11 this item was raped and pillaged by the tow yard that
12 it was found at. The guy sells parts regularly.
13   Q.    So Stark Energy -- are you saying that Stark
14 Energy did not remove any of these parts?
15   A.    I didn't remove any parts, no. Stark Energy
16 did not remove parts from this truck, no.
17   Q.    Okay.
18   A.    I mean, the course of its life, I'm sure
19 I've taken a part off, but I put it back on. I fix
20 things.
21   Q.    Let's move to Exhibit 6.
22         MR. VERSTANDIG: Ms. Stanley --
23         MS. STANLEY: Sorry.
24         MR. VERSTANDIG: Yeah. I need five minutes
25 at some point, and again, it has nothing to do with

97

1  this case and everything to do with a medical thing.
2       MS. STANLEY: Okay. 10:45 work?
3       MR. VERSTANDIG: Perfect. Thank you.
4       (Recess taken from 10:38 a.m. to 10:47 a.m.)
5       Q.    (BY MS. STANLEY) Mr. Fettig, Exhibit 6 is
6  an Order for Prejudgment Seizure of Collateral in the
7  Midland States vs. Stark Energy and you case. Are
8  you familiar with this?
9       A.    Sure.
10      Q.    Do you agree that this order permitted
11 Midland States to seize the 2014 and 2015 Kenworth
12 trucks?
13      A.    I don't know if it did or did not, I'm not a
14 lawyer, but...
15      Q.    You understood that Midland wanted its truck
16 back, though -- the truck back, though. Correct?
17      A.    Yeah, because -- yep.
18      Q.    Okay. And these -- the 2015 Kenworth and
19 the 2014 were S-203 and 204. Is that right?
20      A.    I don't know. You'll have to -- if you have
21 a list of something with that number on it, I don't
22 know.
23      Q.    Okay. Well, let's look at the list. 2015
24 Kenworth and a 2014 Kenworth, 204 and 203?
25      A.    Okay.

98

1       Q.    So, again, you understood that Midland was
2  trying to get the trucks back at this point.
3  Correct?
4       A.    Correct.
5       Q.    And did you and the Debtor comply with this
6  order to turn over the trucks?
7       A.    Did the -- did the Debtor -- what?
8       Q.    Did Stark Energy and/or you comply with the
9  order to turn over the trucks to Midland?
10      A.    I -- does this --
11      Q.    Please, yes or no.
12      A.    How -- how could I do that if they weren't
13 in my possession, though? But, okay. No. I did not
14 turn them over.
15      Q.    Why not?
16      A.    Because they weren't in my possession.
17      Q.    In July -- July and August of 2023?
18      A.    Correct.
19      Q.    They weren't in your possession at that
20 point?
21      A.    No. I -- no.
22      Q.    Didn't the deputy, Matt Keesler, go out and
23 find them out at Stark Energy's shop?
24      A.    He's located them -- I think he located a
25 truck at my shop, and my guy, the mechanic guy,

99

1  pulled it outside and parked it and stopped working
2  on it because he said that they couldn't work on it
3  because the bank wanted it. But I think the sheriff
4  actually said in the interrogation room, too, that
5  they had no right to be on my property, and he's --
6       Q.    I'm not asking that. I'm asking about --
7       A.    Well, I'm not -- I'm not -- I don't care if
8  you're asking. I'm telling you he had no right to be
9  on my property because in the interrogation room he
10 acknowledged that. He acknowledged that he had no
11 right to be on my property.
12      Q.    Yes or no. The trucks were out at your shop
13 when the deputy went out there to --
14      A.    I don't know. I don't know when he went out
15 there. I don't know what date you're talking about.
16 But I know for a fact he went to my property and he
17 interrogated a mechanic, and the mechanic was trying
18 to fix the truck, and the mechanic said: Well, if
19 this thing is up for repo, I'm pulling it outside,
20 and I'm not working on it, and they can come get it.
21 That's what I know happened.
22      Q.    So, yes or no, was the truck there when the
23 deputy went out there?
24      A.    Well, yeah, there was a truck on my
25 property.

100

1       Q.    And --
2       A.    That's what -- that's what the document
3  said. That's what the -- Keesler said under oath, I
4  mean. So, I mean, I don't understand it.
5       I don't find this humorous at all, really.
6  Please. I mean --
7       Q.    You'll do anything you can to avoid
8  answering the question. It's a yes-or-no question.
9  Were the trucks there when the deputy was out there?
10 Yes? No?
11      A.    You know, because I've got a pending
12 criminal case, and you're asking about equipment,
13 like I said before, I'm going to invoke the Fifth
14 because I don't need to have -- be persecuted for
15 anything that I didn't have a party to, have a --
16 have a creditor that takes my equipment. I have
17 nothing to do with that.
18      Q.    Okay. Isn't it true that the trucks were no
19 longer there the next time the deputy came out?
20      A.    Again, like I said, a creditor took my
21 equipment, so I don't know at what date you're
22 talking about when he came back out, but again, I'm
23 telling you right now that a creditor took my
24 equipment.
25      It's been found. The equipment was found on

**101**

1  a creditor's property.  I owed Andy Yuker money.  You
2  asked if I owed him money.  The equipment was found
3  on his property.  He said he was holding onto my
4  equipment and withholding it because he didn't want
5  me to -- because I owed him money, so I don't
6  understand why we're not, you know, highlighting
7  that.
8        I mean, it's all about me.  I'm the victim.
9  I'm the problem.  I'm not.  I am the victim.  Just
10  like underneath the court recordings with the Court,
11  the civil matter, where the Judge said I need to get
12  a lawyer, that I don't understand the law, and that I
13  have rights, and that what we have is creditors
14  coming at me from all angles, and that what you have
15  is a creditor versus another creditor.
16        And didn't Andy Yuker go underneath oath
17  with you guys and say that he held my equipment
18  because he thought he was owed money?  I mean...
19  Q.    Yes or no.  Isn't it true that the two
20  Kenworth trucks, 203 -- S-203 and S-204, were no
21  longer at the shop the second time the deputy went
22  out there?
23  A.    Is it true that they were taken from my
24  shop?
25  Q.    They just weren't there the next time the

**102**

1  deputy went out there?
2  A.    Well, I don't -- what did he say?  He was
3  there.  If they weren't there, they weren't there.  I
4  don't understand the question.  I mean, I literally
5  don't.
6        There's -- there's nothing to infer I had
7  anything to do with a creditor taking my property
8  except for your assertion.  And you're continually
9  asking the same question over and over and over just
10  to try to assert your opinion.  An opinion is not a
11  fact.  A fact is the equipment was found on a
12  creditor's property, not my property.  Not with my
13  free will.  I didn't have free will.  I didn't have
14  free control of the equipment.
15        I don't even own a tow truck.  The truck was
16  in the process of being repaired.  The truck was
17  taken out of my shop and left so somebody could come
18  get it, as a creditor could come it, your creditor.
19  He said he would not work on it.  The guy left my
20  shop.  He said:  If your company's failing, I'm not
21  working for you.
22  Q.    So, Mr. Fettig, you're again -- let's go
23  back to the time period you were picked up on the
24  bench warrant and incarcerated.  Would you agree that
25  occurred October 20th to the 23rd of 2023?

**103**

1  A.    Okay.  Yeah.  I got -- I got arrested.  Yes,
2  I got arrested.  I got arrested trying to get my hair
3  cut.
4  Q.    And at that hearing, the bond hearing, which
5  occurred on a Monday morning, do you agree that you
6  testified you did not know where the trucks were?
7        MR. VERSTANDIG:  Object to the form of the
8  question.
9        You may answer if you're not invoking an
10  applicable constitutional privilege.
11  A.    Yeah, I'm going to invoke my Fifth
12  Amendment, because you have anything and everything
13  you need in that.  You just read facts, so I'm not
14  going to expound on that.  You said that I did
15  something, it's on the record, and I'm not going to
16  expound on that.  I don't have to.  And I'm legally
17  required not to because it would infer things that
18  are untrue.
19  Q.    (BY MS. STANLEY)  Okay.  Let's go back to
20  the phone calls that you had with your mother during
21  that time period.  You made mention -- let me stop
22  this sharing of the screen -- of Black Betty, and
23  we've determined that that is a nickname you gave to
24  S-205.  Is that right?
25  A.    Yes.  A truck.  Yep.

**104**

1  Q.    And did you ask your mother to get Black
2  Betty off the Stark Energy premises?
3  A.    No.  Back on the job site.  I had a job
4  going on, like I said.  I had a job, and the job was
5  not going well because I wasn't there.  Need to keep
6  trucks on the job.  We can't have them sitting at the
7  shop.  The job's like three hours away or two and a
8  half hours away.  It's retarded.
9  Q.    You made mention, reference to the white one
10  and the silver one.  What are those?
11  A.    I don't know what you're talking about.  I
12  don't even own a silver truck.
13  Q.    Okay.  Let's take a look again at your
14  conversation.  Did you -- you made reference,
15  cryptically, to a friend whose dad recently died.
16  Who is that?
17  A.    What?
18  Q.    "My friend whose dad recently died."
19  A.    I have a friend in Texas.  His dad died.
20  What about it?
21  Q.    That's who you believe you were talking with
22  about your --
23  A.    No.  I'm talking to my mom on a call, is
24  what you said.  Right?  So...
25        My mom doesn't understand mechanics of

105

1  trucks, and they were having an issue with one of the
2  lights on the truck or something like that, and I was
3  asking her to try to, you know, get the trucks back
4  on the job site so I can get work, so I can keep
5  work, so I can stay busy.  You can't work at the
6  shop.  It's not -- you know, Stark Energy is not a
7  shop.  It's a trucking company.  And I had a really
8  good job with good money.
9      Q.   Okay.  Let's go back to the transcript.
10     A.   Okay.
11     Q.   You're telling your mom, "What the fuck is
12 going on with my friend that his dad died?"
13          "You know --"
14          "Have you not talked to him?  Doesn't return
15 your calls, or --"
16          Who were you talking about here?
17     A.   A good friend of mine, Cody, in Texas.  He's
18 a mechanic.
19     Q.   And his dad died?
20     A.   Yeah.  I mean, yeah, his dad died, but I
21 don't see the relevance in that.
22     Q.   Is your friend Cody here in North Dakota or
23 is he in Texas?
24     A.   He's in Texas.
25     Q.   Okay.

106

1      A.   He's also a driller.  He's a buddy of mine.
2  Works in the oil field.
3      Q.   "So now let me ask you a question.  Is my
4  friend not receptive, or what?"
5          What were you asking --
6      A.   I'm trying to get the drilling rig down to
7  Texas to go to work.  I was trying to work.  I was
8  trying to find work.  I'm always supposed to be
9  finding work.  Every day you work, you find work.
10 You go do sales calls, you go on the job sites, you
11 make people happy.  They call cousins, friends, and
12 family, and they find more work for you.
13          I just talked to somebody yesterday, and I
14 got a phone call just while we were doing this about
15 me working in Killdeer, just a little bit ago, but I
16 can't go to work because I've got to be here,
17 respectfully.  I'm not trying to be rude.
18     Q.   Here's another one that says, "There's a
19 white item, a black item, and a fucking silver item.
20 All three need to be taken care of."
21          What did you mean by that?
22     A.   I don't know.  I know I was telling her to
23 work on the trucks and trying to get something fixed,
24 and I know one of the trucks had a tag axle that
25 wasn't working.  I don't even know if that's correct

107

1  in what I was saying.  I know that I couldn't hear
2  her.  I don't know if it put correct audio.  I'm not
3  trying to be rude, but I just know that a lot of
4  times that phone cut off of, if this is a phone.
5      Q.   What is the white item, the black item, and
6  the silver item?
7      A.   I don't know.  You're talking about October
8  of last year, ma'am.  I don't know.  But I do know my
9  friend Cody lost his dad.  I do know he's a driller.
10 I was trying to get him to get on board with helping
11 me get my drilling rig working because he's getting
12 screwed over by his boss.  He's supposed to get a
13 promotion, and he's not getting it, and they're going
14 to sell the company.
15     Q.   Here's another one.  "Did you talk to my
16 friend?  Is he gonna get things handled, or what?"
17     A.   Okay.  Again, like, referring to getting
18 work in Texas with the drilling rig.
19     Q.   So you're -- you really -- that's your
20 response, is that your friend Cody in Texas is who
21 you told your mom to talk to?
22     A.   Yeah.  Because I've been trying to find work
23 for the drilling rig, I've been trying to negotiate
24 terms on that job, and I found work for it.
25          We had a job that was supposed to kick off,

