1        UNITED STATES BANKRUPTCY COURT
          DISTRICT OF NORTH DAKOTA
2
                                    Case No. 24-30168
3                         Chapter 11, Subchapter V

4        _____

         In Re:
5
         Stark Energy, Inc.,
6
                      Debtor.
7        _____

8

9                T R A N S C R I P T I O N

10

11                          OF

12               A U D I O T A P E

13

                        341 Meeting
14
                      May 30, 2024
15

16

17

18

19

20

21

22

23

24      Transcribed by:  Carolyn Taylor Pekas, RPR

25

1    (Beginning of recording.)

2              MS. WENCIL:  All right.  We are on the

3    record for the Section 341 meeting of the District of

4    North Dakota, Subchapter 11 case of Stark Energy,

5    Incorporated, Bankruptcy Case Number 24-30168.

6              This meeting is being held at May -- on

7    May 30, 2024, at 3:00 p.m., which was continued from

8    its original time of 2:00 p.m.

9              If this meeting is not concluded today, and

10   I don't believe it will be, the next hearing date

11   will be on June 19th at 1:30 p.m. to continue this

12   matter.

13             And this meeting is being held

14   telephonically.

15             A Chapter 11 petition was filed on April 23,

16   2024.

17             Representing the U.S. Trustee is its trial

18   attorney, Sarah J. Wencil.

19             And could the Subchapter 5 Trustee please

20   state your name?

21             MR. KAPUSTA:  Tom Kapusta, Subchapter V

22   Trustee.

23             MS. WENCIL:  Thank you.

24             And Debtor's counsel?

25             MR. AHLGREN:  Erik Ahlgren on behalf of the

```
1    Debtor.
2              MS. WENCIL:  Okay.  And the Debtor's
3    representatives, starting with Mr. Fettig.  Could you
4    state and spell your name?
5              ROBERT FETTIG:  My name's Robert Fettig.  So
6    it's Robert Gene Fettig.  Spelling it, R-O-B-E-R-T,
7    space; middle name G-E-N-E, space; last name, F, as
8    in Frank, E-T-T-I-G.
9              MS. WENCIL:  Thank you.
10             And, Mr. Fettig, are you the president of
11   the Debtor?
12             ROBERT FETTIG:  Correct.
13             MS. WENCIL:  And are you the sole owner of
14   the Debtor?
15             ROBERT FETTIG:  Yes, ma'am.
16             MS. WENCIL:  Okay.  And was the comptroller
17   also here today?
18             ROBERT FETTIG:  Is -- is what, ma'am?
19   Sorry.
20             MS. WENCIL:  Oh, I'm -- are you testifying
21   here by yourself today?
22             ROBERT FETTIG:  You're saying me?  Ma'am,
23   you're talking to me.  Correct?
24             MS. WENCIL:  Yes.  Are you going to be the
25   only party testifying here today?
```

1          ROBERT FETTIG:  Yes.  On behalf of Stark

2     Energy, yeah.

3          MS. WENCIL:  Okay.  Thank you.

4          And other parties wishing to make an

5     appearance here today that may have questions for the

6     Debtor?

7          MS. STANLEY:  Caren Stanley on behalf of

8     Gate City Bank.

9          MR. KOSTELECKY:  Bryan Kostelecky out of

10    Dickinson, North Dakota.  I'm not sure at this point

11    yet.

12          MS. WENCIL:  Sure.  No problem.

13          Anyone else?

14          (No audible response.)

15          MS. WENCIL:  Okay.  Then, Mr. Fettig, could

16    you raise your right hand and acknowledge when you

17    have?

18          ROBERT FETTIG:  Yes, ma'am.

19          MS. WENCIL:  Do you swear to tell the truth,

20    the whole truth, and nothing but the truth?

21          ROBERT FETTIG:  Yes, ma'am.

22                    * * * * *

23          ROBERT G. FETTIG, having been first duly

24    sworn to tell the truth, the whole truth, and nothing

25    but the truth, was examined and testified under oath

1    as follows:

2                        *  *  *  *  *

3                        EXAMINATION

4    BY MS. WENCIL:

5        Q.    And because this is on the phone and I can't

6    see you, I am asking the question:  Are you under the

7    influence of any medication, substance, or any

8    disability that prevents you from testifying

9    truthfully today?

10        A.    No.  I've got, like, ADD, but no.

11        Q.    Okay.  And, Mr. Fettig, what's your

12    residential address?

13        A.    1860 Fourth Avenue East, Dickinson,

14    North Dakota 58601.

15        Q.    And are you familiar with the schedules and

16    the statements filed in this case?

17        A.    Yes, ma'am.  I helped compile them.

18        Q.    Okay.  And are you aware you signed a

19    certificate swearing to the accuracy of the documents

20    under penalty of perjury?

21        A.    Yep.  I signed an affidavit as well, I

22    think.

23        Q.    And to the best of your knowledge, are the

24    schedules and statements accurate?

25        A.    Yes, ma'am, to the best of my knowledge.

1      Q.    And do you have any knowledge of any false,

2   omitted, or misrepresented information on either the

3   schedules or the statements?

4      A.    No.  I don't have any knowledge currently.

5      Q.    Okay.  And if you do discover an error, just

6   immediately contact your counsel.

7      A.    Yes, ma'am.

8      Q.    Okay.  And they need to be accurate as of

9   the date of filing, so if something changes, you

10   don't need to correct that.

11            And is the Debtor a North Dakota

12   S corporation?

13      A.    Yes, ma'am.  S corporation, North Dakota.

14      Q.    Okay.  And when was it organized?

15      A.    April of 2017.

16      Q.    And the address of record, 1860 Fourth

17   Avenue East, that's also your residence.  Correct?

18      A.    Correct.

19      Q.    Okay.  And then aside from your house, does

20   the Debtor have like a pole barn or an office

21   building?  What's on that location?