108

1  but I -- it doesn't -- the rig got stolen from me,
2  but -- by another shady tow company.
3      Q.   Do you know if your mom contacted Andy
4  Fettig at this point in time while you were
5  incarcerated?
6      A.   Andy Fettig?  I don't know an Andy Fettig.
7  What?
8      Q.   Did you instruct your mother to contact Andy
9  Yuker while you were in these conversations?
10     A.   No, not in this conversation at all.  No.
11 I've asked her to, you know, maybe call him in the
12 past for -- like if repairs were needed or something
13 needed to be towed because it was in the ditch
14 because he had a tow company; but, no, I didn't --
15 don't recall talking to her about calling Andy.  I
16 don't even know what he would be doing in this.
17          I know I needed to get the trucks back on
18 the job and they were pissed off at the -- taillights
19 on the one truck weren't working, the turn signal.
20 I don't know if you're talking.  I can't
21 hear you.  I see your screen, though.
22     Q.   When did you first meet Andy Yuker?
23     A.   I had a tow need.  I met him probably in,
24 I'd say, 2018.
25     Q.   So you met him through asking Yuker Towing

109

1  to come in and tow something?
2      A.    Yeah.  Yeah.  Somebody recommended him.
3      Q.    Do you know if Andy Yuker's dad passed away
4  last year, in May of 2023?
5      A.    Yeah.  His dad did pass away.  I was
6  supposed to go to his funeral but I didn't because I
7  was busy chasing work, and he said he understood.
8      Q.    And you're sure that he's not the friend
9  whose dad recently died in these conversations?
10     A.    Yeah, I'm very sure.  I'm 100 percent sure.
11 And I know we're back from a break, but just so the
12 court reporter knows, I'm under oath.  And I was
13 talking about a job in Texas, trying to get a
14 drilling rig working; so, yes, pretty sure about
15 that.
16     Q.    How did --
17     A.    That -- go ahead.  Sorry.
18     Q.    How did you typically communicate with Andy
19 Yuker?
20     A.    Call him.
21     Q.    Did you text him as well?
22     A.    Not -- not really.  Not often, no.  I
23 usually called.  His wife would usually answer the
24 dispatch phone.
25     Q.    Do you recall being asked to turn over your

110

1  cell phone at the hearing in November, on
2  November 14, 2023?
3      A.    No, I don't recall that.  I do recall you
4  asking for text messages, and I provided those to my
5  lawyer.
6      Q.    So you did have text messages with Andy
7  Yuker, though?
8      A.    No.  I had a text message, and you said that
9  it wasn't pertinent because it wasn't for the
10 timeframe.  You already know about this, ma'am.  You
11 literally saw the text message that was given to you
12 because I know it was given to you because nobody's
13 going to withhold information from you.
14     Q.    What type of phone do you have?
15     A.    A --
16     Q.    TracFone?  AT&T?  Verizon?
17     A.    I have a TracFone right now.
18     Q.    Is that a question, or is that your answer?
19     A.    I have a TracFone right now, yes.
20     Q.    What is the phone -- what is the number for
21 that?
22     A.    I can get the number for you.  I've got the
23 number on a Verizon phone, too.  Hold on a second.  I
24 don't understand the pertinence of this.  It's --
25 whatever.  Makes no difference to me.  A second.

111

1  I've got to look this up.  (701) 300-3336.
2      Q.    That's the TracFone number?
3      A.    No.  That's a Verizon phone.  The TracFone's
4  upstairs.
5      Q.    Do you have another phone that is (952)
6  210-6610?
7      A.    Yeah.  I had that phone before, yep.
8      Q.    What happened to that phone?
9      A.    I still have it.  I just -- I don't -- I
10 don't use that phone, really.
11     Q.    When was the last time you used it?
12     A.    I don't know.  Couple weeks ago.  I used it
13 a little bit ago today, even, I think.  I mean, I
14 have more phone plans, but I don't understand the
15 relevance.  I used the (701) number I gave you for
16 work, but...
17     Q.    Is this the phone that you provided the text
18 messages to your attorney?
19     A.    No.  I provided the text messages from a
20 (701) 300-1558, I think.  That's my dispatch phone.
21 And I provided the text message from the (952)
22 210-6610, so...
23     Q.    You did provide text messages from the (952)
24 210-6610?
25     A.    I don't even know if there was a text

112

1  message from that phone, but I provided whatever
2  phone text messages I had between me and Andy Yuker,
3  and you already have that in your possession.
4      Q.    How did Stark Energy receive invoices and
5  bills from Yuker Towing for the work it had
6  performed?
7      A.    Andy Yuker told me a long time ago he didn't
8  want to cause me financial hardship, and he said that
9  I was going to be able to receive towing services
10 from him, but eventually I needed to make sure I paid
11 up on my bill.
12          So I would randomly get a phone call from
13 him: Hey, man.  You need to give me some money.  You
14 know, you owe me money.
15          And I'd give him a check for two, three
16 grand, or something like that.  Because I've been
17 struggling for this last, you know, year and a half,
18 two years with these predatory lenders that I was
19 involved with.
20     Q.    Please stop.  The question was -- let me
21 rephrase the question.
22          Did Yuker Towing provide you with bills?
23     A.    I think I have one bill from him that I
24 recall finding, and I think I've actually given that
25 to you, too, or -- or I -- I did a dollar amount.  I

---

113

1  did a dollar amount on the -- on the schedules,
2  $27,000, but he said it's $70,000, so I don't know.
3      Q.   Okay.  How did you get the bills?  Mail?
4  Email?
5      A.   I didn't get bills.  Andy Yuker a long time
6  ago said he didn't want to have any problems with me.
7  He didn't want to have me think that I was going to
8  be an adversary of his, get a tow truck.  He knows
9  I'm a hard worker.  He wanted to keep doing the
10  towing.
11          He just wanted to help me out.  He said:
12  Hey, you're a hard worker.  I respect you.  I know
13  you're going to get your business turned around.
14          So, again, I don't recall receiving actual
15  bills from him like the rest of my creditors, you
16  know.  I don't.  And I'm telling you that, testifying
17  to that, whatever.
18      Q.   So you said you have one.  Is that correct?
19      A.   Yeah, I do.
20      Q.   Can you provide that to your attorney to
21  turn over to us, please?
22      A.   I don't know.
23          THE WITNESS:  Can I?  Are you objecting?
24      Q.   (BY MS. STANLEY)  You have been requested to
25  turn over documents.

---

114

1      A.   Okay.  Well, I already, like, turned that
2  over then, or I can.  Yes, that's fine.
3      Q.   The only documents I've received from you is
4  about six text messages, Mr. Fettig, so I would
5  appreciate --
6      A.   Okay.  So I get the bill --
7          MR. VERSTANDIG:  Whoa, whoa, whoa, whoa.
8  Ms. Stanley, in which proceeding is there a
9  document request?
10          MS. STANLEY:  This one.
11          MR. VERSTANDIG:  Okay.  It was directed to
12  Mr. Ahlgren, I assume?
13          MS. STANLEY:  Yes.
14          MR. VERSTANDIG:  Okay.  To the extent the
15  request for production was properly issued, was
16  timely, and includes a request that would encompass
17  any bill or invoice from Yuker, Stark Energy will
18  endeavor to respond by producing responsive materials
19  if they're in the possession, custody, and control of
20  Stark.
21          If any of those criteria are not satisfied
22  or it's otherwise objectionable, we will, of course,
23  confer and respond appropriately in a court with the
24  Federal Rules of Bankruptcy Procedure and, to the
25  extent requisite or necessary, the Federal Rules of

---

115

1  Civil Procedure incorporated in the Federal Rules of
2  Bankruptcy Procedure.
3          MS. STANLEY:  Thank you.
4      Q.   (BY MS. STANLEY)  Mr. Fettig, would this
5  bill be -- where would it be?  Is it in paper form?
6      A.   I don't know.  I've got to find it.
7      Q.   You have no idea if it's in paper form or if
8  it's electronic?
9      A.   I think he printed it out.  I think he
10  printed it up and gave it to me.
11      Q.   So you first started towing -- or using
12  Yuker Towing in -- is it 2018?
13      A.   I believe so, yeah.  I was in the ditch.
14  Yep.  Or our driver was, yep.
15      Q.   So from 2018 through 2023, he issued you one
16  bill, Yuker Towing?
17      A.   That I can recall, yes.  Like I said, it
18  wasn't one of those things.  It was like I respected
19  him with his business: he's running his business, I'm
20  running mine.  Hey, man.  I need you to pay on your
21  tab.  You owe some money on some tows.  I need you to
22  pay some money.  What can you pay?
23          Three or four grand, two grand here, you
24  know, it's just -- I do recall that being the case,
25  yes.

---

116

1      Q.   Okay.  What is the -- can you explain what
2  the Yuker Towing lot at 3046 Highway 22 is like?  Is
3  there, you know, like a locked gate or a privacy
4  fence or anything like that?
5      A.   I don't know what address on 22.  I know
6  he's got a shop south of town, and -- he's got two
7  shops south of town, actually.
8      Q.   So are you -- this is the location, 3046
9  Highway 22, where all of the collateral was seized in
10  March of 2024.  Are you --
11      A.   Are you talking about his house?
12      Q.   No.
13      A.   Yeah, that's where his house is.  He has a
14  house there, too.  He bought that, too.
15      Q.   Highway 22?
16      A.   He has a house off 22, yeah.  A home --
17  there's a home there, and there's a yard in front of
18  it with a bunch of his equipment there.
19      Q.   Okay.  And have you been there?
20      A.   Yeah, I've been to his house before.
21      Q.   Okay.  How many times?
22      A.   I don't know.  A handful of times.
23      Q.   Okay.  And is there a locked gate or a
24  privacy fence?
25      A.   No, not to my knowledge.  You just roll in,

---

117

1  roll out.
2      **Q.**   Did you ever ask Andy Yuker if you could
3  park your -- Stark Energy could park its equipment at
4  that location?
5      **A.**   In what year, I guess?  I don't understand.
6      **Q.**   In 2023.
7      **A.**   I think I parked a truck there, because I
8  was at the truck stop, and I didn't trust the truck
9  stop, yeah.  S-211, I parked it there.  I parked the
10  205 there as well.
11      **Q.**   So is the answer "yes," you have asked
12  Mr. Yuker if you can park equipment there?
13      **A.**   No.  I didn't ask him specifically if I can
14  stash equipment there, if that's what you're asking.
15  No, I never asked him that at all.
16      **Q.**   Did you --
17      **A.**   If you're going to go down that slippery
18  slope, I'm just going to plead the Fifth, because I
19  don't want you to be inferring anything.
20          This guy stole my equipment, and I'm not
21  going to be prosecuted for his problems.  He's going
22  to get brought up on federal charges, too.
23      **Q.**   So let's just make sure I understand.  What
24  you're asserting the Fifth to is -- my question was:
25  Did you ever ask Mr. Yuker, in 2023, if you could

118

1  park equipment there?  Is that what you're asserting
2  the Fifth Amendment on?
3      **A.**   Well, I have a criminal case pending, so I
4  think it would be pretty stupid for me to answer
5  that; so, yes, I'm asserting the Fifth because
6  everybody's inferring that I had anything to do
7  with --
8          MR. VERSTANDIG:  Hold on.
9          If you're going to take the Fifth, without
10  advising you individually, let me just point out you
11  normally don't give an accompanying explanation.
12      **A.**   Okay.  I'm pleading the Fifth.  That's what
13  it is.  I plead the Fifth.  There you go.
14      **Q.**   (BY MS. STANLEY)  Okay.  Did you -- did
15  Stark Energy regularly park its equipment there in
16  2023?
17      **A.**   No.
18      **Q.**   And you earlier said something about S-211
19  and S-205 being parked there.  Is that correct?
20      **A.**   Across the street at the truck stop.
21      **Q.**   I thought you said that you didn't trust the
22  truck stop so you asked to park it at Yuker's.
23      **A.**   I did, yeah.  I asked him.
24      **Q.**   Okay.  Just those two pieces?
25      **A.**   That's correct.