22      A.    Yeah, I have a shop.  I have a shop.  It's

23   on the schedule, yep.  It's 4090 130th C South Avenue

24   Southwest or something like that.  Sorry.

25      Q.    And --

1      A.    It's also North Dakota.  It's on the

2    schedule.

3      Q.    Okay.  So is the business operated out of

4    the shop, then, at the 4090 130th Avenue?

5      A.    Yes, the shop.  Yes.  Yep.  It's also

6    operating -- I do some office work out of my house,

7    but yep.  Yep.

8      Q.    Okay.  Any other locations that the Debtor

9    operates from?

10      A.    Just out in the field, ma'am.

11      Q.    Okay.  And then other than the property the

12    Debtor has that's in transit for its clients, does it

13    store any property at any other location?

14      A.    Sometimes trucks are parked on location or

15    at truck stops.  I mean, we don't store them there

16    permanently, but they -- like, drivers sometimes

17    leave them there or, you know, they're parked there.

18      Q.    And what is the Debtor's business?

19      A.    An oil field service company that does oil

20    field service, as well as aggregate hauling outside

21    of the oil field.  We do it for, like, road

22    construction projects or construction projects.  And

23    we transport, in the oil and gas industry, water and,

24    like I said, aggregate, as well as we do hydro

25    excavating as well.

1          Q.    Okay.  And when you say "oil field service,"

2     do you mean doing the hauling for the oil fields?

3          A.    (No audible response.)

4          Q.    Or do you do --

5          A.    Yes.  Yes, we do that.

6                I'm sorry, ma'am.  What?

7          Q.    I'm sorry.  For oil field service, is the

8     service the hauling?

9          A.    Yeah.  We -- we haul water to and from

10     drilling rigs, production tanks and such.  And we

11     also haul aggregates, like building well sites.

12                But then outside of the oil field we haul

13     aggregate for road construction projects and, you

14     know, building projects; and then we do hydro

15     excavating in the oil field and outside of the oil

16     fields, like potholing, exposing lines for, you know,

17     I guess, utilities or spill cleanups in the oil field

18     or cleaning tanks.

19          Q.    Okay.  And then the -- the customers of the

20     Debtor, that would be the oil field operators?

21          A.    That would be -- you mean names or -- I

22     mean, I don't understand.

23          Q.    Right.  What -- what type of customers do

24     you -- do you have several oil fields that you haul

25     for or work for or just -- do you have a major

1   client?

2      A.   Yeah.  I -- I work for many clients.  I work

3   for Continental Resources, Lime Rock Resources,

4   Kraken Oil and Gas, Neptune, Knife River, CSI.  A

5   multitude of customers.

6      Q.   Okay.  And does the Debtor bid on the

7   projects, or do they contact the Debtor?

8      A.   They contact me, and we have opportunities

9   to bid jobs sometimes.  There's jobs that are bid,

10   whether it's on a tonnage basis with aggregate or on

11   production hauling.  It would be a per-barrel price

12   bidding.

13      Q.   Okay.  And presently --

14      A.   We have master service -- sorry.  Go ahead.

15      Q.   Presently, how many customers does the

16   Debtor have?

17      A.   In excess of 15.

18      Q.   Okay.  And those are all active jobs right

19   now?

20      A.   Well, yes, but not -- not every job is every

21   day.  Like yesterday I had a truck working, and today

22   it was rained out but we're supposed to start up

23   again, like the following day, like when the water

24   subsides.

25      Q.   And how many employees does the Debtor

1    presently have?

2         A.    Full-time and part-time, three to four.

3         Q.    And those three to four, are they --

4         A.    I have -- I have -- I have more potential

5    employees that -- I'm in the process of arguing and

6    trying to get my equipment back.  I could have a lot

7    more revenue coming in if I could get my equipment

8    back.

9         Q.    Okay.  So the full-time and part-time

10   employees are -- there's three to four right now.

11   Does that include you?

12        A.    Yes, ma'am.

13        Q.    Okay.  And those employees, aside from

14   yourself, what do they do?  Are they all doing

15   projects, or are you --

16        A.    They do -- the employees can help with

17   driving or they can help with filing paperwork and

18   doing invoicing or fixing the trucks in-house.

19        Q.    Okay.  And what was your salary in 2023?

20        A.    I didn't take a -- a -- rather than salary

21   in 2023, I think I only took like 5,000-or-so dollars

22   out of the company based on the fact that I was

23   trying to keep the company afloat and I was chasing

24   work and trying to pay down debt.  At points in times

25   I was paying creditors two times or two and a half

1   times multiple what I owed them monthly to try to get

2   back in good standing.

3        Q.    Okay.  And aside from that $5,000, did you

4   take any other distributions from the Debtor?

5        A.    No, ma'am.

6        Q.    And since the bankruptcy case was filed, has

7   the Debtor remained current on its salaries to its

8   employees?

9        A.    Yes.

10        Q.    And does the Debtor provide any benefits to

11   its employees?

12        A.    Not currently, no.  We've always had plans

13   to implement it, but it's been -- never something

14   we've been able to do.

15        Q.    Okay.  Does the Debtor use any contract or

16   independent workers?  Oh, in addition to employees?

17        A.    We have in the past, in the year of 2019 and

18   other years.  We're looking at that as an option to

19   work with people.

20        Q.    And since the bankruptcy case was filed, has

21   the Debtor stayed current on all of its state, local,

22   and federal tax obligations?

23        A.    I think I'm behind on some of that stuff,

24   ma'am.

25        Q.    Okay.

1          A.    I'm working on trying to get my books caught

2     up so I can file my taxes and get things caught up,

3     but to my knowledge, all payroll has been taken care

4     of, to my knowledge, but I know that I've been in the

5     process of trying to get things caught up with the

6     financial matters and get -- you know, get the

7     revenue in and pay it out accordingly.