119

1      **Q.**   Let's take a look again at -- or let's take
2  a look at Exhibit 10.  Is that right?  Oh, I'm sorry.
3  Wrong one.  Okay.
4          You did mention, I believe, that you have a
5  phone, (952) 210-6610.  Correct?
6      **A.**   What is it?  Sorry.
7      **Q.**   (952) 210-6610.
8      **A.**   Correct.
9      **Q.**   Okay.  And I will tell you that these text
10  messages were turned over by Andy Fettig [sic].  They
11  are text messages between you and him.
12      **A.**   Okay.
13      **Q.**   Okay.  Let's take a look at what's marked
14  Gate City 007, and I believe it's June 18th of 2023,
15  a text message from you to Mr. Yuker.
16          Will you tell your repo fellows to chill to
17  someone's out there walking up to my drivers.  I was
18  like great.
19          So do you recall this?
20      **A.**   Yeah, I see the text message.
21      **Q.**   Do you recall that repossession officers --
22  or repossession companies were looking for --
23      **A.**   Yeah, I recall a driver was approached in
24  S-211, and it was free and clear, and he was pissed
25  off, and he wanted to know where the rest of the

120

1  trucks were.
2      **Q.**   So --
3      **A.**   And then my driver said that I -- I was
4  going to lose S-211.
5          And I said:  Where are you at right now?
6  That truck's free and clear.  There's no way I'm
7  losing that truck.
8          And then he said:  I'm walking off the job.
9  Here's the keys.  You know?
10      **Q.**   But you're positive it was -- the repo
11  person was only looking for S-211, or was he --
12      **A.**   Oh, he's probably looking for equipment that
13  was, like, underneath the -- the loan agreements from
14  any bank.  I know that my -- the repo people were
15  calling my customers.  You guys went into Martin
16  Construction's place of business, and they won't even
17  work with me now because of it.
18      **Q.**   So there's some more conversations between
19  you at the bottom.
20          I was worried they were going to contact
21  another wrecker company.  It's none of my guys.  Repo
22  brokers are like hound dogs.
23          Do you recall this conversation?
24      **A.**   Yeah, I recall.  Like I said, he contacted
25  me and said that my trucks were up for repo and that

121

1  I should watch my ass, and he instructed me not to
2  park my truck at the shop.
3       And I said:  Well, it doesn't make a
4  difference.  It's free and clear.  S-211 is free and
5  clear.
6       Q.   So your comment about tell your repo fellows
7  to chill, was that his --
8       A.   Well, they were spreading bad will.  They
9  were like -- what is it called?  They were going up
10 to a truck that's free and clear, harassing my
11 driver.  My driver didn't know if he wanted to
12 believe me or not, but I told him I could bring him
13 the title, the truck's free and clear, and he said he
14 didn't care.  He was going to walk off the job.
15      Q.   Let's look at number -- Gate City 10.
16 Here's your -- this is dated July 21, 2023.
17      Can I move a truck to your lot?
18      Did you ask Mr. Fettig this -- or, I'm
19 sorry -- Mr. Yuker this?
20      A.   Yeah.  Can I park my truck there, my S-211
21 and S-205?  Yeah, I'm sure.
22      Q.   And you're positive it was just S-211 and
23 S-205?
24      A.   Those are the only trucks I was running
25 because I was like -- I don't know.  I was trying to,

122

1  like, not -- what do you call -- I was trying to work
2  with what I had so I could pay off stuff.  Like when
3  I was able to pay off the bank loan with Gate City
4  with the shop, you know, I was able to get that
5  current, and then I was happy.
6       And then I was like:  Oh, I can start paying
7  off this other loan, and then I can ask for that
8  back, and then I can -- you know, because creditors
9  have your equipment, you can't use it, you know,
10 so...
11      Q.   So you're saying that you were not using any
12 of the equipment for Gate City at this timeframe?
13      A.   Correct.
14      Q.   And this is July of 2023.
15      A.   Okay.
16      Q.   Do you agree that you weren't using the
17 equipment in this timeframe?
18      A.   Yeah.  I was -- I'm agreeing to that, yes,
19 ma'am.
20      Q.   Where was it at the time, then?
21      A.   Again, I don't know how to answer that
22 question because I have a pending criminal
23 investigation, but I have nothing to do with the guy
24 that repo'd my equipment and held it ransom because I
25 owed him money.  I have nothing to do with that.

123

1       Q.   So are you asserting your Fifth Amendment to
2  not answer that question?
3       A.   (No audible response.)
4       Q.   Where was the Gate City equipment at this
5  time, in July of 2023?
6       A.   I mean, it's pretty evident that Andy Yuker
7  repo'd my stuff because he was owed money, so...
8       I mean where was it at?  Where did you find
9  it at?  You know?  I didn't do anything with that.
10      Q.   Okay.  So you're absolutely positive you
11 weren't using Gate City's equipment from July of 2023
12 and onward?
13      A.   Correct, until I found some of the equipment
14 that was missing.
15      Q.   Okay.  So he said:  Yeah, if you want to
16 park it at my place, that's fine.  So --
17      A.   I mean, if you -- if you want to infer
18 something here -- and I'm not trying to be too
19 helpful to you, but think about something.  If a
20 truck left my shop and it was being worked on,
21 there's going to be video surveillance of him taking
22 equipment with his tow truck.  He's a tow operator.
23 This guy towed the stuff.  "Andy Yuker" on the side
24 of the thing.  He's a tow company that informed me
25 that my stuff was up for repo, and then he's -- he's

124

1  owed money.
2       And you go back to the court case where I'm
3  in front of the Judge, and then the Judge says:  You
4  have creditor-creditor-creditor war.
5       You have a creditor situation where Andy
6  Yuker was like:  I'm owed money.  I'm taking your
7  stuff.  You don't have access to it, which I don't no
8  if he's going to lie to that, I'm sure he's going to
9  lie to that, but he didn't give me access to
10 anything.
11      It's quiet.  I can't hear anybody, but
12 whatever.
13      Q.   On this day, then, do you recall putting a
14 truck on his lot, July 21, 2023?
15      A.   No.  I don't recall doing that on July 21,
16 2023.  I recall asking him.
17      Q.   Okay.  And it was -- and you believe it was
18 only because you were worried about the truck stop
19 across the street?
20      A.   I had a fuel tank that was drained.  I
21 thought somebody stole my fuel.
22      I had a hose missing -- you know what I'm
23 saying? -- when I was going through my side box, and
24 I was like:  Where's my air hose that I add air to
25 the tires?  I thought stuff was stolen.

125

1    Q.    What is the point in time when you think
2    that Mr. Yuker allegedly started seizing your
3    equipment?
4    A.    Again, like I said, the equipment left my
5    shop in the latter part of 2023, so if you went to my
6    shop and it was not there, guess who took it?  Not
7    me.  I don't have a tow truck.  I don't have the
8    means to move a bunch of equipment.  I'm out working
9    with my little truck, you know, two trucks, chasing
10   work, you know?
11   Q.    And there's no -- I mean, were you offering
12   him to hold some of this equipment as collateral --
13   A.    No.  No.  No.  I will -- I will attest to
14   that.  That man is a fraud, and I have been trying to
15   call my attorney, and that dude is -- he tried -- I
16   just stuck in this -- no.  I -- I did not do that.
17   Dude tried to seize my equipment.
18        I tried to sell him part of the business.  I
19   tried to pay off creditors.  I tried to do what I was
20   supposed to do.  Never sell --
21   Q.    Has he helped you out with trying to rent
22   out frac tanks?
23   A.    Yes, he was supposed to rent out frac tanks,
24   but he was supposed to have been renting them out
25   since he came and got them from my shop.

126

1    Q.    So he's currently -- or they're currently
2    out on rent somewhere?
3    A.    For him, yeah, through a company called Pale
4    Horse, Pale Horse Trucking, through him.  Pale Horse
5    Trucking is with Andy Yuker, and I think he was
6    working for Marathon Oil and Gas.
7    Q.    And did you agree to turn these over to him?
8    A.    I agreed because the trailer -- the frac
9    tanks were free and clear, and I didn't think I'd --
10   there was nothing wrong with that.  I was trying
11   to -- you know, he said that I could make some money
12   off of it.  I never was paid any money, but then I
13   owed him money, so I didn't think it was like -- I
14   couldn't demand money.  I couldn't say:  Hey, man.
15   You need to pay me those rental payments.
16        I thought that was helping him pay down on
17   his debt that I owed him.
18   Q.    Were the frac -- did they need to be fixed?
19   A.    No.  They're towed.  They're towed.  He said
20   that a flange, a flange, like a little, small metal
21   flange cracked, but, you know, it can be cracked
22   because you're running water through it and it
23   cracks.  You fix it.  It's like a $30 part.  I don't
24   know about fixing a frac tank.  I mean, you air up a
25   trailer tire or something, though.

127

1    Q.    Okay.
2    A.    You've only got two of the tanks.
3    Q.    I'm looking at Gate City 25.  It's a little
4    further down here.  Whoops.  Wrong one.  This is
5    Monday, July 31st.  You said:  Need you to call me.
6        Please ASAP.
7        1694 code.
8        What is the code?
9    A.    I don't know.  Honestly, I don't know.
10   Q.    Is that the code to the shop?
11   A.    It could be a code to the shop, but the code
12   changes to the shop so often, so I don't know.
13   Q.    Okay.  Is it a four digit code to the shop?
14   A.    Yeah.  It's a four digit code, yeah.
15   Q.    And his response was:  K.  I'm here.
16        Do you know what this conversation was
17   about?
18   A.    Like I said, he's fixed equipment before, so
19   he probably could have been fixing something, helping
20   me fix something.
21   Q.    So he would typically go out to the shop to
22   help you fix something?
23   A.    He pitched in a couple times.  He helped
24   wire a -- he helped wire up a truck once for me, and
25   then when I -- in 2018 when I was doing the truck

128

1    then he helped me put my first LED lights on a truck,
2    but that's not 2018 now, you know?
3    Q.    Okay.  Let's look at Gate City 28.
4    Saturday, August 5th, you said:  Need to move items.
5        What items did you need to move?
6    A.    I -- I don't know.  I know I had to pick up
7    something, like physically pick up something.  I
8    couldn't fix something.
9    Q.    So you had to pick something up?
10   A.    Yeah.  Like yesterday I had to move some
11   tires because I had to move my truck inside the shop
12   because of hail, you know, so...
13   Q.    So he responded:  Okay.  Someone come by.
14        Were you asking him to move something from
15   somewhere?
16   A.    No.  I'm not asking -- if I was -- if I
17   asked anybody to move something from somewhere, I'd
18   give them a GPS pin coordinate, you know?
19   Q.    So it's not possible that at this point you
20   said, "Can you come pick up some equipment from the
21   shop?"
22   A.    No.  I -- I wouldn't tell him to pick stuff
23   up from the shop.
24   Q.    You responded -- Okay.  Someone come by.
25        And then he said:  That was a question.

129

1    And then you responded:  No, not as of yet,
2    but like you said, that would be a smart play.
3        What's the smart play?
4        A.    I don't know.  I don't even know what this
5    is about.  This is in August of 20- -- 2023.  He was
6    telling me to rent out my frac tanks, and he was
7    telling me to, you know, try to find work.  I mean,
8    we were always talking about work, so I don't know
9    what the smart -- the smart play would be to go and
10   find work, I guess.  I don't know.
11       (Delene Fettig joined the deposition.)
12       Q.    (BY MS. STANLEY)  Okay.  Let's look at
13   Gate City 032.
14       MR. VERSTANDIG:  Ms. Stanley, let the record
15   reflect Delene Fettig has joined us, and I believe
16   that's because her deposition is noticed for two
17   minutes from now.
18       MS. STANLEY:  Ms. Fettig, can we let you
19   know when to log back in?  I apologize.
20       DELENE FETTIG:  Okay.  And how are you going
21   to let me know?  I had a hard time getting into this
22   part.
23       MS. STANLEY:  How about if we go -- yeah, I
24   probably have about another hour.
25       DELENE FETTIG:  Oh.