8          Q.    Okay.  And which taxes do you believe you

9     are behind on?

10         A.    I don't have an exact name or whatever.  I

11    just think I'm behind on some tax filings.

12              My CPA firm out of -- in -- Mahoney Ulbrich

13    out of Minneapolis states that they will be able to

14    bring the -- the -- the stuff like -- like -- my

15    taxes current with the filings, but they need, you

16    know, payment for that, so I think the Court's got to

17    approve me working with a CPA to move forward with

18    them.

19         Q.    That's correct.  Yes.

20              Okay.  And is it correct the Debtor has not

21    filed a tax return since 2020?

22         A.    I believe so.  I think the 2021 is almost

23    complete.  But, again, I have to get the Court's

24    permission to pay them 1,400 bucks and, I think,

25    another $3,000 to finish the tax filing for 2021, but

1    they've got it complete, I guess.  Right?

2        Q.    Okay.  And you understand that you can't pay

3    them for any outstanding debt; you can only pay them

4    for the work they do going forward?

5        A.    Yeah, I understand that.  Yes, I know that.

6    That's why I have not paid them that amount, and that

7    I have to make a petition with the courts to pay

8    anything to anybody.  Yes, ma'am.

9        Q.    Okay.  And since the bankruptcy filing date,

10   has the Debtor remained current on its other

11   payables, so your trade creditors?

12       A.    I don't -- I mean, since the filing, yes.  I

13   mean, I haven't really had any issues, no.  I haven't

14   been able to, you know, pay, you know, the old debts,

15   right, but the new debts I've been able to pay, yes.

16       Q.    And, in your opinion, what caused the Debtor

17   to file for Chapter 11 protection?

18       A.    I think overleveraged due to the fact of

19   COVID.  COVID initially started the process.  In 2020

20   I lost close to $800,000.

21            And then going on into new environments, the

22   aggregate hauling being not a hundred percent my

23   business, but a newer addition in the year 2019 and

24   2020, you know, to survive through the -- the

25   downturn of the COVID economic turn.

1        When I went to the bank and I tried to work

2   with them to restructure loans, they were unwilling

3   to do that.  When I went to them to seek other

4   financing, alternative financing, to keep operating,

5   they were not willing to do that.

6        And a cold call to a merchant cash advance.

7   Merchant cash advance.  And that type of financing is

8   what led to the -- you know, the -- the bad part of

9   the -- the company, you know, the financial problems

10  of the company.  Merchant cash advances are highly,

11  like, predatory.  They have high interest rates and

12  just not helpful, you know?

13     Q.    Sure.  And I'm going to ask some questions

14  on the Schedule A/B.  For the bank accounts, does the

15  Debtor understand that while the case is pending, all

16  business must be conducted through your designated

17  debtor-in-possession account?

18     A.    That's correct.  I have an account, yep.

19     Q.    Okay.  And then --

20     A.    A DIP account.

21     Q.    And once you get your checks, just send a

22  voided check to our office.

23     A.    Yeah.  I will make sure to do that, yes,

24  ma'am.  Send it to my lawyers, and they'll send it to

25  you.

1      Q.    Okay.  And then the accounts at Dacotah and

2    Western Cooperative, are those accounts still open?

3      A.    No.  Any bank accounts that were

4    pre-petition have been closed, and they were closed

5    on or just after the filing.  Everything was ceased

6    as of the date of filing, and I canceled all

7    accounts.  I closed them out.

8      Q.    Okay.  And then Number 18 of the Statement

9    of Financial Affairs also states the Debtor closed an

10   account -- one account at Dacotah and one account at

11   Gate City in the past year, and do you have that

12   balance sheet that was filed with the Court before

13   you today?

14     A.    (No audible response.)

15     Q.    It was filed at Doc- --

16     A.    Do I have it?

17     Q.    Yeah.  Do you have that in front of you

18   today if I have some questions about that document?

19     A.    No, I don't have that in front of me right

20   now, ma'am.  I don't.  Sorry.

21     Q.    Okay.  Well, I have some questions, and

22   I'll -- we'll just come back to that on -- when we

23   come back on June 19th --

24     A.    On the 19th.  Correct?

25     Q.    Yeah.  Yeah.  Just bring that document that

1      was filed at Document 15.

2          A.    Document 15.  Writing it down.  Thank you.

3          Q.    Sure.  And Number 11 states that the Debtor

4      has zero accounts receivable right now.  Is that

5      accurate?

6          A.    As of date of -- as of the date of filing, I

7      had zero accounts receivable, but I have now accounts

8      receivable because I've been working since that date.

9          Q.    Okay.  And what are the accounts receivable

10     today, would you estimate?

11         A.    13 to 15 grand, roughly, give or take.  I've

12     had a lot of time away from work, and I've been

13     focusing on getting schedules corrected, but now I'm

14     focusing on work.  I'm actually trying to get my

15     equipment back so I can increase my cash flow

16     exponentially.  I've been turning down 50- to 60- to

17     $70,000 worth of work because I don't have my

18     equipment.

19         Q.    Okay.  At Number 47 on the schedules you

20     list all of the vehicles, the trucks.  How did you

21     value --

22         A.    Correct.

23         Q.    -- those vehicles on the schedules?  What

24     did you use to come up with the values?

25         A.    I reached determination on values because I

1    was told I had to figure out if you guys were going

2    to take this stuff to an auction and what it would

3    sell for.

4        Q.    Okay.  Did you have an appraisal of these?

5    And I'm not just talking about the banks --

6        A.    No.

7        Q.    -- I'm talking about the entire list under

8    Number 47.

9        A.    No.  I -- I did not have an appraisal done.

10   No, ma'am.

11       Q.    Okay.  When you came up with the numbers of

12   what the value was, for example, the first one says

13   the 2017 Volvos were (indiscernible) $10,000, how did

14   you come up with that figure?