130

1        THE WITNESS:  Can I get five minutes so I
2    can take a piss?  Excuse my language.
3        MR. VERSTANDIG:  Off the record.
4        (Recess taken from 11:29 a.m. to 11:35 a.m.)
5        (The proceedings resumed without the
6    presence of Delene Fettig.)
7        Q.    (BY MS. STANLEY)  This is back on
8    Exhibit 10, Gate City 032, and this is an August 8th
9    text message to -- from Mr. Yuker to you.  He said:
10   Just wondering about sending a guy to move trailers.
11       Do you know what that meant?
12       A.    What's that?
13       Q.    He made the comment:  Just wondering about
14   sending a guy to move trailers.
15       Do you know what that meant?
16       A.    No.
17       Q.    Did he send someone to pick up some
18   trailers?
19       A.    I don't know if he did or not.  I don't know
20   what he did, so...
21       Q.    So you have no idea what that meant?
22       A.    Honestly, no.  I mean, it's just a text
23   message, so...
24       Q.    Okay.  Further down, August 14th, you asked
25   him to give you a call and said:  Do not talk to Matt

131

1    until you talk to me.
2        What was -- what were you going to talk to
3    him about?
4        A.    I was trying to talk to Matt about coming
5    back into the business and taking a part of the
6    business, like be part of the business.
7        And me and Andy Yuker also talked about him
8    taking part of the business, like -- not taking the
9    business, not taking -- I did not condone any taking
10   of my equipment, I can promise you that, but I was
11   thinking that they had, like, good intentions.  Like,
12   Matt used to be my previous business partner.  He's
13   like:  Hey, man.  You fell on hard times.  You know,
14   I can help you out.  I'm pretty wealthy.  I can make
15   something work.  Let's get this caught up.  You're a
16   good dude.
17       I can -- I don't want to be doing stuff on
18   the side, though.  I want to do it above board.  And
19   I said:  I want you to be a percentage owner of the
20   business.
21       And I talked to Matt, and Matt told me that
22   he was going to wire the money to Gate City Bank --
23   if this is the right timeframe.  You can confer with
24   Ms. Stepheny Reger.  And Stepheny Reger talked to
25   Matt, and she said that:  You know, Matt used to be

132

1    your business partner.  He can wire the money.  I'll
2    give you guys some time to talk out the details.
3    That would be good.
4        And then my mom and/or Matt and/or Andy all,
5    like, literally said:  Do you know what?  It would be
6    better for you -- you and Matt and Andy to be part
7    owners of the business because Matt is, like, this
8    minded, you're that minded, and Andy's this minded,
9    and it can work out, and you guys can all benefit and
10   prosper.
11       And I said:  Be -- be part of the business.
12       And he agreed to sit down with me and have a
13   conversation with me as to me putting him onto the
14   business.  And then he flat-out told me during the
15   conversation that he didn't have the money.  But I
16   was like:  Well, why are we even talking, dude?
17       And then that's what Matt said.  Matt said:
18   I can't give you the money.  I can't do this anymore.
19       And then Andy seemed like he was leading me
20   on about coming on board, taking a part of the
21   business, too.
22       So I just think that they were both trying
23   to take my equipment from me, you know, like -- if I
24   was going to agree to sell them the business, then
25   they were going to agree to push me out of the

133

1  business, if that makes any sense.

2  **Q.**  On -- this is Gate City 34.  August 28th, he

3  asks you:  What's going on with the truck you're

4  using?

5  Do you know which truck he was referring to?

6  **A.**  S-211 or S-205, the two trucks I was using.

7  **Q.**  Gate City 34.  I'm sorry.  38.  Gate City

8  38.  This is September 27th.  He says:  You got some

9  belly dump work or you sell the trailers?

10  Do you recall this?

11  **A.**  I'm looking at it, yes, ma'am.  I see it,

12  yep.

13  **Q.**  Okay.  And were you -- and you said:  Yep,

14  chasing -- working on chasing work, been hell.

15  So were you -- did that mean you were

16  working?  You weren't working?  What did that mean?

17  **A.**  I -- September?  I'm pretty sure I was

18  working, but it was limited, probably.  Maybe.  I

19  don't -- I don't know at that time.

20  I know that it was like hell because people

21  were -- you know, like I said, I -- the Stark County

22  sheriffs went into -- and I'm not trying to digress,

23  but they went into, like, Martin Construction's shop,

24  and they said, "Are you holding on to his equipment?

25  You're hiding and stashing it for him."

134

1  And I was like, "That's retarded.  Why would

2  I ask anybody to do that?"

3  Third of all, that's a 50-year-old company.

4  Now I can't work there, you know.  Martin

5  Construction won't work with me because of the

6  inference of all this stuff, you know?  They --

7  people are saying, "Do you pay your bills?"

8  And I was like, "Yeah, I'm paying my bills.

9  I'm trying to get work, and I pay the bills," I said.

10  I said, "It all comes in."

11  **Q.**  So I think earlier you said that you weren't

12  using any of Gate City's collateral at this point,

13  from July onward.  Did you have some belly dumps that

14  were other than Gate City collateral?

15  **A.**  I have a friend of mine that I've borrowed

16  some of his equipment before.

17  **Q.**  What's this friend's name?

18  **A.**  What?

19  **Q.**  What is this friend's name?

20  **A.**  What -- what friend?

21  **Q.**  Well, you said you have a friend that has

22  some belly dump work.  Were you borrowing this

23  friend's belly dump?

24  **A.**  I was planning on borrowing it.  I've been

25  planning on borrowing lots of people's equipment and

135

1  working with it, but everybody seems to not have

2  work.  There's a guy up in Killdeer right now, and

3  he's hauling frac sand, but you have to have, you

4  know, three or four trucks to be on the job, so...

5  **Q.**  So are you saying that you were not doing

6  belly dump work at this time, or were you?

7  **A.**  No.  I was chasing belly dump work.  I was

8  looking for belly dump work, for a frac sand

9  opportunity, but in September, as you can see, it's,

10  like, the end of the season, so I was chasing work.

11  I mean...

12  **Q.**  And you did or did not have the Gate City

13  collateral at this point?

14  **A.**  I -- I didn't have the -- I don't recall.  I

15  don't recall having the equipment in my possession

16  because, again, like I said, that the -- the bad

17  actor, the person that was trying to take my

18  equipment and change titles and do a bunch of illegal

19  stuff that I had nothing to do with.

20  **Q.**  What about the bad actor?

21  **A.**  I don't know.  You found the equipment on

22  his property.

23  **Q.**  So did you not -- I mean, you were obviously

24  corresponding with him at this point in time.  Do you

25  know if he had done the bad acts at this point in

136

1  time?

2  **A.**  I wasn't aware of it at that time, no,

3  ma'am.

4  **Q.**  When did you first become aware that he was

5  the alleged bad actor?

6  **A.**  I -- I can say that I -- I can say without

7  conviction that I was made aware of it during the

8  fact that he -- he took the equipment because he was

9  owed money, so...

10  **Q.**  And my question was when?

11  **A.**  I don't have a date.  I don't recall.

12  **Q.**  How did you become aware?

13  **A.**  Well, I got a phone call on March 15th that

14  said, "Andy Yuker is not going to get paid the money

15  he's owed."

16  And I said, "Oh, yeah?  How is that

17  possible?"

18  **Q.**  Who did you get the phone call from?

19  **A.**  Andy Yuker's -- what is it?  There's a guy

20  that works in the field, his name's Chris, and he

21  said that Andy Yuker was upset and thinking he was

22  going to get in trouble for holding on to your

23  equipment because he wasn't filing the proper

24  paperwork and he's probably going to get in trouble.

25  **Q.**  All right.  And --

137

1    **A.**   And I said: It's not my problem. If he
2    decided to take the equipment, I mean, he gets in
3    trouble, it's not my problem he gets in trouble. I
4    didn't have nothing to do with him getting in
5    trouble.
6    **Q.**   You're telling me that you had no idea he
7    had any of this equipment from -- until March 15,
8    2023?
9    **A.**   I think with the pending case that I have
10   going on, I don't need to, you know -- I need to
11   plead the Fifth on that because I have nothing to do
12   with any of this illegal stuff. I'm not an illegal
13   person. Turned my life around 20 years ago.
14   **Q.**   Let's look at -- oh, it also talks about:
15   You sell the trailers.
16        Were you trying to sell some trailers?
17   **A.**   No. And it says -- it says -- it does not
18   say I sold trailers. It says: Do you got belly dump
19   work or you sell the trailers?
20        He's asking if I have work or if I'm willing
21   to sell something. That's all he's asking.
22   **Q.**   You interpret this as he's asking if you're
23   going to sell trailers to him, or were you trying to
24   sell the trailers to someone?
25   **A.**   I tried to tell him that I wanted him to

138

1    come on part -- and be part of the business. I told
2    him and Matthew Barrett that I wanted them to be part
3    of the business. I didn't want to have borrowing
4    money or anything like that. I wanted them to be a
5    percentage owner of business, and then if they could
6    be a percentage owner of the business, it could help
7    me and it could help them, and then they both backed
8    out.
9         And Andy Yuker obviously tried to do some
10   deceitful things by taking the equipment without
11   authorization, and -- I mean, he lied when the cops
12   came there. He said he knew nothing about the
13   creditors after my equipment, but yet he called me
14   and said that the equipment was up for repo. I mean,
15   come on, man.
16   **Q.**   Mr. Fettig, did you have a conversation with
17   him about selling trailers?
18   **A.**   No.
19   **Q.**   Okay.
20   **A.**   I had a conversation with him, and I'm
21   waiting for my criminal defense attorney to let me
22   know how I can proceed with that, but that man tried
23   to do some criminal fraud stuff, and I don't want to
24   be a part of that, so...
25   **Q.**   Let's look at Gate City -- I think this is

139

1    39. Did you -- is this a Stark Energy piece of
2    equipment?
3    **A.**   It's a picture. It's a picture of a truck.
4    **Q.**   Uh-huh. And you -- you're sending this
5    picture. Right?
6    **A.**   Uh-huh.
7    **Q.**   So what truck is this?
8    **A.**   I don't know what truck that is, but that's
9    an old picture. I know that.
10   **Q.**   And you didn't have one of the Stark Energy
11   pieces of equipment get stuck on this day, October 3,
12   2023?
13   **A.**   The S-211 got stuck, and S-205 almost got
14   stuck but I got it un-freed up.
15   **Q.**   So you think this is S-211 in this picture?
16   **A.**   That's a -- that's a picture from forever
17   ago. I don't know what truck that is.
18   **Q.**   Well, what about this picture?
19   **A.**   What picture? You just showed the same
20   picture.
21   **Q.**   Yeah. One of them has "Bakken Fail" on it,
22   "Of The Day," but it looks like it's the same picture
23   as this one. Right?
24   **A.**   Yes.
25   **Q.**   So what truck is in this picture?

140

1    **A.**   I don't know. That looks like a Kenworth.
2    **Q.**   Uh-huh.
3    **A.**   Go back to your evidence report. If it
4    looks like that truck, that's what that truck is, but
5    that's an old picture.
6    **Q.**   Okay. So you're saying at the same time,
7    October 3rd, 9:08: Hill is slick.
8         Can't really get traction, plus winter OTR
9    tires.
10        Why are you telling him -- I mean, is this
11   truck stuck on October 3rd?
12   **A.**   Not that truck, but a truck was stuck.
13   **Q.**   So there was a truck that was stuck?
14   **A.**   Uh-huh.
15   **Q.**   And which one was it?
16   **A.**   I believe it was either S-211 or S-205.
17   **Q.**   How would you find out?
18   **A.**   Those are the only two trucks I was running,
19   so it was either one of those trucks. I mean, I
20   don't...
21   **Q.**   Did you ever give Andy Yuker the master list
22   of equipment?
23   **A.**   No.
24   **Q.**   So how would he know -- would he have any
25   idea, you know, as to VIN numbers for the equipment,

141

1  you know, the unit numbers for your equipment?
2      A.    I don't know if he would or not, ma'am.  And
3  I don't know any relevance to that except for the
4  fact that I -- I don't know.  I don't know.  I don't
5  know if he has a list of my equipment or not.
6      Q.    So what happened to the -- so you -- I
7  assume that you called -- this is you calling for
8  assistance to get this truck unstuck.  Correct?
9      A.    Yeah.  There was some trucks on the job, and
10  I think it was either my truck or one of the other
11  trucks got stuck, and I asked him to get the truck
12  unstuck, because I told the other company and my
13  company -- there's a company called Running Horse,
14  and they were running on the job, too, and they run a
15  lot of trucks, too, and they went up the hill, and
16  the company man freaked out, and he said, "Why did
17  your trucks go up that way?  I told them to go the
18  other way."
19          And I said, "I told them to."
20          He said, "You better get that truck
21  unstuck."
22          And I said, "I know a guy that's got a
23  towing company.  Let me call him.  I'm sorry, sir."
24      Q.    Okay.  So yes or no, did Yuker Towing help
25  get these -- this truck unstuck?