15       A.    If you looked on the Internet with Ritchie

16   Brothers auctions and/or the recent sales and/or

17   comparables, like when the -- at one point in time

18   when I got a business loan for equipment, I had to go

19   online and look at the -- they wanted to -- the

20   auction quick sale pricing, so I had to figure out

21   what things were selling in that similar condition,

22   so I made phone calls and inquiries to people that

23   own and run other auction houses.

24       Q.    Okay.  And Number 47.4 states that a 2014

25   Kenworth T800 is missing, and what does that mean,

1    that it's missing?

2        A.    On the -- the date of 3/15, what I think is

3    3/15, March 15th, the date in question that I guess

4    some equipment was found, I went to my shop, and I

5    was going there for a part, and I was going back to

6    the field, and I noticed that a truck was missing, so

7    I reported it stolen.

8            And I've been in the process of calling,

9    inquiring, driving around town and looking for this

10   item because the police department's not willing to

11   help find it.

12       Q.    Okay.  But you did file a police report?

13           MR. AHLGREN:  And for what it's -- for what

14   it's worth, it's March 24th that you filed for

15   bankruptcy, not March 15th.

16           ROBERT FETTIG:  I filed bankruptcy in

17   April 23rd of '24.

18           MR. AHLGREN:  Oh, April 23rd.  Oh, gotcha.

19   Oh, you're --

20           ROBERT FETTIG:  Sorry.

21           MR. AHLGREN:  -- referring to something

22   else.

23       A.    On March -- on March -- on March 15th of

24   2024 is the date, I think, the 15th and the 16th,

25   thereabouts, I reported it stolen.  Somewhere in

```
 1   thereabouts.  I called the sheriff's department,
 2   asked them if they took it.  They said no.  I asked
 3   them if I could report it stolen, because I was told
 4   by judges I need to report it stolen.
 5        Q.   (BY MS. WENCIL)  Okay.  Did you make a claim
 6   with the insurance company?
 7        A.   No, ma'am.
 8        Q.   Okay.  And who insures that 2014 Kenworth
 9   T800?
10        A.   It would have been insured at the time
11   underneath the -- the insurance I have with
12   Progressive, possibly.  I don't know.  I think it's
13   called price Progressive.  It's got the auto policy.
14        Q.   Okay.  And why have you not made an
15   insurance claim for that property?
16        A.   Because I think a -- a dubious creditor took
17   it.  I don't think it was actually stolen.  I think
18   someone just took it.
19        Q.   Okay.  And what --
20        A.   I think someone took it that thinks I owe
21   them money.
22        Q.   Who do you think took it?
23        A.   I don't have an exact answer for that, but
24   I've got a sneaky feeling.  My stomach's hurting.
25   You know, I have a churning motion that I think
```

1    someone took it because -- you know, I just --

2    I just -- I think someone took it.  I really do.  I

3    don't think it's -- I've never had items stolen from

4    my shop except for during this proceeding of

5    creditors coming after me, and I'm finding out during

6    this meeting of creditors and/or court hearings and

7    everything else that other people that I owed money

8    to have taken items from me.

9        Q.   Okay.  Now if this was a truck, doesn't it

10   have keys?

11       A.   Yes.  The keys are locked up in -- inside

12   the shop, though, ma'am.

13       Q.   Okay.  Was there a break-in to the shop,

14   then?

15       A.   No.  There's no break-in to the shop, and I

16   was really frustrated, and I'm still frustrated.  I

17   have surveillance cameras at my shop, but they only

18   record for one week, and they overlapped already.

19            And I'm in the process of trying to get my

20   Internet up and running correctly so I can have

21   mobile access and/or a cloud -- you know, cloud --

22   cloud backup to, like, you know, the camera system.

23       Q.   Okay.  And was there a creditor threatening

24   to take that piece?

25       A.   I've had numerous phone calls from these

1   MCA, merchant cash, people and/or other creditors,

2   and I've had people say:  Hey, you owe me money.  I'm

3   worried about you paying me money.  But I don't have

4   anybody saying that -- there was no lien on that

5   truck.  The truck is free and clear.

6        Q.   Okay.

7        A.   It's free and clear.

8        Q.   But you say you think someone took it, but

9   you're not giving us any information of who you think

10  it is.  I mean, you do have to tell us who you think

11  took it.

12       A.   Yeah.  I -- I just -- I have a feeling that

13  someone took it, ma'am.  I don't have an idea of who

14  took it yet.  That's why I've been driving around the

15  Bakken and going to truck stops and driving up to

16  people in the truck stops and asking them to look at

17  their VIN numbers.

18            I've been looking for it like a repo person

19  because I think someone took it, a previous employee

20  that was owed money or a previous person that, you

21  know, I owed money to, maybe, that had done towing,

22  or somebody -- because I recently had a rig, a

23  drilling rig, taken from my shop, and I'm in the

24  process of getting that back with Erik Ahlgren, who

25  is on the phone with us right now, because that rig

```
1    is supposed to come back to my shop because they

2    repossessed a trailer and took a rig illegally, and

3    they were going to hold on to it, and then when my

4    lawyer, Mr. Erik, got involved -- because I found

5    out, through making phone calls and finding out who

6    was on my property that day, I was able to find out.

7    I found out before the Stark County Sheriff found

8    out.

9          I instructed my attorney to talk with that

10   individual, and that individual has now agreed to

11   return my drilling rig that's on the schedule as

12   well, 2012 drilling rig.

13   Q.   Okay.  Well, why don't you send our office a

14   copy of the police report that you filed.

15   A.   Yeah, I -- I'll give it to Erik.  Yes,

16   ma'am.  I'll give it to him right away.  I'll call

17   the police department and get it for you guys.

18   Q.   Okay.  And then the same question for the

19   2007 International that's also listed as missing at

20   Number 47.5.

21   A.   It's -- it's -- it's -- go ahead.

22   Q.   Now, that says missing, too.  Is that the

23   same circumstances, or just different circumstances?

24   How did that one go missing?

25   A.    I -- I feel similar, again, that someone
```

1    took it off my property at a point in time I don't

2    know, because I was out chasing work and working and,

3    you know, trying to generate revenue.