142

1      A.    I -- I -- I don't recall.  He may have.  I
2  mean, he -- I called him a couple of times asking him
3  to get things moved, and he sent trucks later on, but
4  I know that -- I think that time he did get a truck
5  unstuck, but I know one time he didn't show up, a
6  couple times he hasn't showed up because he said he's
7  too busy, but -- obviously, because I'm a hard --
8  like a -- hard-pressed to pay my bills on time, I
9  mean, he doesn't really want to make me his first
10  priority.  Right?
11      Q.    So his response here says:  Okay.  We will
12  get it out of there.
13          He's about 20 minutes from the truck.
14      A.    Okay.
15      Q.    So do you think they helped get this truck
16  unstuck?
17      A.    I don't know.  I know that one time I was
18  waiting for five and a half hours, and I got a truck
19  unstuck, so...
20      Q.    So you just don't have any recollection?
21  Yes or no.
22      A.    Can you scroll down so we can get
23  recollection together?
24      Q.    He isn't there yet.
25          Don't see him getting closer.

143

1          I see him now.
2      A.    So, obviously, he showed up and got the
3  truck out of the ditch when I asked him to get the
4  truck out of the ditch.
5          I mean, I don't -- I don't see the point of
6  relevance.  I'm not trying to be misleading.  I mean,
7  I've asked him many times to tow a truck.
8      Q.    Okay.  And you --
9      A.    My trucks or other companies.  I've
10  recommended his service.
11      Q.    And he never billed you for these services?
12      A.    I -- like I said, he -- he mentioned to me
13  that he did not want to have an issue with me.  He
14  knew that I was fighting really hard to get my
15  business turned around.  He didn't want me to get a
16  tow truck and then be an adversary of his.  He wanted
17  to see me try to succeed and try to help me out, is
18  what he said.  So I would -- I randomly and rarely
19  paid him over the last three or four years, but that
20  was based out of him -- his choice and me
21  understanding that he was giving me a break, and I
22  was okay with it, you know?  I don't think he likes
23  me, but whatever.  Doesn't matter.
24      Q.    Let's look at Gate City -- GC 0044.
25      A.    Uh-huh.

144

1      Q.    This one.  So this is October 23rd, and you
2  said:  I am out, brother.  Call me.
3          Do you know -- what were you out?
4      A.    I don't know.  I was out.  I don't know.
5  Out looking for work.
6      Q.    Wasn't October 23rd the day that you got
7  released from the Stark County Sheriff's custody?
8      A.    It might -- yeah, it -- you said -- because
9  I was in court from October 20th and then the bond
10  hearing, so that makes sense.  Yep.
11      Q.    So is this you telling him that "I'm out of
12  custody"?
13      A.    I -- I guess, or out looking for work.  I
14  mean, I've been out looking for work, and people have
15  shared their ideas and tips where work might be at,
16  but yeah.
17      Q.    So why were you thanking him?
18      A.    Because he's been pointing me in the right
19  direction to try to find work.  I don't know.
20          I mean, because he hasn't been an asshole
21  because he didn't -- he didn't -- he didn't go around
22  and say I didn't pay my tow bill or -- do you know
23  what I mean?
24          Like -- because he took a tow truck with me
25  all the way to Boston when I had a truck break down.

145

1    I mean, I thought he was, like, a friend,
2    but -- you know, he's trying to give me advice.  He
3    called me and said, "Maybe you should go back to the
4    workover rigs."
5        And I said:  I've been getting work, so why
6    would I go back to the workover rigs, you know?  Why
7    would I give up on my dream of running my business?
8    I mean, I've been running my business now, and I've
9    been getting work, so, I mean, post- -- post-petition
10   or with this bankruptcy now I've been getting work
11   and finding work, so I don't see the point and
12   relevance.
13      Q.   So you don't really know why you were
14   thanking him or --
15      A.   I would thank him for the idea of being a
16   person that, like, can give me advice as to, like,
17   renting out the frac tank.  Even though he didn't pay
18   me the payments on it, I thought it was paying down
19   the debt there.
20       And him telling me to, you know, chase work
21   and be positive.  I mean --
22      Q.   Is it possible you were thanking him for
23   assisting your mother in moving equipment from the
24   Stark Energy shop?
25      A.   No.  Like, are you kidding me?  Like, no,

146

1    I -- no.  Like, I had a truck -- or two -- I had two
2    trucks running water in Stanley, and, you know, I had
3    a tire issue.  I mean, maybe -- maybe he helped her
4    with something like that.  But, no, I don't -- I
5    don't recall him moving stuff from my shop, no.
6       Q.   Did you have two trucks running water in
7    Stanley at this point, in October 2023?
8       A.   I had a company man that was using me and
9    Running Horse, like I said.  Yep.
10      Q.   What type of equipment do you use to run
11   water?
12      A.   Use water trucks.  I mean, you use a truck
13   and a trailer.
14      Q.   You use the Dragon water haulers.  Correct?
15      A.   I think I was using a steel trailer that I
16   had rented from a guy from -- his name is -- he's out
17   of Fargo.  He's an asshole.  He used to have a --
18   Liquid Connections out here in Dickinson.  He had a
19   trailer I was renting from him.
20      Q.   So you're positive it wasn't using any of
21   the Gate City Dragon trailers?
22      A.   I -- I -- like I said, I had a Dragon
23   trailer that I found in Januaryish, and I was using
24   that to -- to keep the business going, but I don't --
25   I don't know what you're getting at here, and I guess

147

1    if you're going to say something that's untrue, I
2    mean, I just -- I'm just trying to tell you
3    everything that I know.  I mean, I was out working in
4    the field and chasing work, so...
5       Q.   Were you using the Dragon trailers in
6    October of 2023?
7       A.   I do not believe so.
8       Q.   When you were -- so you were having multiple
9    phone calls with your mother during the time -- three
10   days you were incarcerated.  Did you ever ask her to
11   contact Andy Yuker?
12      A.   No.  I asked her to try to keep up with the
13   work I had going and try to tell the drivers that I
14   was going to get out and that I was going to get in
15   front of this, and try to make sure she found a good
16   maintenance person for that tire issue she was
17   having.  I think a tire or something blew, or -- and
18   then there was, like, a turn signal or something that
19   wasn't working on the one truck.
20      Q.   Would she have unilaterally called him
21   without you asking her to?
22      A.   No, I don't think so.  I mean, I don't -- I
23   don't know why she would.  I don't -- maybe because
24   she was, like, trying to get something fixed, you
25   know?

148

1       Q.   It wasn't to ask him to move collateral out
2    of -- or move equipment out of the facility in
3    Belfield?
4       A.   No, ma'am.  I got arrested in Dickinson.  I
5    got down from Stanley.  I wasn't even in Belfield, so
6    I don't -- you know.  No, I don't see any point of me
7    answering that except for, no, I don't think so.
8       Q.   Let's look at Exhibit -- what I've got
9    marked as Exhibit 14.
10      A.   Uh-huh.
11      Q.   14.  Is your mother's phone number
12   (701) 690-3988?
13      A.   I -- I don't know.  I mean, I can look.  It
14   says "Mom" in my phone, but...
15      Q.   Why don't you do that.
16      A.   Can I go upstairs and look at that, or --
17      Q.   Never mind.  We'll --
18      A.   I'm sorry.  I just...
19      Q.   This is a text message from your mother to
20   Andy Yuker on October 21st --
21      A.   Uh-huh.
22      Q.   -- asking him to reach out.
23      A.   Uh-huh.
24      Q.   Do you know anything about this?
25      A.   Again, like I said, I had a truck that had

149

1  an issue with a tire or something like that, and
2  there was an electrical issue on some turn signal
3  one of the drivers was complaining about, supposedly,
4  so I don't know if that's why she called him, but...
5    Q.   Okay.  She says:  Black Beauty has to go.
6    A.   Yeah, that's S-205.  It has to go back on
7  the job site.  They had a problem with a tire.
8         And I told the company man that I was going
9  to make sure that like -- you know, I -- he was upset
10 because I only had one or two trucks.  I only had one
11 or two trucks.  I only had one or two trucks.  I only
12 had one, you know what I'm saying?  And I was trying
13 to get -- to rent another tanker from somebody else,
14 because I was renting the other tanker, and I was
15 trying to make it work.
16        And he was like, "I can see you're
17 struggling.  Do you have equipment?"
18        And I said, "I wish I can.  I'm going to try
19 to work something out with my bank."
20        And he said, "Well, just keep your one truck
21 going, keep it steady, and I'll keep you working.
22 I'm going to get Running Horse in here to run
23 alongside you, and you can keep working with us."
24   Q.   So what do you mean -- what do you think she
25 meant about "Black Beauty has to go"?

150

1    A.   Has to go back to work, be back on the job
2  site, go back north, go to work.  If he doesn't go to
3  work, I'm going to be fucked.  Excuse my language.
4  I'm not trying to swear.  I just...
5    Q.   He asked -- and this is 8:36 p.m.:  Are
6  there locks on the garage doors of the shop?
7         Is that normal, for them to come out at
8  8:36 p.m. to pick up equipment?
9    A.   Again, I don't know what you're saying about
10 picking up equipment.  I had to get the truck back on
11 the job site.  That's Black Betty.  That's S-205.
12 That's the tag axle that was malfunctioning.  So I
13 don't understand anything about equipment except for
14 getting fixed and put on a job site.
15        Keep in mind, I'm incarcerated at this time.
16 I have work.  I get arrested.  I can't report and
17 turn myself in; I just get arrested.  I get a
18 warrant.  You get a warrant.  I'm getting my hair
19 cut.  "You've got a warrant."
20        I'm like, "Hey, man.  I've got -- what's
21 going on with this?  Why do I got a warrant?"
22        "You've got to come in and see us."
23        I'm like, "Okay.  I've been to court before.
24 I've turned myself -- I've showed up to court dates.
25 Why do I got to go in?"

151

1         So Black Betty, again, is S-205, and has to
2  go, has to go back to work.
3         Is it in the shop or outside?  I don't know.
4  I don't know what that is.
5         Is there locks on the shop?  I mean, you've
6  got to protect your equipment.
7    Q.   What is this a picture of?  This is your
8  mother sending a picture.
9    A.   I don't know.
10   Q.   You don't recognize this piece of equipment?
11   A.   No.
12   Q.   What about this picture?
13   A.   No.
14   Q.   What about this one?
15   A.   No.
16   Q.   No idea what those are?
17   A.   Looks like a truck.
18   Q.   And which truck would that be?
19   A.   I don't know.  You see a lot of semis,
20 ma'am.  It looks like the rear end of a semi.
21   Q.   What about this?
22   A.   What about it?
23   Q.   What -- any idea what piece of equipment
24 this is?
25   A.   No.  I don't know.