4            I was in the truck training somebody, maybe,

5    or I was not able to -- you know, somebody said they

6    parked it back at the shop, and it wasn't there.  At

7    what point in time did that go missing?  I don't

8    know.  But, again, that went missing around the same

9    period, anywhere from the last three to six months.

10   But I'm in the process of looking for that, the same

11   way I've been looking for everything that people say

12   is missing, and I actually keep looking for these

13   items because I want to go to work, and I need my

14   items to go to work.

15       Q.   Okay.  And then you said somebody said they

16   left it on the property.  Who was that person?

17       A.   When I had employees, they would say:  Hey,

18   I left this truck at this truck stop or I parked it

19   here or I parked it there.  When I had past

20   employees.  And sometimes employees have given me

21   misinformation.  I don't recall an exact time for

22   that truck being placed on my property, but I know

23   for a fact it was on my property and then it was

24   gone.

25       Q.   Okay.  And when would you last see it on the

1    property?

2        A.    Anywhere within the last three to six

3    months, ma'am.

4        Q.    Okay.  When did you last see it on the

5    property, though?

6        A.    I would say within the last -- again, I'm

7    dealing with trying to find my equipment that's still

8    missing, that 2014, and I'm looking for that truck as

9    well, so I have a lot on my mind.

10            But to be honest with you, I don't recall an

11    exact time period when it was on my property.  I was

12    only surmised it was on my property within the last

13    six months.  It was not on the property last month.

14    It's been missing for about four to six months.  I've

15    been looking for it.

16        Q.    Okay.  Now, you said an employee told you

17    that they had left it on the property.  Who was that

18    employee?

19        A.    I said employees left items on my property.

20    They would -- as an example -- here's an example.

21    You have a gentleman on the phone right now.  His

22    name is Dylan Boykin.  Right?  Dylan Boykin.  That

23    gentleman was in Minnesota driving a truck, and he

24    said he was going to drive back to the shop and just

25    park my truck.  I didn't know that until I saw a

1    voicemail.  That was a Volvo, though.  That was

2    nothing to do with the 2007 International.

3              So who and what and when, I don't have an

4    exact answer for when that truck was put on my

5    property, but it was on my property, and at a point

6    in time, it left my property, and I believe it left

7    my property within the last seven months or so.

8              I've been dealing with creditors, like I

9    said, taking my -- my one R- -- RGN trailer from my

10   property with my drilling rig on it.  That happened

11   around January.

12             I dealt with other times and places when

13   equipment was left on my property, and all of a

14   sudden it was gone.

15        Q.   Did you file a police report for this piece

16   of property?

17        A.   No.  I didn't file a police report for the

18   2007 International.

19        Q.   Why not?

20        A.   Because I can't -- because I can't recall

21   the exact date and time that I can misplace it.  I

22   can recall the exact date and time that I noticed my

23   2014 Kenworth coming and going.  And I'm not trying

24   to make false statements to anybody.  So I don't know

25   if a -- an employee took it or -- thinking they're

1    owed money or a creditor took it thinking they're

2    owed money or anything.  So I can't speak to any

3    exact fact, and I'm not going to get in trouble.  I'm

4    already getting, you know, backed into a corner.

5        Q.    Okay.  And it's a missing asset.  Did you

6    make an insurance claim?

7        A.    It's free and clear.  I did not, ma'am.

8        Q.    Well, it has value, though.

9        A.    Yes, and I'm still trying to find it, and I

10   think I can find it.  I'm not like -- I'm a very

11   active person.  I'm out working and looking for these

12   items.

13       Q.    And what -- okay.  So you haven't done a

14   police report and you haven't done an insurance claim

15   on that one?

16       A.    No, ma'am.

17       Q.    Okay.  And then the other one that's

18   reported as missing is the 2014 --

19       A.    I can't hear you.  There's a lot of noise,

20   background.  Sorry.

21            MS. WENCIL:  If somebody is not on mute,

22   please mute their phone.

23       Q.    (BY MS. WENCIL)  And under Number 47.15

24   there's a 2014 Dragon 200 BBL that's reported as

25   missing, and how did this one go missing?

1    A.    It is -- I don't know how it went missing,

2    ma'am.  I think a creditor that was owed money

3    took it off my property at some point in time.  I

4    don't know exactly what time, but I've been looking

5    for it as well.  I've been looking out in oil field

6    locations, thinking somebody's using it or thinking

7    it's parked somewhere, and I'm going to find it

8    because I'm a very diligent person.  I'm trying to do

9    my best.

10    Q.    When was the last time you saw that?

11    A.    I -- I -- I don't have a recall on the exact

12    answer of when I -- I saw that last, ma'am.  Again,

13    there was a lot of chaos in the -- in leading up to

14    me filing this bankruptcy with creditors coming and

15    going and calling me and coming on my property,

16    without the right proper reason, to take my

17    equipment, and at some point in time it was, I guess,

18    taken.  I don't know.

19    Q.    Well, how long ago was the last time you

20    noticed it?

21    A.    I -- I -- I don't recall at this time,

22    ma'am.  I -- I just -- I -- I don't understand even

23    the reasoning for it.  I just -- I don't know where

24    it's at.  I'm looking for it.  I've declared it

25    missing.

1       Q.    Did you file a --

2       A.    I don't recall.

3       Q.    Did you file a police report?

4       A.    No, ma'am, because I'm not going to file a

5    police -- no, I did not.