152

1    Q.   Is that Black Betty?
2    A.   I don't know.  It doesn't have a unit number
3  on it.  And, again, I've nicknamed the other truck on
4  that job Black Betty because the rider was always
5  jamming out to country music and rock music, but
6  whatever.
7    Q.   Black Betty has how many wheels?
8    A.   The truck?  The truck has eight, eight on
9  the -- on the rear and then two on the front, so ten.
10   Q.   Can you -- hang on a second.  I'd like to
11 look back at this conversation you had with your
12 mother.
13   A.   Uh-huh.
14   Q.   And it says -- here it's talking about "work
15 on Black Betty."
16        "Working on it."
17        "He hasn't even talked to you, or what?"
18        And then she says, "Yeah, I communicated.
19 Okay?"
20   Q.   Okay.
21   Q.   She's talking about communicating with?
22   A.   The company man?
23   Q.   I don't know --
24   A.   There's a couple times in there that I also
25 called my mom about the company man, and she wasn't

153

1 able to answer or get ahold of him, but I don't know.
2 I'm not there. I mean, I'm asking and answering your
3 questions.
4     Q.    So you were there; this is your
5 conversation.
6     A.    No, I'm not physically wherever the hell
7 she's at on the phone, and you're asking me who she
8 was talking and referring to. And I'm on a jailhouse
9 phone call that clicks every 15 or 20 seconds, saying
10 you're on a jailhouse phone call, mind you.
11     Also, mind you, I was gaining traction and
12 getting work, had cash on hand, everything was moving
13 in the right direction.
14     If you're talking August or September,
15 whenever this is, or October even, I recently paid my
16 shop current. I'm told by Gate City that I can't
17 make my shop current anymore because you guys are
18 refusing to take my payments. I was willing to try
19 to start paying down on my loan, but -- I mean, this
20 is adversely affecting your client, you, and
21 everything. It's like -- I've asked and answered.
22     Q.    Okay. Mr. Fettig, you said on this
23 conversation, "Black Betty's fucking got two wheels."
24     Why did --
25     A.    My cat's also Black Betty. The thing runs

154

1 around the shop like a jackrabbit. It's crazy. And
2 she couldn't find the cat. There's even audiotape,
3 I'm sure, of me and her trying to find the cat. I
4 don't know if you see that, but I know that for sure.
5     Q.    Yeah, and I think it's referred to as "the
6 cat," not referred to as "Black Betty."
7     A.    Well, that's its nickname.
8     Q.    All right. So is Black Betty also referred
9 to as a motorcycle?
10     A.    No.
11     Q.    So you had a motorcycle that you purchased
12 through Gate City. Is that correct?
13     A.    Yeah. I bought that down in Kansas City,
14 yes.
15     Q.    What happened to that motorcycle?
16     A.    I don't know.
17     Q.    Is that missing?
18     A.    I -- I -- missing? I don't know where it's
19 at.
20     Q.    How do you not know where it's at? When was
21 the last time you saw it?
22     A.    My friend Dan Gerstberger went to pick it up
23 in Kansas, and he had brought it up to North Dakota,
24 and then I had a friend in Fargo that was supposed to
25 work on it, and then I had a cousin of mine that was

155

1 thinking about buying it.
2     Q.    Timeframe?
3     A.    Again, I -- I -- timeframe for what, ma'am?
4     Q.    When was your cousin thinking of buying it?
5     A.    Oh, everybody wants to buy everything, but
6 I'd say he was thinking about buying it in the month
7 of -- he was kicking it around, but his wife said no
8 around April or May of last year? Yeah, April or May
9 of last year.
10     Q.    So you're having a conversation here with
11 your mother about the Harley. Is that correct?
12     A.    I -- telling her that I bought a Harley.
13 Okay.
14     Q.    Okay. "I'd still like to use it in the next
15 couple months and years."
16     What did you -- were you instructing her
17 there to go ahead and move it? Hide it?
18     A.    No, ma'am.
19     Q.    Did you have the Harley at this point in
20 time?
21     A.    No, ma'am.
22     Q.    So then why are you telling her that you
23 still want to use it?
24     A.    Because my cousin wants me to try to go
25 riding with him, and he's been telling me that I need

156

1 to get a motorcycle license, and I want to try to
2 start living a life, so I don't --
3     Q.    Would you normally bring that up in the
4 middle of this jailhouse call?
5     A.    Yeah, because I was pretty stressed out, and
6 I was referencing a lot of things, you know? I was
7 looking for a bail bondsperson; I was trying to see
8 if a company man was still working my truck; seeing
9 if I could find work down in Texas.
10     Q.    Do you -- is this refreshing your
11 recollection any about what the silver item and the
12 white item are?
13     A.    No.
14     Q.    So S-205 is black, I assume. Right?
15     A.    No. It's white, and I had a driver that was
16 really interested in, like, the -- not the country,
17 but the rock song, like "Rock Betty, Betty." It's
18 like -- I don't know. It's an upbeat song, and he
19 was always humming it and stuff. It was just --
20     Q.    So is -- the S-205 is white?
21     A.    Uh-huh. It was reported stolen March 16th.
22     Q.    Did you have any equipment that was black at
23 this point?
24     A.    Not that I know of, ma'am.
25     Q.    What about white? Other than -- another

157

1  white one?

2  A.  No.  The S-205 is free and clear, and it was

3  parked at my shop.  It was stolen by Andy Yuker.

4  Q.  211?

5  A.  It's blue.

6  Q.  So no clue, though, what the white and the

7  black reference is or -- was it silver? -- white and

8  silver references are about?

9  A.  Not at all.

10  Q.  Let's go back to Exhibit 11.  This is more

11  text messages, but -- between you and Andy Yuker, but

12  again, it's into 2024.

13       Did you have a welder stolen?

14  A.  Yeah, I had a welder stolen.  And I was able

15  to track that down in Billings, Montana, and I went

16  and picked it up myself.  I had to pay a kid 50 bucks

17  to help me put it in the truck because it was pretty

18  heavy, but...

19  Q.  Okay.  Now you're -- January 9th, and

20  you're -- I believe you're talking about Mr. Jordan

21  Goldade.  Dude called the sheriff on you.  Did

22  Mr. Goldade call the sheriff on you at this point?

23  A.  Yeah.  He called the sheriff on me because

24  he was mad because I was telling him, like, we're

25  going to go to the job, and he's like, "I didn't sign

158

1  up for this shit.  I'm not hauling fucking rock.  I'm

2  not hauling water.  I'm not doing anything.  I want

3  to go over the road."

4       And I was like, "Dude, we're working in the

5  oil field, dude.

6  Q.  So you call -- you said you were taking his

7  snitch ass to home.  Why did you call him a snitch?

8  A.  Because he's going to call the cops.  If you

9  don't want to work for somebody, don't -- just tell

10  them.  Like, I can take you home.

11       He called the cops because, he said, he had

12  a restraining order against him and a previous

13  employer because when he quit going to work for the

14  guy, the guy threatened him.

15       I said, "Dude, I have never threatened you

16  in my entire life.  I'm a very nonviolent, loving

17  person.  If you don't want to work for me, that's

18  fine.  I don't care.  And I'm sorry, like, that you

19  don't want to work for me, but, like, you don't need

20  to call the cops because you don't want to work for

21  me.  That's retarded."

22  Q.  So that's what he called the cops on was

23  because he didn't want to work for you and --

24  A.  I can promise you that.  It's embarrassing.

25  Q.  Who did he call?

159

1  A.  McKenzie County Sheriff.  It was S-205.  The

2  guy even checked the registration.  I don't care

3  because it's free and clear, and I'm not running

4  illegal stuff.

5  Q.  I'm sorry.  I --

6  A.  I can't believe that.  That guy's a clown.

7  He's a really weird person.

8  Q.  You're able to see this again.  Right?

9  A.  Yes, ma'am.

10  Q.  And let's look at Gate City 48, this page.

11  So now we're into Friday, January 19th.

12  A.  Uh-huh.

13  Q.  And you ask:  Can I park a?

14       What did you mean by that?

15       Just a couple of days.

16  A.  Can I park a truck.

17  Q.  And which truck were you planning to park?

18  A.  S-205.

19  Q.  And I guess, Mr. Fettig, where were you

20  planning to park it?

21  A.  I parked it at -- I was planning on parking

22  it at the County Line, and I wanted them to watch it

23  for me so nobody messed up with it.  And then he saw

24  me walking down the road, and he asked me if I needed

25  a ride, and I said, "I already got a ride."

160

1  Q.  So this is the location on Highway 22?

2  A.  County Line Truck Stop is on 22, yes.

3  Q.  Where all the equipment was?

4  A.  No.  County Line Truck Stop is across the

5  street from his -- his house there, and I -- I parked

6  my truck there, and I walked -- and I was walking

7  because I was going to get a ride.

8  Q.  Okay.  And that's where -- that's the

9  location where all of the equipment was found in

10  March.  Correct?

11  A.  No.  No, ma'am.  I parked S-205 at County

12  Line Truck Stop.  He frequently goes there.  I told

13  him before that somebody stole one of my air hoses

14  and somebody stole some of my fuel, and he said he

15  would watch out for it if he saw anything.  I said,

16  "I appreciate it."

17  Q.  So this is across -- didn't you say

18  something about this is across the street from where

19  he --

20  A.  Yes.

21  Q.  Okay.  Are you able to see the stuff that's

22  parked there from that truck stop?

23  A.  No.  I mean, you've got -- he's got this big

24  thing -- or he had these big blue -- what is it? --

25  sand movers he bought from some sand hill place for

161

1 $5,000 apiece, so he got them for two grand and said
2 he was going to sell them for seven grand. He was
3 using them as a -- like a fence or something.
4 **Q.** So you can't see in there, is what you're --
5 **A.** In theory, you can't see in there. I mean,
6 you've got these big blue -- I don't know, they're
7 like -- they're called mountain movers. They're like
8 15 or 12 feet high. They're big pieces of iron.
9 They're 53 feet, each trailer. If you drive out to
10 the shop, you can see them, man. Go take a picture,
11 if you want. They're big.
12 **Q.** And you never had any clue that -- for all
13 of these months that you're texting him here that the
14 Gate City equipment and the -- the Midland equipment
15 was sitting there?
16 **A.** Sitting where? At the County Line Truck
17 Stop? I would have seen it.
18 **Q.** At the facility that is across the street
19 from the County Line Truck Stop on Highway 22.
20 **A.** No, ma'am. I didn't know he had all -- all
21 of the equipment that he had, but when I found out
22 that he had all of the equipment that he had and you
23 guys had found it and I went back to my shop, I asked
24 where S-205 is.
25 And I believe that -- again, that this

162

1 individual stole my equipment, was trying to commit
2 fraud by changing the titles. And then when he got
3 caught, he was frustrated, started lying, and then he
4 went ahead and came to my shop with his wrecker and
5 stole S-205.
6 And if you were to subpoena the North Dakota
7 highway record logs you would see that the truck is
8 probably being towed by a red tow truck, which is
9 his, down the highway from my shop. He stole S-205.
10 There's -- there's proof that he took the
11 items from my shop. There's proof. There's --
12 there's video proof that he took the items, off these
13 highway cameras, off these truck stops. Those truck
14 stops sometimes -- you know, they have cameras.
15 **Q.** So the video cameras are just -- there's
16 none at Stark Energy's facility. Correct?
17 **A.** There are, and I've been trying to get them
18 updated as to get -- like so you can do a --
19 real-time viewing, but I have Starlink out there, and
20 Starlink sucks because they don't have a customer
21 service number -- excuse my language -- and I can't
22 get it to connect to the Internet.
23 And then it only backs up for one week on
24 the -- on the online thing. It only backs up one
25 week. I thought I had it backed up for a month.

163

1 Because as soon as I found out about that truck being
2 stolen, when I went to my shop, I went to try to get
3 into the system, and I had to get the code to get in
4 the system, and I got in there, and I found out it
5 was only backed up a week.
6 **Q.** So at the time all of this stuff went
7 missing, you -- did you or did you not have video
8 surveillance working?
9 **A.** It was not working to back up, if that makes
10 any sense. I was trying to get into it. I couldn't
11 get the code. Like, there's a code to get into it,
12 you know? There's a Hispanic nice lady, she's
13 Hispanic, and she tried to set it up for me before,
14 and I lost the code.
15 **Q.** Okay. Let's move on to Exhibit 12.
16 **A.** Uh-huh.
17 **Q.** This is a -- sort of a summary sheet of the
18 charges that was provided by Yuker Towing.
19 **A.** Okay.
20 **Q.** Okay? And it talks about a tow call from
21 Maine. I think you referenced that earlier. Right?
22 Something about --
23 **A.** Uh-huh.
24 **Q.** Okay. Here it says there was a $1,000 loan,
25 a $5,500 loan. Do you recall these loans?