6       Q.    Okay.  Did you make a claim for insurance?

7       A.    No, ma'am, I did not.

8       Q.    Okay.  And then going back up that list, the

9    2018 Great Dane trailer, was that the one that was

10   taken by Alliance?

11      A.    No.  There's a 2015 Trail King that was

12   taken by Alliance.  2015 Trail King.

13      Q.    Okay.  So do you still have possession of

14   that 2018 Great Dane trailer?

15      A.    Yes.

16      Q.    Okay.  Is that secured by a party other than

17   the Brigit credit agreements and the SBA?

18      A.    I -- I -- I know I have two reefer trailers,

19   ma'am, but one of the reefer trailers is -- I --

20   I might have a security interest, but the other

21   reefer trailer is free and clear.  To what -- to what

22   exact VIN number you're speaking to, exact item, I

23   don't have it in front of me.  I'm sorry.  I will

24   write it down.  This VIN number or 2018 or whatever

25   schedules, I will bring this with me on the 19th.

1    I'm sorry, but I just --

2        Q.    Okay.  It's the 2018 Great Dane trailer

3    listed at 47.6.  It's the VIN number ending 152.

4        A.    152?

5        Q.    Yeah.  Just determine, do you have that one

6    or not, and --

7        A.    Yeah.  Yeah.  I have a Great Dane trailer,

8    yes.

9        Q.    Okay.  You think you have this one, then?

10       A.    What is that?

11       Q.    You believe you have possession of this

12   trailer?  A creditor didn't --

13       A.    I guarantee I have possession of it, yes.

14       Q.    Okay.

15       A.    I have possession of it, yes.  Creditors do

16   not.

17       Q.    Okay.  That's kind of what I want to know.

18            And then there are assets listed at Number

19   47.7, 47.8, and 47.9.  I noticed they were not listed

20   on the balance sheet that was filed at Document 15,

21   which was from the end of December.  Are those new

22   assets?  It's a 2014 Trail King.

23       A.    At the end of December?  It's a 2014 what?

24       Q.    Trail King.  Did you purchase that in the

25   last six months?

1      A.    (Indiscernible.)  I did not purchase

2  anything in the last six months.

3      Q.    Okay.  So they're just missing from that

4  balance sheet.  Okay.

5           Okay.  And then there were three vehicles on

6  the balance sheet that was filed at Docket 15 which

7  weren't on Schedule B, and I just wondered if you

8  still have those assets.  One was a 2012 Chevy 3500.

9      A.    No, I don't have that.  I do not have that.

10  That truck's not been in my -- I -- no, I don't have

11  it.

12      Q.    Okay.  Did you once -- did the Debtor once

13  own it, or --

14      A.    Not to my knowledge.  I'm pretty sure that's

15  free and clear.  Maybe initially.  Maybe initially,

16  but that truck's been free and clear for sometime.

17      Q.    Okay.  Whose name is the truck titled in?

18           UNIDENTIFIED SPEAKER:  (Indiscernible.)

19           ROBERT FETTIG:  I don't --

20           (Indiscernible speakers.)

21      A.    You're saying 2012, ma'am?

22      Q.    (BY MS. WENCIL)  2012 Chevy 3500.

23      A.    That truck was purchased, I believe, in 2017

24  or 2018, and that truck was in the -- in an accident,

25  and it had been totaled out and was part of an

1    insurance claim, so I think someone bought it back

2    from the insurance, but that truck has never been in

3    use at my company for many years.

4        Q.    Okay.  It's long gone, then?  It just showed

5    up on that --

6        A.    Yes, ma'am.

7        Q.    Okay.  It just showed up on the balance

8    sheet.

9            So there's also a 2013 Ford F-150 with a VIN

10    ending 634.

11        A.    I -- okay.  I -- I don't really -- I

12    don't --

13        Q.    Do you recall -- and a 2015 Ford F-150, VIN

14    ending 354?

15        A.    I -- I don't recall.  Maybe you can send

16    them to me.  Can you send me emails or something,

17    maybe?  Sorry.

18        Q.    Sure.  You can just check on that.  It was

19    on that balance sheet for the next meeting that we

20    have.

21            To the best --

22        A.    Yeah.

23        Q.    -- of your knowledge, does the Debtor have

24    possession of either of those Ford F-150s that I just

25    mentioned?

```
1          A.    I'll have to look and -- and check.  I'd

2    have to look at my shop, I mean, to be honest with

3    you.

4          Q.    Okay.  And then in Gate City's motion for

5    relief, they state that 18 pieces of equipment were

6    recovered at Yuker Towing & Repair.  Do you know how

7    that equipment got there?

8          A.    Ma'am, at the advice of my counsel, I have

9    an ongoing criminal matter, and I choose to plead the

10   Fifth.  I mean, I'm not looking to -- I'm just going

11   to plead the Fifth at the advice of my counsel.

12         Q.    Okay.  And then my -- it's totally within

13   your rights.

14               So do you know why Yuker had the equipment?

15         A.    Hold on one second, ma'am.

16               Again, ma'am, I -- I choose to -- at the

17   advice of my counsel, I choose to plead the Fifth.

18         Q.    Okay.  Did you have knowledge that the

19   equipment was located at the Yuker Towing & Repair

20   prior to the issuance of that search warrant?

21         A.    Again, at the advice of my counsel, I choose

22   to plead the Fifth on that question.

23         Q.    Okay.  And then under Number 48, we're going

24   to talk about -- I guess it's trailers.  How did you

25   value those trailers?  This is the same as the
```

1    question I asked under Number 47.

2         A.    Any valuations are derived from the fact of

3    talking to people that do auctions or -- or current

4    price valuations.  That's the only way I was able to

5    come up with price valuations.

6         Q.    Okay.  And then Number 48.4 states that a

7    2014 -- is it -- or -- I'm sorry.  A -- it says a

8    2007 Retinauer trailer is missing, with a VIN number

9    ending 280.  How did this piece of equipment go

10   missing?