164

1 **A.** No.
2 **Q.** No? It references Fettig Enterprise
3 account. Did Fettig Enterprise also have a separate
4 account at Yuker Towing?
5 **A.** Well, if you're talking about the tow from
6 Maine, I was in Maine for Fettig Enterprise, so
7 that's the $5,500 for -- I mean, the towing from
8 Maine. Right? If that makes any sense? Because I
9 don't see a loan. I don't see how the loan would
10 have worked that way. I don't understand a loan for
11 $5,500. I don't recall a loan, anyway. Honestly, I
12 don't.
13 **Q.** Okay. What about the $50,000 -- the two
14 $50,000 ones?
15 **A.** Yeah. I was waiting on some payments to
16 come in, and he lent me some money.
17 **Q.** What payments were coming in?
18 **A.** From customers, people. Revenue. I don't
19 know.
20 **Q.** And did you repay those loans to him?
21 **A.** I don't know. I -- I probably did. It says
22 there I did.
23 **Q.** But you don't remember?
24 **A.** I don't recall, no, but I -- I see it says
25 50, though. The loans were for $60,000 payback.

165

1    Q.    Uh-huh.
2    A.    So the payment had to have been $60,000.
3    Q.    Okay.  So -- but you recall making a $60,000
4    payment?
5    A.    I would only assume.  I mean, the deal was
6    it was -- he was going to lend me 50,000 for 60
7    payback.
8    Q.    Okay.  Let's take a look at -- this is a
9    fairly lengthy exhibit because it includes a lot of
10   invoices.  Is this similar to the invoice, the one
11   invoice that you said you thought you had?
12   A.    Yes, ma'am.  It looks something similar.
13   Q.    Okay.  So is it fair to say that this is a
14   type of invoicing that Yuker Towing would typically
15   do?
16   A.    I would assume so, without making an ass of
17   myself.  Excuse my language.
18   Q.    Let's look at -- let's see -- Gate City 90,
19   and there's a lot of these.  I'm just going to scroll
20   through a bunch of them.
21         Okay.  I think this is 90.  So here's an
22   invoice that is dated 8/20/22.  It talks about S-208,
23   and it says, "Towed to Yuker yard for collateral
24   against towing debt."  Do you see that?
25   A.    Uh-huh.

166

1    Q.    What does that mean to you?
2    A.    What is what?
3    Q.    What does that mean to you, "Towed to the
4    Yuker yard for collateral against towing debt"?
5    A.    I don't know what that means to me.  I
6    mean --
7    Q.    You never saw this?
8    A.    I never saw the bill, no.
9    Q.    Okay.  How would he -- well, so this is
10   8/20/22, and this is talking about S-208.
11   A.    So this is, like, a full year previous to
12   the time that you're talking about.  Correct?
13   Q.    Yeah.  So did you have possession of S-208
14   for -- I mean, was it gone for that whole year?
15   A.    I doubt it.  I don't -- I -- I don't recall.
16   I mean, it was at my shop at one point, and then all
17   of a sudden, my equipment left my shop.  Because,
18   again, I owed collateral to -- obviously, towing
19   debts to this guy and debts to that person and debts
20   to -- you know, debts, man.  And that's why I filed
21   bankruptcy, because I needed protection from all
22   these illegal actions.
23   Q.    Did you agree to have him hold collateral
24   because of the debt owed?
25   A.    No.  I've never agreed to that.  Not to my

167

1    knowledge.  I mean, I'm not trying to be deceitful.
2    I --
3    Q.    You would have received this.  Correct?
4    A.    I would have -- I never -- I don't recall
5    seeing this here.  I do not.  If someone did their
6    job perfectly and they had accounts payable and the
7    accounts and everything, they would have sent it to
8    me, and they would have followed up and they would
9    have said, "Hey, did you see that notice?"  But I
10   don't recall any of those conversations taking place.
11   Q.    It also refers to -- there's a truck VIN
12   number and a trailer VIN number, so we're -- any idea
13   if both S-208 and a belly dump were taken?
14   A.    I -- I don't recall that date.  You're
15   talking about 2022.  No.  But he's saying he did it,
16   so obviously he did it.  Right?  Or he didn't.  I
17   don't know.
18   Q.    Do you recall if you ever used S-208 after
19   this point in time?
20   A.    After that point in time?
21   Q.    Uh-huh.
22   A.    I -- I don't recall.  I don't know.
23   Q.    Let's look at Gate City 93.
24   A.    I think I had offered -- for protection, I
25   offered a thousand dollars for it, but dude just said

168

1    you only owed 800, which is really weird, but
2    whatever.
3    Q.    This one is dated January 16, 2023.
4    A.    Uh-huh.
5    Q.    Impounded S-206 from Sweet Crude, sitting
6    for months in disrepair.
7          Do you recall S-206?
8    A.    S-206.  Yeah, I recall S-206.
9    Q.    Was it sitting for months in disrepair?
10   A.    No.  It was parked there, and I told the
11   lady I was going to come back and pick it up.  And I
12   went to go pick it up and get it free from the snow
13   that they plowed around it, because the snow was
14   plowed around it heavily, and I had to go get, you
15   know, a -- borrow a skid-steer, because I had a
16   problem with my skid-steer, and then I went to go do
17   that, and then it was already towed.
18   Q.    Okay.
19   A.    And so -- so how did you tow this?  Like,
20   that's crazy.  I told you I was going to come get it.
21   There's nothing wrong with it.
22   Q.    So did you inquire as to who had towed it?
23   A.    Yeah.  I got it back.
24   Q.    So you got 206 back and were using it?
25   A.    Yes.

169

1    Q.    And --
2    A.    In January of 2023.  Correct.
3    Q.    Do you recall if S-206 was at -- was one of
4    the vehicles impounded -- or not impounded, but
5    seized in March of 2024 again?
6    A.    Yes.
7    Q.    And had you used it in between the time it
8    was -- when -- when did it go missing again, then, I
9    guess is --
10   A.    I said, again, the equipment went missing in
11   the latter part of 2023 when all my creditors were
12   coming down on me, and they were taking things, and,
13   obviously, Andy Yuker's got his propensity for
14   taking things illegally and not caring about the law.
15   Q.    Do you think it's fair to say that he could
16   say the same thing about you?
17   A.    No.  I didn't take anything illegally,
18   ma'am.
19         MR. VERSTANDIG:  Object.
20         Sorry.  I was on mute and I shouldn't have
21   been.
22         Object to the question.
23   Q.    (BY MS. STANLEY)  Let's look at March 13,
24   2023.  This is Gate City 96.  Again, here's another
25   one that says "Tow S-204 and T-101 to Yuker yard for

170

1    collateral."  Did you get --
2    A.    That's cute.  So he did that, because he
3    doesn't tell you guys and he doesn't tell me.  I
4    thought you were supposed to give notification if you
5    do that.
6    Q.    Did you give him permission to --
7    A.    No, I did not do that.
8    Q.    And you had no idea this had happened?
9    A.    No, I did not know that he took my equipment
10   illegally.
11   Q.    S-204 is the -- one of the two Midland
12   trucks; is it not?
13   A.    We just went over that.  Yes, ma'am.  He
14   lied about the numbers, yes.
15   Q.    So this was March of 2023?
16   A.    Uh-huh.
17   Q.    Did you get it in your possession when the
18   deputy saw it in Oct- -- April -- August, I believe
19   it was, of 2023?
20   A.    That doesn't make any sense.
21   Q.    That's why I'm asking you.  The deputy saw
22   this S-203 at Stark Energy --
23   A.    This thing says S-204.  Is that -- I'm
24   just -- I'm trying to get an understanding here of
25   this.

171

1    Q.    S-204 is one of the Midland trucks.  Right?
2    A.    Sure.  Is that the one that the officer said
3    he saw at the shop?
4    Q.    He saw both of them, I believe, at the shop.
5    A.    No, he did not.  That's an incorrect
6    statement.  You can go back through your notes with
7    Matthew Keesler, and he said that he only saw one of
8    the vehicles at the shop.
9    Q.    He saw one, and then the other one was
10   dismantled and parked, and --
11   A.    No, no, no.  That's incorrect.
12         MR. VERSTANDIG:  Whoa, whoa, whoa.
13         This is a deposition.  We're going to ask
14   questions; we're going to give answers.
15   Q.    (BY MS. STANLEY)  (Zoom audio distortion) --
16   so did you (Zoom audio distortion) S-204 subsequent
17   or have possession of it subsequent to March of 2023?
18         THE COURT REPORTER:  I missed the beginning
19   of your question.  It didn't come through.  Can you
20   please restate it?
21   Q.    (BY MS. STANLEY)  Subsequent to March 12,
22   2023, did you have possession of S-204?
23   A.    I don't recall.
24   Q.    What about T-101?  Did you have possession
25   of T-101 subsequent --

172

1    A.    I -- I don't recall, ma'am.  And this guy's
2    saying he took this stuff to his yard, so how is he
3    taking it to the yard and then it's found somewhere
4    else but then it's found on his property?  I don't
5    understand this.
6         MR. VERSTANDIG:  Mr. Fettig --
7    A.    At the same time to cover his butt.
8         MR. VERSTANDIG:  Mr. Fettig, try to answer
9    the questions and not go beyond it.
10        THE WITNESS:  Well, he needs to be
11   investigated.  This guy's a fraud.
12   Q.    (BY MS. STANLEY)  I'm looking at Gate City
13   97.  This is March 7, 2023.
14   A.    May 7, 2023.
15   Q.    Oh, I'm sorry.  What -- what did I say?
16   A.    It says May 7th.  You said March 7th of
17   2023.
18   Q.    You're correct.  It is May 7, 2023.  This
19   one says, "Tow S-10 [sic] and a trailer to Yuker
20   yard."  Do you know if S-10 was used after this point
21   in time?
22   A.    I don't recall, ma'am.
23   Q.    The trailer VIN, I will tell you,
24   corresponds to BD-002.  Do you know if that was used
25   after this point in time?

173

1    **A.**    I don't recall, ma'am.

2    **Q.**    Did you give Yuker Towing permission to take

3    this collateral as collateral against the tow debt?

4    **A.**    No, I did not.  And he didn't notify me.

5    That's illegal.

6    **Q.**    The next one is 101.  Let's see.  Sorry.

7    **A.**    These are fraudulent bills, ma'am.  This is

8    crazy.  I don't recall any of this.

9    **Q.**    This one is August 27, 2023.  This one says

10   they "picked up a belly dump for collateral against

11   unpaid tow debt."  Do you recall this?

12   **A.**    No, ma'am.  I was never issued that bill,

13   and I don't recall that.

14   **Q.**    So this is --

15   **A.**    What unit number is that?

16   **Q.**    I believe this is BD-005.  Do you recall

17   when possession of BD-005 was --

18   **A.**    No.  Like I said, during the latter part of

19   2023, items began missing, and it's kind of crazy

20   that he can't notify me of this.  Aren't you supposed

21   to notify people that you take stuff?

22   **Q.**    The next one is 9/9.  9/8.  This is winching

23   out S-205 and a -- what is BD-003.  I believe that's

24   the trailer referenced in there.  Do you recall this?

25   **A.**    No.  And I don't understand how a belly dump

174

1    would have to get winched out.  That doesn't make any

2    sense.  Belly dumps are generally on job sites where

3    they have rock that they drop.  If they drop rock on

4    a job site, you're going to have a scraper or a dozer

5    there, and they're going to push you out.

6    **Q.**    On Battlefield Road?

7    **A.**    I don't know where Battlefield Road is.

8    They have three names out there.  That sounds like a

9    Killdeer road, but I didn't run any belly dumps out

10   there.  I don't recall that.

11   **Q.**    Here's another one that's dated 9/9, brought

12   a belly dump to Yuker for collateral.  I believe this

13   one is BD-003.  Do you recall the last time you saw

14   BD-003?

15   **A.**    My -- I guess it can't be the same statement

16   for everything, but, no, as I go back to the same

17   statement, I don't recall.  I do recall the latter

18   part of 2023.  This may or may not correlate with

19   that timing.

20   **Q.**    Okay.

21   **A.**    But isn't he supposed to notify me?  This

22   doesn't make any sense.

23   **Q.**    This one is Gate City -- let's see.  What

24   page?  104.  And this is October 3, 2023.  This is

25   the same date that those pictures were in that text

175

1    message, and you indicated you thought that you --

2    you recalled that incident.  Correct?  And we

3    discussed that?