11        A.    I don't know.  I can only think that someone

12   took it because, I mean, how else would they have it,

13   you know?  It's missing.  I don't understand.

14        Q.    Okay.  When did you last notice it was

15   missing?

16        A.    Again, I don't recall when any of the items

17   went missing except for the fact that when the Judge

18   and the people now are telling me to pay clear

19   attention.  On March 15th a 2014 Kenworth was taken

20   from my shop.  I know that for a fact.  That's the

21   only date that I can recall.  Recalling the date of

22   when any other item went missing, I cannot recall

23   that.

24        Q.    Okay.  Did you file a police report for the

25   Debtor?

1          A.    No, ma'am.  No.  There's only one police

2     report that's ever been filed and that's for the 2014

3     Kenworth.

4          Q.    Okay.  And did you file an insurance claim

5     for the trailer?

6          A.    No.  I did not file an insurance claim for

7     any missing items.

8          Q.    Okay.  And then you referenced this drill

9     before.  I'm looking at Number 15, the 2012 CZM long

10    mast drill mounted.

11         A.    Uh-huh.

12         Q.    And it -- did you get -- did you say you

13    have possession of this drill back?

14         A.    I'm in the process of getting possession of

15    it back.  I was recently made aware of its

16    whereabouts, and I pursued that, so yeah.

17         Q.    Okay.  And what -- your schedules state that

18    Regent Bank had the lien.  Is that correct?

19         A.    Correct.

20         Q.    And when --

21         A.    And Regent Bank actually state -- ma'am,

22    Regent Bank actually stated that they wanted nothing

23    to do with that rig when the -- the tow yard that I

24    found it at, you know, so I -- I'm fighting harder

25    for this stuff than the creditors are at this point.

1        Q.    Okay.  And when did Regent Bank repossess
2    the drill bit?
3        A.    They never repossessed it.
4        Q.    Oh.
5        A.    It's not in their possession.
6        Q.    Okay.
7        A.    It was taken illegally from my shop when
8    Alliance Funding tried to repossess a trailer, and
9    they tried to use it as a bargaining chip or just to
10   hold it to -- to be rude and disrespectful as to
11   so-called creditors that they there.
12       Q.    Okay.  So Alliance Bank took the drill bit?
13       A.    A towing company --
14             MR. AHLGREN:  It was iSpy (indiscernible).
15             (Simultaneous, indiscernible crosstalk.)
16             ROBERT FETTIG:  Go ahead, Erik, please.
17             MR. AHLGREN:  ISpy Asset Recovery -- yeah,
18   iSpy Asset Recovery, who was a contractor on behalf
19   of Alliance Funding, took the drill rig.  I believe
20   that we will be getting it back.  I drafted up a
21   Complaint, I sent it to them, and I think that has
22   convinced them that they need to give it back.
23       Q.    (BY MS. WENCIL)  Okay.  In the balance sheet
24   that was filed at Docket 15, it valued it at $406,000
25   at the end of 2023.  Given that value at the end of

1  2023, how did you come up with the $85,000 value on

2  Schedule B?

3       A.    Hold on.  At -- at the end of what, ma'am?

4       Q.    Your balance sheet that was filed, that you

5  filed, at -- at Docket Number 15 with the Bankruptcy

6  Court, it was dated --

7       A.    Okay.

8       Q.    -- the balance sheet as of December of 2023.

9  It -- it listed the value at $406,000.

10      A.    I think that's -- okay.  So my books -- my

11  QuickBooks and everything is kind of like in disarray

12  because I hired people that said they went to

13  accounting school, and they didn't do a good job --

14  back to me trying to apply with the courts to get

15  that financial firm to get involved.  But I valued

16  it, again, at the $85,000 for a quick sale price

17  because I've called around, and that's the price that

18  I came up with.  I called other drilling companies

19  and people, and I called auction houses, and that's

20  where I came with that valuation.

21           The balance sheet is probably just a -- a --

22  a (indiscernible) where people put in sheets, like,

23  in the wrong area, or someone took some payment

24  history or something and put that in there.

25           But I apologize for the discrepancy.  I'm

1   trying to work to get my books in order and get my --

2   my taxes caught up and everything else.

3       Q.    Okay.  And then who prepared that balance

4   sheet?  Do you know?

5       A.    That, I -- that exact balance sheet, I don't

6   know.  I know that my CPA firm briefly looked over

7   everything and said who did I have hired to do some

8   of this stuff.  Oh, my God, your books are a mess.

9   We need to get involved as soon as possible.  And the

10  CPA lady is trying to work with Mr. Erik to get

11  approved through the courts to be my CPA people to

12  help get my stuff caught up.

13      Q.    Okay.  And then also under this Number 15,

14  there's these three frac tanks.  Those are listed as

15  missing, too.

16      A.    Yeah.

17      Q.    How did those go missing?

18      A.    There's one missing.  There's one missing,

19  ma'am.  I know the location of two of the other

20  tanks, but the -- the one that's missing, it's

21  missing because it was left on a well site and

22  another company or trucking company or somebody just

23  grabbed it by mistake, I can only assume.

24          I have looked for it.  I've not been able to

25  locate it.  It's one frac tank.  It's -- it's -- it's

1    been a focus of -- when I go look for things, I look

2    for that as well as other things, but that's been

3    missing for -- I don't know.  20- -- the early part

4    of 2023 I started looking for it again.  It's been

5    missing since 2022, I think.

6        Q.   Okay.  And the other two, where are they

7    located at?

8        A.   They're located -- they're rented out on a

9    location, to my knowledge.  I -- I -- I -- I made

10   a -- I made a deal to rent them out so that I could

11   clean them (indiscernible) hydrovac, so I -- I -- I

12   talked to someone and said:  Hey, can you rent these

13   out so I can clean them and get that business?  And

14   they agreed, so -- I believe they're in Dunn Center.