4    **A.**    I recalled running two trucks out there,

5    S-205 and S-211, yes, ma'am.

6    **Q.**    Okay.  This indicates it was S-207.

7    **A.**    Okay.

8    **Q.**    That's a -- do you know which piece of

9    collateral S-207 is?

10   MR. VERSTANDIG:  Object to the question.

11   You may answer.

12   **A.**    It's a truck.  I mean, it's a semitruck.

13   **Q.**    (BY MS. STANLEY) Yeah.  Do you recall

14   which -- S-207?

15   MR. VERSTANDIG:  Objection.

16   You may answer.

17   **A.**    Again, I said, again, on that date in

18   question, I sent him an old picture, so if he got the

19   picture and did the VIN number thing wrong, that's

20   his problem, but I ran S-205 and S-211.

21   **Q.**    (BY MS. STANLEY) So you don't believe it

22   was S-207 in that picture?

23   **A.**    The picture can very well be S-207.  It

24   doesn't matter.  It's an old picture.

25   **Q.**    Why would you be sending him an old

176

1    picture --

2    **A.**    I send pictures to people all time, like --

3    I send a picture to him saying:  Oh, you know, it

4    would be cool if we were doing this, cool if we were

5    doing that.

6    I post a picture of me hauling rock in the

7    middle of winter.  Like, I just do it just for eff

8    sake, you know, just to joke around, I guess.

9    **Q.**    I mean, the picture is showing trying to get

10   up a hill.  Right?  Was it that picture near Stanley?

11   **A.**    That's the idea.  You send a picture so it's

12   relevant.

13   **Q.**    Not --

14   **A.**    Just like you do on the Internet.  When you

15   search Google, you search, you know, stock art or

16   pictures for something, you know, mechanic-ing, you

17   know.

18   **Q.**    Is it reasonable to send a picture to the

19   tow truck driver of the situation at the time?

20   **A.**    Yeah, to tell him what's going on.  That

21   makes sense.  So I tell him that the truck got stuck.

22   I don't even think I was there physically.  I think I

23   was over by Williston chasing another job and the

24   driver got stuck, and he told me he was stuck.

25   **Q.**    Didn't you say:  Okay.  I see him now?

177

1    **A.**    That's what the driver told me. I think the
2 driver even might have been with Running Horse. Like
3 I said, I was running one truck. I was trying to get
4 a second truck on the job. Running Horse was running
5 alongside of us, and we were working.
6    **Q.**    So you don't believe that was S-207 in that
7 picture?
8    **A.**    I --
9        MR. VERSTANDIG:  Objection.
10    **A.**    I already -- I already answered your
11 question, ma'am, so...
12       THE COURT REPORTER:  Excuse me, Counsel.
13 Delene Fettig is in the waiting room.
14       MR. VERSTANDIG:  Ms. Stanley, I will say I'm
15 trying to avoid speaking objections. We're here on a
16 deposition pursuant to a stay of relief motion.
17       MS. STANLEY:  Yes.
18       MR. VERSTANDIG:  The field of relevant
19 inquiry for this deposition is perhaps more limited
20 than it would be for certain other matters you're
21 handling, and we just seem to be testing the
22 boundaries of that.
23       MS. STANLEY:  I think it goes to the issue
24 of good faith, which is wholly within the issue we
25 are looking at.

178

1        MR. VERSTANDIG:  I appreciate that, but
2 questions, while not verbatim repetitive, are
3 becoming familiar, and not accounting for breaks, we
4 are roughly four hours in. There is a point where
5 the horse is deceased.
6        MS. STANLEY:  Understood.
7    **Q.**    (BY MS. STANLEY)  The last invoice here is
8 10/21. Any idea why there's no invoices subsequent
9 to this?
10    **A.**    10/21? Where is that invoice?
11    **Q.**    This one right here.
12    **A.**    10/21, and what does it say?
13    **Q.**    It says, "Tow S-207 and its trailer from a
14 truck stop in Watford to Stark Energy."
15    **A.**    That doesn't make any sense. Why would I
16 have a truck towed from a -- no. That doesn't make
17 any sense.
18    **Q.**    Why are there no invoices? Did you do
19 any -- did Stark Energy stop doing work with Fettig
20 after this point in time?
21    **A.**    With what?
22    **Q.**    I'm sorry. Did Stark -- I keep screwing
23 that up.
24        Did Stark Energy stop doing business with
25 Yuker Towing from this point onward?

179

1    **A.**    I don't recall the last time I used Andy
2 except for the fact that I had told those guys to go
3 up the wrong road and I almost got in trouble for it,
4 and I secured a tow company to come out and get the
5 truck out.
6    **Q.**    I want to do just one more exhibit quickly.
7 This is Exhibit 13. And --
8    **A.**    Okay. Your note there, that's a joke. It
9 says "missing tire." That tire there has got a hole
10 in it.
11       MR. VERSTANDIG:  Whoa, whoa, whoa, whoa.
12 Whoa.
13        Answer questions. Don't volunteer anything
14 that's not an answer to a question. That can't be an
15 answer to a question because there was no question.
16       THE WITNESS:  All right.
17    **Q.**    (BY MS. STANLEY)  Is this the building that
18 Stark Energy has its business premises at?
19    **A.**    Correct.
20    **Q.**    Okay. Does this look like it's a photograph
21 of a transmission?
22       MR. VERSTANDIG:  Object to the question.
23        You may answer.
24    **A.**    Yeah. That's the transmission, yeah.
25    **Q.**    (BY MS. STANLEY)  Is that a transmission

180

1 from one of the pieces of collateral that was seized
2 on March 15th?
3    **A.**    I don't know. It could be from that or it
4 could be from one of the trucks that I'm currently
5 running, and I've had spare transmissions or we've
6 done transmission work for other customers, Fettig
7 Equipment has.
8    **Q.**    Are these trailer parts still out at Stark
9 Energy's property?
10    **A.**    They have nothing to do with Stark -- Stark
11 Energy and Gate City.
12    **Q.**    I'm asking if they're still there.
13    **A.**    I don't know. I'm not there right now. I'm
14 sure they are.
15    **Q.**    Is this a lift axle?
16       MR. VERSTANDIG:  Object to the question.
17        You may answer.
18    **Q.**    (BY MS. STANLEY)  It's GC 109.
19    **A.**    It looks like a lift axle.
20    **Q.**    And is that a lift axle from one of the
21 pieces that was picked up on March 15th?
22    **A.**    No. That's a re- -- that's like a
23 replacement. That's a -- it was already replaced, I
24 believe. I paid for a brand-new axle. That's an old
25 axle off one of the old trucks, like the -- there's

181

1   no truck that you have that has a missing lift axle.
2   That's a semitruck lift axle.
3       Q.   Do these tires that are out there have any
4   value?
5       A.   No.
6            MR. VERSTANDIG:  Object -- hold on.  Hold
7   on.
8            Object to the question.
9            But you may answer.
10      A.   They're scrap, and I'm supposed to scrap it.
11  They're, like, torn.  They have wear and tear, flat
12  spots.
13      Q.   (BY MS. STANLEY)  Okay.
14           MR. VERSTANDIG:  Did you just describe them
15  as being like porn?
16           THE WITNESS:  No.  Torn.  Torn.  Like
17  they've got a tear.
18           MR. VERSTANDIG:  That makes much more sense.
19  Thank you.
20      Q.   (BY MS. STANLEY)  What about this -- this is
21  Gate City 111.  These tires, are they -- any of them
22  usable?
23      A.   I don't know.  I'm not physically there yet.
24  I mean, some of them might be.
25      Q.   Are they --

182

1       A.   That's Stark Energy's property, though.  I
2   don't understand what that's about.  I'm not --
3       Q.   Are they still there?
4       A.   They very well could be, ma'am.  I'm not
5   there currently.  Last time I was there I had some
6   spare tires.  Every shop in America has spare tires.
7       Q.   Is this another transmission?  This is
8   Gate City 112.
9            MR. VERSTANDIG:  Object to the question.
10           You may answer.
11      A.   Is that what?  Sorry.
12      Q.   (BY MS. STANLEY)  A transmission from one of
13  the vehicles that was picked up in March 2023 --
14  2024?  Sorry.
15      A.   There's no way of telling if that's from one
16  of those trucks or another truck of mine that's free
17  and clear, so, no, I don't know.
18      Q.   This is Gate City 116.  Is this an engine
19  (Zoom audio distortion) the vehicles --
20      A.   Yeah, that's an engine that was already
21  replaced.  The motor blew up.
22           THE COURT REPORTER:  Excuse me.  You cut out
23  during your question, Ms. Stanley.  Can you repeat
24  it, please?
25      Q.   (BY MS. STANLEY)  I think I was asking if

183

1   this is an engine from one of the pieces of equipment
2   picked up in March 2024?
3       A.   I believe that's the motor that blew when
4   the truck was in Colorado, and it was S-20- -- S-207.
5   The truck was in Colorado, and the driver was driving
6   it, and the motor blew, and I had to pay an
7   exorbitant amount of money to that tow company or
8   they were going to seize my truck.  And then I had to
9   get a new motor, so I -- I drove all the way down to
10  the Ozarks and bought a new motor and put it in the
11  truck, so...
12      Q.   What is that white pickup truck there?  This
13  is on Gate City 118.
14      A.   Did I not say that S -- the 2004 F-150 is
15  parked out back?  It's a white F-150.
16      Q.   I'm asking, is that what that is?
17      A.   Correct.
18      Q.   And --
19      A.   That's 207.  207.  I told you I replaced the
20  motor.  There's my credibility, since I'm such an
21  in-credible person.
22           MS. STANLEY:  Okay.  I will move on.  I
23  think that is -- I will move on with your -- Delene,
24  if we will.
25           Do you have any questions, Mr. Verstandig?

184

1            MR. VERSTANDIG:  No.  He'll read.
2            MS. STANLEY:  He'll read and sign?
3            MR. VERSTANDIG:  He at least reserves the
4   right to read and sign.  Yes.
5            (These proceedings were concluded at
6   12:45 p.m.)
7            - - - - -
8            (The original deposition transcript of
9   Robert G. Fettig was forwarded in a sealed envelope
10  to Attorney Stanley, who is to retain the same until
11  such time as it can be filed.)
12           - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

185

1                    **DEPOSITION CORRECTION SHEET**

2        **CASE TITLE:**  In Re:  Stark Energy, Inc., Debtor.

3        **NAME OF DEPONENT:**  Robert G. Fettig

4        **DEPOSITION DATE:**  June 28, 2024

5        **Page No. Line No.  Correction/Change    Reason**

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16

17       _____        _____

18       Dated            ROBERT G. FETTIG

19

20       **RETURN PROCEDURE:**

         Please return this page within 30 days to:

21
         CATS Court Reporting Service, Inc.
22       PO Box 886
         Fargo, ND 58107

23
         Reporter@CATSReporting.com

24

25

186

```
 1                    NOTARY REPORTER'S CERTIFICATE

 2        STATE OF NORTH DAKOTA
          COUNTY OF CASS
 3
               BE IT KNOWN, I took the foregoing
 4        videoconference deposition of Robert G. Fettig;

 5             THAT, I was then and there a Notary Public in
          and for the County of Cass, State of North Dakota,
 6        and exercised the power of that office in taking said
          deposition;
 7
               THAT, said witness, before testifying, was
 8        remotely sworn to tell the truth, the whole truth,
          and nothing but the truth;
 9
               THAT, the reading and signing of the deposition
10        by the witness was reserved;

11             THAT, I am not related to or employed by or
          contracting with any of the parties or attorneys to
12        the action in which this deposition is taken and am
          not financially interested in this action;
13
               THAT, the cost of the original has been charged
14        to the party who noticed the deposition, and that all
          parties who ordered copies have been charged the same
15        rate for such copies;

16             THAT, the testimony was taken down in stenotype
          by me and reduced to one hundred eighty-four (184)
17        typewritten pages and is a true and correct
          transcript of the proceedings to the best of my
18        ability and given the quality of the audio in the
          remote deposition setting.
19
               WITNESS my hand and seal this 1st day of July,
20        2024.

21

22        ___/s/ Carolyn Taylor Pekas_____
          Carolyn Taylor Pekas, Notary Public, North Dakota
23        My commission expires:  December 16, 2026

24

25
```