15       Q.   Okay.  And how did you value them at

16   $15,000?  Or is that apiece or for all three, first

17   of all?

18       A.   That's -- that's going to be all three, and

19   that's a low valuation, or that's going to be a high

20   valuation at -- two of them at 8,500, you know.

21   There's a -- there's a give-and-take, you know.

22   People are willing to pay what they're willing to

23   pay.  The Internet, you can see them listed for 11-

24   or 12,000 all day long, but for someone to actually

25   come off their pocket and really click, oh, I'll buy

1    them today, they're going to pay anywhere from 5,000

2    to 8,500.  So it can be anything from -- again, it

3    can be the two of them at 8,500 or all three of them

4    at 15,000 at the extreme low side.

5        Q.   Okay.  And your real estate that you listed

6    at 55.1, how did you value that at $202,000?

7        A.   That's just a tax valuation, the -- the tax

8    people, I think.  That's what the lawyer guy pulled

9    off the tax thing, or my mom did.

10            I mean, you have to be able to -- willing to

11    buy it.  There's a shop that's been up the road for

12    sale for three and a half years and it's never been

13    sold, so, I mean...

14        Q.   Okay.  Is the Debtor current on its real

15    estate taxes for that property?

16        A.   I think I'm behind a little bit.  Actually,

17    bringing that up, I actually brought that shop

18    current, and I brought that shop current with Gate

19    City, and I brought that shop current underneath the

20    guise of the permission of that lady that's on the

21    phone there, Ms. Caren Stanley, and she said that she

22    wasn't going to foreclose on the shop, and I -- I --

23    I brought that current, and then the bank refused to

24    take payment on that.  They won't let me make my

25    payments on my shop.

1    Q.    Okay.  Did you pay the year taxes directly,

2    then, to the County?

3    A.    I -- I can go to the County and get the

4    amount.  I can start working on paying that and

5    getting that current.  I've got no problem with that,

6    ma'am.  I'd like to keep my shop, I'd like to keep

7    all my equipment, but again, creditors are being

8    dubious and deceitful.

9    Q.    Okay.  And when was the shop purchased?

10   A.    The shop was purchased in -- trying to think

11   really hard here, ma'am.  We're going over seven

12   years.  Right?  I believe in the end of 2019, give or

13   take, maybe the beginning of 2019, somewhere in

14   there.

15   Q.    Okay.  And under Number 70, you checked that

16   the Debtor -- you checked that the Debtor owns assets

17   that are not reported, but then it didn't -- you

18   didn't list any.  Are there other assets that are not

19   reported?

20   A.    I -- I don't know what check mark you're

21   talking about, but I -- all the assets have been

22   listed.  I went through the schedule that was updated

23   on the 20 -- on the 17th, May 17th.  I went over that

24   with my lawyer, his law firm, and they updated it to

25   make sure that they were updated currently.

1     Q.    Okay.  We can check that one, maybe, by the

2     next hearing, if that was just an error.

3          But I do have a question on one thing.  The

4     2020 tax return lists that the Debtor owns a business

5     called Fettig Enterprise, and that's not listed.

6     A.    No.  Fettig -- Robert Fettig owns that.

7     Stark Energy doesn't own that.

8     Q.    Okay.  And why did the tax return list that?

9     Did the Debtor --

10    A.    Huh?

11    Q.    -- used to own it?

12    A.    What did you say, ma'am?

13    Q.    Did the Debtor used to own Fettig

14    Enterprise?

15    A.    Not -- no.  I've never done that.  It's a

16    wholly owned company by me --

17    Q.    Okay.

18    A.    -- Robert Fettig.  I have the bill of sale

19    and everything.

20    Q.    Do you recall why it was listed as the

21    Debtor owning it on the 2020 tax return?

22    A.    I don't know.  I think that there was some

23    errors on the 2020 tax return.  That's why, again, my

24    CPA firm was getting involved and saying:  Listen.

25    You're not suited to hire these people that say they

1    go to accounting school to help you with this stuff.

2    Let's work with -- you're saying 2020.  Right?  So I

3    don't think the 2020 tax return -- or the 2021 tax

4    return -- sorry.  I'm misspeaking.  But to my

5    knowledge, 100 percent Fettig Enterprise is its own

6    company.  It has nothing to do with Stark Energy.

7          MS. WENCIL:  Okay.  Well, I've just gotten

8    through Schedule B, and that was probably the longest

9    group of my questions, but I think we're out of time

10   today, so I'm just going to continue the meeting

11   today, and then we'll reconvene on the -- June 19th

12   at 1:30.  Okay.

13         MR. AHLGREN:  Okay.

14         UNIDENTIFIED SPEAKER:  Okay.

15         MS. WENCIL:  All right.  Well, thank you.

16   We'll talk to you on June 19th.

17         MR. AHLGREN:  Thank you.  Yeah.

18   (End of tape.)

19

20

21

22

23

24

25

```
 1                 COURT REPORTER'S CERTIFICATE

 2           I hereby certify that I transcribed the

 3     preceding forty-two (42) pages from an audio

 4     recording provided to me by the Vogel Law Firm to the

 5     best of my ability;

 6           That I was not present at the time said

 7     recording was prepared;

 8           That I have broken the transcript into separate

 9     conversations to the best of my ability;

10           That I am not a relative or employee or counsel

11     of any of the parties or a relative or employee of

12     such attorney or counsel;

13           That I am not financially interested in the

14     action and have no contract with the parties,

15     attorneys, or persons with an interest in the action

16     that would affect my impartiality.

17

18

19
                            /s/ Carolyn Taylor Pekas
20                          Carolyn Taylor Pekas, RPR
                            PO Box 886
21                          Fargo, ND 58107

22

23     Dated this 12th day of June, 2024.

24

25
```