1      UNITED STATES BANKRUPTCY COURT
           DISTRICT OF NORTH DAKOTA
2

                              Case No. 24-30168
3                    Chapter 11, Subchapter V

4      _____

       In Re:
5
       Stark Energy, Inc.,
6
                     Debtor.
7      _____

8

9                T R A N S C R I P T I O N

10                          OF

11               A U D I O T A P E

12

13           Continued 341 Meeting

14               June 19, 2024

15

16

17

18

19

20

21

22

23
       Transcribed by:  Carolyn Taylor Pekas, RPR
24

25

1    (Beginning of recording.)

2          UNIDENTIFIED SPEAKER:  My bad.  I just

3    joined.

4          MS. WENCIL:  Okay.  We are back on the

5    record for the Section 341 meeting for the District

6    of North Dakota, Chapter 11, Subchapter V case of

7    Stark Energy, Incorporated, 24-30168.

8          This meeting is being held on June 19, 2024,

9    at 1:30 p.m. by telephone.  This is a continued

10   meeting from the original meeting that started on

11   May 30, 2024.

12         And, Mr. Fettig, could you raise your right

13   hand and indicate when you have done so?

14         ROBERT FETTIG:  Yep.  Go ahead.

15         MS. WENCIL:  Okay.  Do you swear to tell the

16   truth, the whole truth, and nothing but the truth

17   here today?

18         ROBERT FETTIG:  Yes, ma'am.

19                     * * * * *

20         ROBERT G. FETTIG, having been first duly

21   sworn to tell the truth, the whole truth, and nothing

22   but the truth, was examined and testified under oath

23   as follows:

24                     * * * * *

25                     / / /

```
1                   CONTINUED EXAMINATION

2    BY MS. WENCIL:

3       Q.    Okay.  And I'm just going to start following

4    up with a few --

5       A.    (Indiscernible.)

6       Q.    -- just some -- tying up loose ends, and I

7    think right before we went on the record you stated

8    you're in the process of still getting the copy of

9    the police report that you filed for the missing

10   trailer.  Trailer or truck.  And then, also --

11      A.    It's not -- it's not a trailer.  It's a

12   truck.

13      Q.    Truck.

14      A.    Truck.

15      Q.    Thank you.

16            And then, also, we have a request to get

17   copies of the checks that go with the bank statements

18   that you provided.  If you recall providing us with

19   the three months of bank statements, we still need

20   copies of the checks that were written.

21      A.    Those were emailed -- those were emailed

22   today to Erik.

23      Q.    Okay.

24      A.    I -- yep.

25      Q.    Okay.  And to the extent that any of the
```

1    financials that were filed with the Bankruptcy Court,

2    the balance sheet and the profit and loss statement,

3    are inaccurate, we do need some corrected financials.

4    And that kind of goes to the question, I think, that

5    we touched on at the hearing.  You were looking at

6    hiring a CPA to assist you with your books and

7    records.  And what's the status of getting the CPA

8    hired?

9         A.   Yeah.  I -- I've located a CPA.  I'm just

10   going to hire them.  It's...

11        Q.   Okay.  Have you provided their name to your

12   attorneys so they can do an employment application?

13        A.    I've given -- I've given it to them

14   previously, yep.  I can give it to them again.  I can

15   do that here tonight.

16        Q.   Okay.  Yeah, just keep that --

17             MR. AHLGREN:  I've got that.  If we're ready

18   to do that, we can, if we got the approval to be

19   factoring the accounts receivable, so we should be

20   able to move forward.

21        Q.   (BY MS. WENCIL)  Okay.  And, also, I was

22   going to say, at the prior meeting you indicated you

23   may be behind on state, local, and federal taxes

24   since April 23rd.  Do you believe that you're current

25   on those taxes now?

1      A.    To the best of my knowledge, I'm current on

2    the taxes that matter and that I'm working with

3    keeping in touch with my lawyer if anything comes in

4    the mail, but I am going to be working on getting

5    anything and everything, like my back filings, caught

6    up, but I won't owe any money because I had

7    substantial losses in certain categories in --

8    whatever they call that.  I mean, the CPA does

9    their -- their business.  You know, they know their

10   rules and regulations, you know.

11     Q.    Okay.  And then last time we were going to

12   ask you questions on what was filed as a balance

13   sheet at Document 15.  Did you bring that today?  You

14   were going to bring that one today.

15     A.    What are you referring to again, ma'am?

16   Sorry.

17     Q.    It was a balance sheet that the Debtor,

18   Stark Energy, filed with the Bankruptcy Court at

19   Document Number 15 on the -- and it states it's a

20   balance sheet dated as of December 31, 2023.  Did you

21   bring that today?

22     A.    I'm sorry.  I had mute on.  Sorry, ma'am.

23     Q.    Okay.

24     A.    I have some stuff with me.  I don't think I

25   have that with me, but I know that my mother has been

1    working on cleaning up the -- the balance sheet and

2    putting things in the correct -- what do they call --

3    filings in the QuickBooks.

4         And then that CPA firm wants to get hired

5    because they just want to get it done.  They said

6    that they're qualified, ready to go, and they can get

7    all my books caught up and -- and it will be done

8    quicker than me trying to do it, if that makes any

9    sense.

10         I'm not doing anything wrong or maliciously.

11   It's just I had employed people that had graduated

12   from Dickinson State University, and they may or may

13   not have graduated with an accounting degree.  Right?

14   And they said that they wanted 20 or 30 hours a week,

15   and they worked, and they were paid.

16         And they worked underneath the guise of me,

17   like:  Hey, what are we working on today? or kept

18   constant communication with the CPA lady.  But they

19   were putting stuff in the wrong quadrants.  They were

20   putting receipts in where they shouldn't be.  It was

21   just a mess.  And -- and I'd like to get that cleaned

22   up, and that's why I want to use that CPA firm, to

23   get that cleaned up.

24         I mean, I'm trying to clean it up myself in

25   between driving the truck, interviewing drivers,

1    working with people, fixing equipment, you know, but

2    there's only so many hours in a day.  Sometimes I

3    work 20 hours a day, so...

4        Q.    Okay.  And are you stating that balance

5    sheet that was filed with the Court is inaccurate?

6        A.    I'm not saying that it's overly inaccurate.

7    I think it's pretty accurate, but I think there's

8    some inaccuracies --

9            MR. AHLGREN:  Well --

10       A.    -- due to the fact of --

11           ROBERT FETTIG:  I'm sorry.  Go ahead.

12       A.    I'm just -- I'm not -- I'm not stating that

13   it's inaccurate, no.  I'm not saying that.  I'm just

14   stating that some of my QuickBooks in my -- in my

15   stuff, even you said, it's kind of like -- respect --

16   you're -- you're the -- excuse me.  You're the

17   Trustee.  Correct, ma'am?  Sorry.  I'm just trying to

18   get this correct.

19       Q.    (BY MS. WENCIL)  Mr. Kapusta is the Trustee

20   assigned to the case.  I'm with the Department of

21   Justice --

22           (Simultaneous, indiscernible crosstalk.)

23       Q.    (BY MS. WENCIL) -- we're called the U.S.

24   Trustee, so it's very confusing.

25           But I do have a question.  On those bank

1    accounts that were listed on that document, the

2    balance sheet that was as of December 31st, it states

3    that there was $365,000 of cash in your bank

4    accounts.

5        A.    That's inaccurate.  If I had $365,000 worth

6    of cash, respectfully, I would have been able to buy

7    time and stave off bankruptcy.

8        Q.    Okay.  So you -- at the end of December, how

9    much cash do you think that the Debtor had?

10        A.    I don't know the specific answer on that.

11    I'm not trying to be eluding.  I'm not trying to be

12    evasive.  I'm not even trying to be rude.  I just --

13    I -- I can't speak to that at this exact moment.

14            I know I was -- I was working.  Let me

15    think.  Janu- -- you said December?  I -- I don't

16    have an exact figure, but I can get that figure.  I

17    can focus on that being a goal, to figure out that

18    exact number.  I've been trying to figure out -- but,

19    again, with respect to the Court or you or -- and

20    this is the Court.  Right?  The CPA, they're going to

21    be critical, because they -- they get this thing

22    caught up in like, I don't know, lightning speed, you

23    know?  So...

24        Q.    Okay.  You provided --

25            MR. AHLGREN:  Ms. Wencil?

1           MS. WENCIL:  Yes.

2           MR. AHLGREN:  Sarah?  Can you hear me?

3           MS. WENCIL:  Yes.

4           MR. AHLGREN:  Okay.  So we provided the bank

5    statements.  The bank statements would show how much

6    cash was on hand as of December 31st.  I do believe

7    that those balance sheets are inaccurate as of

8    December 31st.  We did provide a balance sheet that

9    we believe is accurate as of the date of filing, the

10   balance sheets as of December 31st.  To the extent

11   that they can be recreated, that will be one of the

12   goals of the CPA firm, but...

13        Q.   (BY MS. WENCIL)  Mr. Fettig, do you agree

14   that all the cash the Debtor had would show up in

15   those bank statements?

16        A.   Yes, ma'am.  I don't hide any money.

17        Q.   Okay.

18        A.   Yes, ma'am.  Sorry.  I'm not trying to admit

19   to anything, but I wouldn't do that.  That's stupid,

20   so --

21        Q.   Okay.  As of December 31st, did the Debtor

22   have any other bank statements other than those four

23   accounts that were open?

24        A.   No.  No.  I gave all my bank accounts,

25   truthfully and honestly, to Mr. Erik's people, his

1   staff and him.

2      Q.   Okay.  Did the Debtor keep any cash in any

3   other location other than the four bank accounts that

4   have been provided?

5      A.   No.

6      Q.   Okay.

7      A.   I might have had petty cash, like a hundred

8   bucks or something, but I doubt that.  You know, you

9   get -- you take something back, you get a return,

10   there's a hundred bucks.  You use it for screws or

11   something.  But, no, I didn't have any cash.  No.

12      Q.   Okay.  And then your accounts receivable at

13   the last meeting, the end of May, you had about 13-

14   to $15,000.  As of today, what are the accounts

15   receivable?

16      A.   I can have that fixed up here.  Outstanding

17   right now is right around $11,267.25.  I've received

18   some payments since then.

19      Q.   Okay.  And then another issue at the prior

20   meeting was that I believe Alliance had taken your

21   oil rig.  Have you -- has the Debtor received that

22   asset back?

23      A.   I'm in the process of renting an RGN.  I was

24   waiting to do, like, smart cash management and

25   negotiations.  I have three people in the state of

1    North Dakota that own an RGN, and all three of them

2    said that they would rent me an RGN, so they just

3    told me to let me [sic] know when I need it and then

4    go pick it up, so...

5        Q.   And then an RGN, what is an RGN for someone

6    like me that --

7        A.   It's a trailer.  It's a -- it's a -- it's

8    all right.  It's an RGN.  It's a loyboy.  It's a

9    removable gooseneck trailer used to haul the weight

10   of that truck and trailer.  It's going to haul --

11   it's going to be a combined gross weight of 165- to

12   170,000 pounds, so I've got to call North Dakota

13   state troopers.  I have to get a permit.

14   Respectfully, I'm not trying to talk rude or

15   disrespectful or (indiscernible) them, but I have to

16   get a permit, and I have to rent a trailer, so I was

17   just waiting to make sure I had more cash on hand

18   before I spent the money to do that.  I still have a

19   little bit of time to do that per my agreement with

20   the person that, you know, was funky, I guess.

21   Right?

22       Q.   Okay.  And was that getting your drilling

23   rig back as well?

24       A.   Yeah.  I'm -- I'm going to be getting my

25   drilling rig back.  I'm going to be getting the

1    drilling rig back by renting an RGN trailer --

2         Q.    Okay.

3         A.    -- and going to pick it up where it's

4    located at, and then bringing it back to my shop,

5    function testing it, doing sales calls, and putting

6    it out to work.

7         Q.    Okay.  Another item that you discussed at

8    the last meeting is that the Debtor was renting out

9    some of their frac tanks.  Is the Debtor still

10   renting those out, the two?

11        A.    They're -- they're still underneath a

12   rental.  I have to communicate with the -- excuse

13   me -- with the person that's renting them and find

14   out from the month of April 20- -- you know, since I

15   filed going forward or -- you know, where we're at,

16   standing, in financials and, you know, if I'm not

17   going to be receiving money, why not, and/or, you

18   know, take the trailers -- not the trailers, sorry --

19   the -- the tanks back.

20        Q.    Okay.  What's the name of the person who's

21   renting those tanks?

22        A.    Oh, I -- I -- I had went -- fell on hard

23   times, and I -- I authorized a company called Yuker

24   Oilfield Services to rent them out through Pale

25   Horse.

1          Q.    How much did they pay in rental income?

2          A.    They haven't paid yet.  The reason why they

3    hadn't paid previously is because I was in debt to

4    the individual quite a bit, and I -- and I felt --

5    you know, and the company wanted to be able to get a

6    tow truck, you know, like -- they wanted the --

7    the -- what is it called?  If my truck gets in the

8    ditch, I need a tow company to be willing to tow my

9    vehicle, and I was going to -- at the time, when we

10   started the process of me renting the -- the trailers

11   to him -- not the trailers, sorry -- the tanks to

12   him, he said:  Hey, I can rent them out, and I can

13   help you set -- offset your cost, and he talked

14   something like 1,300 or a thousand dollars a month.

15   That was around July, I believe, July of 20- -- 2023.

16   And then I -- I had -- I had not received any rental

17   payments from him because I know that he, himself, is

18   like a business, and he probably was struggling, too,

19   and I had owed him a bunch of money.

20          But now, since I'm in the court, there can't

21   be any of those side deals.  It needs to be 100 --

22   I'm not trying to say it was a side deal, either.

23   I'm just trying to be very transparent with you,

24   either, that the situation was I wasn't being so

25   boastful and demanding payment, because Stark Energy,

1    the Debitor, owed money.  I saw an invoice in the

2    area of 27,000, and now I'm hearing a number of like

3    70,000 owed, but...

4             He's listed on my schedules, you know, so...

5        Q.    Right.  And he can't be paid.

6        A.    But I know I -- I'm sorry.  What?  Yeah, I'm

7    not paying.  No.  I understand that.  Sorry, ma'am.

8    I wasn't trying to talk disrespectfully.  But, no,

9    I'm not paying him.  I just -- I need to get

10   clarification as to if there was any rental income

11   earned from them, what dates were they earned?  He's

12   supposed to do an accounting of that -- right? -- his

13   company is, and then give that information to Erik so

14   I can find out how I legally -- what -- what states

15   I'm able to get paid for, if -- all payments, if we

16   need to do demand payments, if we go pick it up if

17   he's not willing to pay.  I mean, this is an area I'm

18   not familiar with, you know.  I've never been in

19   bankruptcy before.

20       Q.    Okay.  And, yeah, that was one of the

21   problems is this rental agreement's not disclosed on

22   the schedules, and it would need to be.

23       A.    And what?  Sorry.

24       Q.    Oh.  The rental agreement was not disclosed

25   on your schedules.

1        A.    It was just kind of like that situation

2    where we sat down and talked about renting them out,

3    and he said he was willing to rent them out.  I

4    didn't -- I never received a payment from him,

5    so whether he rented them out or not, I -- I assume

6    he rented them out.  I'm telling you truthfully, with

7    my hand up in the air, not trying to be

8    disrespectful.  I'm just trying to do things -- when

9    you ask me a question, I'm trying to answer them.

10   I'm sorry.

11       Q.    Okay.  And, well, it just needs to be

12   disclosed, so you'll just need to amend the schedule

13   to add that in, and any other rental agreements --

14       A.    Oh, yeah.  I'll do that.

15       Q.    Okay.

16       A.    That's the only one currently, ma'am.

17   That's the only one currently that I know of.  I was

18   trying to get, you know, a rental agreement in place

19   with, like, equipment I have, you know, but we

20   already know how that goes.  Waiting to get my

21   equipment back.

22       Q.    Okay.  And then, also, you were unsure on

23   the real estate that the Debtor owns, whether you're

24   current on the real estate taxes.  Do you know today

25   if the Debtor is current on those taxes?

1       A.    I don't think I'm current on the taxes, no,

2    ma'am.

3       Q.    Okay.

4       A.    I think there was a credit or something that

5    I applied for, and they -- they paid a credit towards

6    it, but I don't think I'm current right now.  I can

7    work to be current, but I don't know how that works.

8    I mean, I have to ask permission to pay past bills, I

9    think.

10       Q.    Okay.  And what period is delinquent?

11       A.    The -- the gal said she was going to send it

12    over in an email.  I -- I -- I've got to find that

13    email that she sent it over and so I'll have an

14    accounting.  I can send that over to Erik today as

15    well.

16       Q.    Okay.

17       A.    I can do that here when we get off the

18    phone.  If it's -- in an hour or two, this will be

19    over, so make sure that's in there.

20       Q.    Yes.  And then if that arose prior to the

21    bankruptcy, that would have to be disclosed as well.

22       A.    That what?  I'm sorry.  What?

23       Q.    Also, if those taxes arose prior to the

24    bankruptcy, that you owe, they would need to be

25    listed as well on the schedules, so the -- the

1    schedules will need to be amended to add that credit.

2         A.    Well, so I meant both of those, the rental

3    agreement, once I get them figures, if he's actually

4    rented them out, and then the taxes, you're saying.

5    Correct?

6         Q.    Yes.  If they're prepetition tax receipts,

7    you'll have to amend that as well.

8              Now, Number 70 on the Schedule B you also

9    were going to check, because you checked that there

10   were other assets, but none were disclosed.  Are you

11   aware of any other assets that have not been

12   disclosed on the schedules?

13        A.    No.  I went over that schedule with Erik's

14   people.  We've updated it and made sure.  There's --

15   the frac tanks are on there.  There's drilling bits

16   on there that I need for my drilling rig.  No,

17   there's no other assets.

18        Q.    Okay.  Then you probably need to amend that

19   number as well.

20        A.    What?  Hold on.  I said there's no other, so

21   why would I amend that?  So I'm just trying to get

22   clarification.

23        Q.    You checked --

24        A.    Because the drilling bits are -- sorry.  Go

25   ahead.

1        Q.    If you could hold on a second.  You checked

2    under Number 70 on Schedule B that there are other

3    assets, and then you didn't list them.  There's a

4    "no" and a "yes" on whether there are other assets,

5    and you checked "yes."  So if you don't have any

6    other --

7        A.    Oh, then I'll have to double-check that.  I

8    might have -- I might have checked the wrong box.

9    Sorry, ma'am.  I can do that tonight as well before I

10   give you the report, the monthly report.

11       Q.    Okay.  And then --

12       A.    I've got to do that -- I've got to do that

13   tonight because you've got to get that tomorrow.

14       Q.    And then picking up on the schedules, what

15   is Fettig Enterprise?

16       A.    What is -- what is Fettig Enterprise?

17       Q.    Yes.

18       A.    It's an over-the-road trucking company, and

19   it's a repair shop.  It's a separate entity I own.

20       Q.    Okay.  Does Fettig -- has Fettig Enterprise

21   used any of the Debtor's assets in the past five

22   years?

23       A.    Has it used any of the -- no.  It hasn't

24   used the assets, but it's -- like, the whole plan was

25   to be, like, providing repairs for Stark Energy

1    'cause the current rate of repair shops -- I don't

2    know where you're physically located at, ma'am, but a

3    current repair shop in Dickinson, North Dakota, is

4    $200 an hour, and I can do the repairs for like 90

5    bucks an hour, so it would be cheaper, so that was

6    the plan.

7         Q.   Okay.  Is Fettig Enterprise operating?

8         A.   On a limited basis.  I kind of like --

9    sorry.  I kind of skipped that, you know.  I was

10   hoping to do the maintenance to help -- you know,

11   help offset the cost for maintenance, because like --

12   like I said, the -- to maintain equipment, it's $200

13   an hour, so fiduciarily speaking, it would be better

14   to pay, say, 90 bucks an hour with a fully fledged

15   equal technician, you know?

16        But, you know, I mean, Fettig Enterprise is

17   going to be firing back up here soon because the

18   over-the-road -- the distance -- like, the

19   over-the-road is better money, but that's like a

20   different company.  I mean, I don't understand the

21   relevance.  I'm not trying to be rude; I'm just

22   saying it's a different thing.  But -- and, you know,

23   I've been focused 100 percent on rebuilding Stark

24   Energy, ma'am.

25        Q.   Okay.  And my question was:  Has Fettig

1    Enterprise used any of the Debtor's assets in its

2    business in the past five years?

3        A.    I -- I mean -- hold on.  Has Fettig

4    Enter- -- well, I guess Stark Energy probably has --

5    Stark Energy has went into, say, Montana, like I told

6    you, or went into South Dakota, like I had spoken to

7    you before, and to go into the other state, you have

8    to have a DOT or MC number, so I don't think Stark

9    Energy has used the assets, but I think Stark

10   Energy -- I mean Stark -- Fettig Enterprise hasn't

11   used it, but I think Stark Energy has used the

12   ability to work -- have a working relationship, if

13   that makes any sense, ma'am, like so that I can go

14   and earn money while, say, work is slow in the state

15   of North Dakota, because Stark Energy has to have a

16   DOT -- I mean, not Stark Energy.

17           To work in Montana, you have to have a DOT

18   or MC number; or to work in, say, South Dakota, like

19   what I did in 2020 when everything, like, took a

20   crap -- excuse my language -- I took my belly dumps,

21   owned by Stark Energy, and I took them down to

22   South Dakota to work, but Stark Energy made the

23   money; Fettig didn't.  But Fettig was able to go into

24   South Dakota because it had a DOT or MC number, and

25   at ports of entry with DOT or MC -- DOT or MC

1    authority, all I had to do was sign a piece of paper

2    saying that I own Fettig Enterprise and I own Stark

3    Energy, and it's a handshake, you know, like, you

4    know, agreement where Stark Energy could use the DOT

5    number, so -- if that makes any sense.  Sorry.

6         Q.   Correct.  So Stark Energy was using Fettig

7    Enterprise's DOT numbers to work in those states?

8         A.   Yeah.  Yeah.  Yes, ma'am.  Because, I mean,

9    if you -- like, if you don't have -- like right now I

10   have an aggregate customer out in Williston.  He

11   says:  Do you have the permission to go into Montana?

12            And I can tell him:  Yes, I do, because I

13   have this other entity that has the DOT or MC number.

14            Oh, okay.  Well, we'll use your truck

15   instead of no work today.  He says -- I mean, I

16   know you -- you know what I'm saying.  Sorry.  I talk

17   a lot, but...

18        Q.   Okay.  I'm going to pick up on Schedule D

19   where you're -- ask you some questions about your

20   secured creditors.

21            And Alliance Funding Group, when did you

22   take that -- when did the Debtor take that loan out?

23        A.   I -- Alliance Funding, when did I take

24   the -- the -- the debt out?

25        Q.   Correct.

1        A.    I -- I don't have a specific date, ma'am.  I

2    don't want to misspeak, but I would say in --

3    anywhere from 2020 to 2021.

4        Q.    Okay.  That's fair.

5              How about Avanza Group?  That's the next

6    one.

7        A.    That was like probably 2022, maybe.

8        Q.    Okay.

9        A.    That's an unsecured creditor, though, type

10   of unsecured.  It's not a secured creditor.  I think

11   you said secured earlier, but...

12       Q.    Okay.  It's listed -- you listed -- you

13   listed it as a secured creditor on the Debtor's

14   schedules, so that's where I'm coming up with the

15   secured reference.

16       A.    Oh, I'm just -- I'm just being clear with my

17   answers.  I'm sorry.  I'm just trying to listen to

18   everything and tell it truthfully, so...

19             Avanza Group is an unsecured creditor,

20   ma'am.

21       Q.    Okay.  That might be something you need to

22   amend as well.  And then --

23       A.    I'm making a mental note of all this, and

24   I'm sorry for this.  Sorry.

25       Q.    Okay.  And then CHTD Company, when was that

1   loan taken out?

2       A.   I don't even know what that is.  It's

3   just -- it's a UCC, like a UCC on the Internet.  They

4   have this UCC thing where they put things.  That's

5   probably one of those merchant cash things.  I don't

6   have any literature from them.  I don't know anything

7   about them.  I don't even know if I owe them any

8   money, honestly.  I didn't use that.  That's an

9   unsecured.

10      Q.    Okay.  How about Cloudfund LLC?

11      A.    Sorry.  Go ahead.  Sorry, ma'am.

12      Q.    Cloudfund LLC, when was that loan taken?

13      A.    Quads Fund?  I have the headset on.  I'm

14  trying to hear you clearly, but (indiscernible).

15      Q.    Okay.  Cloudfund, C-L-O-U-D.

16      A.    Oh, Cloud.  Cloud, Cloud.  Okay.  Cloud, if

17  that's listed as a secured, it should be listed as

18  unsecured as well.

19           And you're saying when did I take that

20  funding out?  That was in 2001 or '2, I believe.  And

21  then that's, like, one of them MCA things.  I think

22  it's called Yellowstone Capital.  They just went

23  bankrupt and changed their whole company up, so

24  they -- that's -- that's a (indiscernible).  I don't

25  know.  That's like one of those shady lenders from

1     New York.

2          Q.    Sure.   And then CT Corporation System?

3          A.    I'm sorry.   The phone cut out.   What did you

4     say, ma'am?   I've got five bars, too.   I know I'm

5     supposed to have good signal, so I'm not trying to

6     say I don't have good signal, but...

7          Q.    Okay.   The next secured debt that the Debtor

8     lists is CT Corporation System.   When was that loan

9     taken out?

10          A.    CT, that's that -- that thing's got to be

11     paid off.   That's a -- that's a -- that's a merchant

12     cash thing, I think.   That's unsecured as well.

13               It's -- to my knowledge, they list these

14     things, and they -- and they go under -- underneath

15     different names.   Right?   And I've done some

16     investigating on that.   And then that's going to be

17     in 2001, I think, as well.

18               I'm pretty sure that's been satisfied,

19     though, so I don't know why they're still having a

20     UCC, so I don't know about that.

21          Q.    Okay.   And how about Financial Pacific?

22          A.    You said "Pacific"?

23          Q.    Yes.

24          A.    I -- I -- I have -- I'm trying to dig into

25     that.   I don't have any literature on that.   I don't

1    understand that debt.  I was trying to -- I'm trying

2    to figure that out.  I don't know.  I can't speak to

3    when I've taken it out because I -- I don't even know

4    who they are, honestly, so...

5          But it's listed on the United States

6    government website for North Dakota where they

7    have -- where they have UCCs, so I have to list

8    everything on the schedules, you know.  I've got to

9    be truthful.  Right?  So...

10   Q.   Sure.  You need to give them notice.  That

11   would be the right thing.

12         MR. AHLGREN:  There's a lot of background

13   noise.  I'm going to ask everybody who's on this call

14   that if you are not speaking, and the only two people

15   who are speaking are Sarah and Rob, I ask you to

16   mute.  I hear somebody continuing to have some kind

17   of respiratory issues.  Please mute the phone.

18   Q.   (BY MS. WENCIL)  Okay.  And then Gate City,

19   we can refer to the motion for relief documents, but

20   the next one was M2 Financing.  When was that loan

21   taken out?

22   A.   Yeah.  That's all -- I think that's around

23   2001, 2002.

24   Q.   2001 or --

25   A.   Not even trying to --

```
1                   (Simultaneous, indiscernible crosstalk.)

2         Q.    (BY MS. WENCIL)  -- or 2021?

3         A.    -- answer.  I'm just being honest.

4         Q.    You said 2001 --

5         A.    I'm sorry.  What did you say, ma'am?

6         Q.    You said 2001, 2002 --

7         A.    I said 2- --

8         Q.    Did you mean --

9         A.    Yeah, between that range, yeah.

10        Q.    Did you mean 2001 or 2021?

11        A.    Oh, I'm sorry.  Sorry.  Sorry.  Yeah.  The

12   business wasn't even formed.  Anyway, 2021 or 2022,

13   yeah.  And that's a secured -- secured credit, yes.

14   A secured, not unsecured.

15        Q.    Okay.  And then Regions Bank, when was that

16   loan taken out?

17        A.    I think I was able to get it funded just --

18   just in 2020, I think?  The end of 2020.  Because it

19   took a while to get that loan funded.  That's my

20   drilling rig, ma'am.  That's secured funding.

21        Q.    And River Capital, when was that loan taken

22   out?

23        A.    Maybe 2001, 2022.  And that's an unsecured.

24   Sorry.  I'll make a change to that.  River Capital.

25        Q.    And, again, just to correct the record,
```

1    2001, you meant 2021?

2        A.    Yeah.  Yep.  I apologize, ma'am.  I really

3    do.  I'm not trying to -- yep.  2021, yes.

4        Q.    Okay.  And then your last debt listed is the

5    U.S. Small Business Administration.  It's listed

6    at --

7        A.    Uh-huh.

8        Q.    -- $2.8 million.  Was this a small business

9    loan or some kind of disaster loan?  What kind of

10   loan was that?

11       A.    Pretty sure it's a disaster loan, and that's

12   like a combination of 2020, '21, like a whole period

13   of time.  Right?  There's a whole period of time

14   where they give you -- they gave us like 300 grand at

15   first, I think it was, or 150 grand at first, and

16   then they just kept walking it up.  But it's not

17   28 -- 2.8 million.  They put like $700,000 in

18   penalties on there or interest or something.  There's

19   $2 million in aggregate of the loan.

20       Q.    Okay.  But the loan total was $2 million?

21       A.    Roughly.  Yes, ma'am.

22       Q.    Okay.  And then you're stating you took that

23   out in 2020 to 2022?

24       A.    I would -- yeah.  They didn't have anything

25   after that, so it would be that period of time, yes,

```
1    ma'am.
2         Q.    Okay.  And then --
3         A.    It might have been like 2020 and 2021,
4    maybe, even.  I don't think -- it might have even
5    been 2020.  I don't --
6         Q.    Okay.  And then --
7         A.    I've got the 72-page document somewhere at
8    the house, and it's got each day that they doled out
9    the cash.
10        Q.    Okay.  And how were these proceeds used?
11        A.    For the business, paying the expenses for
12   the business.  Fuel.  Labor force.  Maintenance.
13        Q.    Okay.  Did the Debtor get additional -- like
14   the payroll loans in addition to these loans?
15        A.    Yeah.  Yeah.  I got -- I got PPP loans, and
16   I got them both forgiven because they -- like
17   136 percent of them, because I used my own money,
18   too, that I was making, or more than it, because --
19   actually, when I went to go get it, like, forgiven,
20   respectfully, somebody at Gate City said that I was
21   like -- like -- I was not -- like this is -- these
22   numbers don't work out.
23             And I'm like:  Well, here's the payroll
24   report, you know?  I paid 120 percent of the payroll,
25   you know?  I used a hundred percent of that money
```

```
1    plus the money -- you know, I was excited.  I used it

2    for payroll, you know?  That's what it was for, you

3    know?  Hired more people.

4         Q.   Okay.  And how much were the PPP loans?

5         A.   230-something apiece, I think.

6         Q.   And how many were there?

7         A.   Only two of them, ma'am, that there were

8    ever given, the PPP loans.

9         Q.   So that was $660,000?

10        A.   And they both -- no.  If it was 230 and you

11   times it by two, that would be 460.

12        Q.   460.  460,000.  Okay.  And this was in

13   addition to the $2 million disaster loan?

14        A.   That's correct, ma'am.

15        Q.   Okay.  And going to the Schedule E/F, the

16   priority loan of -- the first one listed is a $19,000

17   claim for a Greg Moore.  Is that a former employee?

18        A.   That's a -- a former employee, yeah, but

19   that was a former employee -- I think there's

20   maybe -- 3,000 of that, I think, is eligible for

21   priority.

22        Q.   That's correct.

23             What --

24        A.   Because of the six-month rule.

25        Q.   What period did this 19,000 arise from?
```

1          A.    I'm sorry.  What, ma'am?  What --

2          Q.    When did the --

3          A.    -- period what?

4          Q.    When did his wage claim arise from?  What

5     period was he not paid?

6          A.    I don't have that exact number in front of

7     me.

8          Q.    Okay.

9          A.    I mean, to have that exact number in front

10    of me -- I can send it to you, but I went over those

11    numbers with Erik's staff, and I was truthful and

12    honest.  I think $3,000 of it was the mathematical

13    equation, because there was three weeks that were

14    eligible in that six-month window.  Right?  So...

15         Q.    That's right.  And -- and you had -- we just

16    discussed these -- the $460,000 of PPP loans, and you

17    have a large number of wage claims --

18         A.    Oh, this is going to be -- this is -- this

19    is going to -- it's not no wage claim, no.  It's

20    going to be Greg Moore worked for me in the year of

21    2023 or 20- -- the end of 2022 going into 2023.

22         Q.    Okay.  So what's --

23         A.    So like --

24         Q.    -- the PPP loans --

25         A.    The PPP loans were like -- the PPP loans are

1    like 2020 and 2021.

2         Q.   Okay.  So once the PPP loans ended, the

3    Debtor was unable to pay its employees?  How did --

4    I'm just curious how all of these wage claims arose.

5    You don't usually see a business that doesn't pay

6    their employees to the extent you have.

7         A.   Okay.  So the wage claim arose due to the

8    fact that I had money coming into my account, but I

9    had what you'd call predatory lenders called MCA,

10   cash advances, that were taking money out of my

11   account.  So I would make $100,000, and I'm happy and

12   everything's going good, but as soon as they take

13   money out of my account, it just didn't work.  Those

14   MCA loans pretty much tanked my business.  The

15   merchant cash advances, they're -- they're all over.

16   I'm sure a lot of companies go bankrupt because of

17   them.

18        Q.   Okay.  Well, how were you using those

19   merchant cash advances in the first place?

20        A.   How was I or why was I?  Sorry.

21        Q.   Yeah.  No.  How were you using that money?

22   I guess I don't understand why, when you were getting

23   the loans, you weren't just paying the employees.

24        A.   Because I -- I -- I don't even know for a

25   fact, and I don't want to get into an emotional thing

1    where I talk about other people, but there's -- let's

2    just say there's a person that might be on this phone

3    line, and that person was signed up to do a job, and

4    that person walked away from the job within two

5    weeks.  It wasn't like me telling them that they had

6    to go work, but they signed up for the job.

7         I went through a lot of hiring people that

8    said they could drive a truck that were on board and

9    that left the job before they even got a paycheck.

10   They left loads, underneath loads.  Like, they were,

11   like, underneath, like, making money, and they were

12   paid, but they would leave a load.

13        Or even now, if I get a job lined up with

14   three or four trucks, you have a situation where you

15   have to have a good workforce.  Right?  So I -- in

16   that period of time, in 2020 and 2021, it was hard to

17   get what you'd call people, workforce that wanted to

18   come to work.  I had people quit because I made them

19   go to work because I was getting the PPP loan to keep

20   them at work, and they wanted to sit at home on the

21   government dollar.

22        So I would get a predatory loan, and I would

23   get that for the idea of keeping the company going.

24   I had even a -- a -- a vendor owed me $176,000 on a

25   rock aggregate project, as an example.  I went to go

1    get my paycheck from them.  I -- I did my

2    calculations.  I was owed 117,000.  I thought I was

3    going to get paid 117,000.  They said that they were

4    only able to cut me a check for 19,500, and then in

5    another 30 days I would get paid another group of

6    money, you know.  It was just -- you know, I mean --

7    I'm not even trying to get emotional about it.  I'm

8    not trying to get upset.  You're just asking

9    questions.  But I would take a -- a business loan,

10   like those merchant cash advances, because I was

11   trying to get things going in the right direction,

12   and I would be able to get things going in the right

13   direction, but then people would be -- walked away

14   from the job.

15           And then when you go back to the labor force

16   and nobody wants to go to work during 2020, 2021, and

17   even 2022, it's not even until the later part of 2023

18   that people were able to start finding employers and

19   people they wanted -- that wanted to go to work, you

20   know, that were willing to go to work, if that makes

21   any sense.  You know?  Not trying to speak to all

22   people, but that's what I was experiencing.

23      Q.    Okay.  And then the North Dakota Tax

24   Commissioner has a claim -- is listed with a claim of

25   $51,000.  What are those taxes for?

```
1        A.    I honestly don't know.  I'm not even going
2    to lie to you about that.  Like, I don't know.  Like,
3    I'm upset about it because I know that any of the
4    wages that I have paid, I've paid wages, so it can't
5    be wages.  I don't -- I don't foresee that to be.
6    But you say it's 550 -- what is it?
7        Q.    51,000, about.
8        A.    I -- I don't know exactly what that tax
9    liability would be for.  I have no problem digging
10   into it, but I don't know.
11       Q.    Okay.  And then for the general unsecured
12   claims, does the Debtor understand that it cannot pay
13   any of those claims without a court order or a
14   confirmed plan?
15       A.    The secured -- you're saying that I can't
16   pay any claims without a -- and a what?  Sorry.
17       Q.    You can't pay any of the Schedule F general
18   unsecured claims.  Does the Debtor understand that
19   they cannot pay those claims without a court order or
20   a --
21       A.    Yeah, I'm not paying any -- I'm not -- I'm
22   not paying anybody.  The Debtor understands that he
23   cannot pay any past-due debt from the date of
24   April 23rd, since inception of the note, and that
25   anything I want to pay I have to ask Erik's
```

1    permission, and he's got to write something with the

2    courts and then -- yes, ma'am.  I understand that a

3    hundred percent.

4        Q.    Okay.  And then on the larger claims, the

5    question, this Amerifi Capital, LLC, has $181,000.

6    What was this -- how did this claim arise?

7        A.    That is an unsecured creditor, and that is a

8    predatory lender, and that claim arose in the year of

9    2021 and 2022.  And they would call you and keep you

10   in debt.

11            I actually think that that claim was

12   inflated with a bunch of ridiculous fees and --

13   and -- not saying that I know anything about fees,

14   but I don't think he can charge $100,000 in fees, you

15   know, and 49 or 60 percent interest or, if you do the

16   math, a hundred -- 120 percent interest, you know,

17   APR.

18       Q.    Okay.  What kind of services is Bright

19   Design Homes?

20       A.    That would be employee housing, ma'am.

21       Q.    Okay.

22       A.    At -- employee housing.  I lost a contract

23   up there.

24       Q.    Okay.  And then another larger claim, this

25   Brian Adolph Koststelecky?  Kostelecky?

1          A.     Kostelecky, yep.

2          Q.     $18,000.  What kind of claim is that?

3          A.     That's employee housing as well.

4          Q.     Okay.  Did he provide the employee housing,

5     or was he an employee?

6          A.     No.  He provided the employee housing, and

7     we rented that from him for many years with no

8     problems, and then when the company started

9     experiencing difficulties -- it experienced

10    difficulties, so...

11         Q.     Okay.  And then I'm jumping ahead to Number

12    3.19, Dynasty Capital 26, LLC, 144,000.  Is that

13    another predatory lender?

14         A.     Correct, ma'am.

15         Q.     And when was that loan made?

16         A.     I'm sorry.  What?  When was it taken out?

17    I'm just going to assume, but I couldn't hear you.

18         Q.     Correct.

19         A.     The same period of time, the 2021/2022.  I

20    don't touch those funds -- loans.  I haven't touched

21    anything, obviously, since bankruptcy.  Even prior to

22    bankruptcy, I stayed away from that stuff.  I ignore

23    all phone calls, block phone calls.  Not to hide from

24    a debitor, but they just -- they'll call -- if you

25    call them now, they'll say:  Hey, I'll send you

1    another hundred grand.  You're a good person.  You'll

2    dig yourself out of the hole.

3            They don't care.  They want you to go

4    bankrupt.

5        Q.    Okay.  Is it the same for this EN OD

6    Capital, LLC?

7        A.    Yeah.  It's -- yeah.  He's a real creative

8    person.  He calls his company "end of day."  Yep.

9        Q.    End of day.  Okay.  And when was that loan

10   taken out?

11       A.    2021/2022, ma'am.

12       Q.    Okay.  And how --

13       A.    I'm saying 2022 as in, like, early part of

14   2022.  It wouldn't be the latter part, any of these

15   2021/2022s, just so you know.

16       Q.    Okay.  And the Everyday Funding Group, LLC,

17   is another $100,000.  Is that the same situation?

18       A.    Yes, ma'am.

19       Q.    Is that the same --

20       A.    I'm sorry.  Something was banged in the

21   background.  What did you say?

22       Q.    I hope everyone's all right there.

23            Is that -- was that Everyday Funding Group

24   loan taken in the same period?

25       A.    Yes, ma'am.  All predatory loans were taken

1    anywhere from 2021 to 20- -- even in 2020 --

2    right? -- but I'd say mainly 2021 and 2022.

3         Q.    Okay.  And who is the John C. Williams &

4    Associates?

5         A.    What's the dollar amount?

6         Q.    About $62,000.  Is that a lawyer, or --

7         A.    Fuel card with a ridic- -- it's a law firm

8    representing a fuel account with a ridiculous penalty

9    fee of like 30- or $40,000, plus legal fees.  Crazy.

10        Q.    Okay.  And then I believe this creditor was

11   on the line.  Keller Paving & Landscaping for

12   $52,000.  How did that debt arise?

13        A.    I had a spill cleanup in the state of North

14   Dakota.  A spill cleanup in the state of North

15   Dakota.  I was able to pay a few payments to them,

16   and I was hoping to get the payments caught up.  He

17   was going to retain a lawyer, which I think he ended

18   up doing, but then we were going to work it out, and

19   then I -- I obviously filed bankruptcy, and I

20   couldn't pay him, you know.  I filed bankruptcy.

21        Q.    Okay.  This Knightsbridge Funding, LLC, is

22   that another of how you'd characterize a predatory

23   lender?

24        A.    Yes, ma'am.

25        Q.    Okay.  Is that the 2021/2022 period as well?

```
1        A.    Yes, ma'am.

2        Q.    And how about the Landmark Funding?

3        A.    Similar loan.  Predatory loan.

4        Q.    Okay.  Same period?

5        A.    What did you say, ma'am?  Sorry.

6        Q.    Oh.  The same period?

7        A.    (No audible response.)

8        Q.    2020- --

9        A.    For the Landmark Funding.  Correct?

10       Q.    For 2021/2022?

11       A.    Yes, ma'am.

12       Q.    Okay.  And then the Matthew Barrett claim of

13   $60,000, is he the former partner in the business,

14   co-owner?

15       A.    Yeah.  He was a partner, but respectfully, I

16   don't -- I don't want to be disrespectful or

17   anything, but I don't really want to characterize him

18   as a partner.

19             He was a -- a person that I started the

20   business with in 2017.  In the early part of March

21   of 2019, I bought him out at the -- at the bequest

22   [sic] of him, because he said he was going to get

23   lawyers, and his mom and dad didn't want him to work

24   with me anymore.

25             And I ran the business from 2020 -- 2020 --
```

1    2019 on without him even being on paper, but in that

2    sense, he just was operating side by side with me for

3    four to five months and then found out he didn't like

4    to work with me during the whole entire life of his

5    entire existence.

6              The $60,000 stems from a

7    hundred-thousand-dollar cash infusion that he agreed

8    to give me, and the terms of the arrangement were

9    that I was to pay him $120,000 return on investment.

10   I told him I was dealing with some tough times; I've

11   got to figure this out; you know, I'm trying to get a

12   better footing.  I'm only able to pay you 60,000

13   right now, and so the $60,000 arises from that, that

14   -- that loan.

15       Q.   Okay.  And he also guaranteed the Gate City

16   assets?

17       A.   No.  He guaranteed three of the assets, I

18   believe, and I got -- I got -- I bought him out of

19   the business, again, in 20- -- 2019, and it was my

20   understanding that Gate City was to remove him off

21   the -- the assets.  I gave the paperwork to a Greg

22   Ellwein.  He's their business banker.  And then their

23   business banker and/or Gate City in that sense --

24   respectfully I say this.  I'm not trying to be

25   insulting, but everybody's got a tactic here.  Even

1    Gate City allowed me to bring my shop current and

2    then backed out.  When I went to go make the payment

3    on my shop, like I told you before, they wouldn't let

4    me make the payment.

5         So their tactic was since he's still liable

6    on this one or two assets -- or three assets, they're

7    going to, you know, rope anybody in, because they

8    didn't take him off the loan.  They were asked to.

9    Except Matt didn't take him off the debt, didn't do

10   the paperwork like he was supposed to when he was

11   bought out in 2020 -- '19, March.  2019.  Sorry.

12   Q.   Okay.  And have you personally guaranteed

13   any of the Gate City debt?

14   A.   I don't know.  I -- I signed a lot of

15   paperwork.  I'm sure they're going to say I did, but

16   to be honest with you -- I mean, it might sound

17   stupid, but I'm sure at one point in time, I did.

18   I'm sure there's something that says that, but I

19   don't know if I signed it or not or if it was put in

20   later.

21   Q.   Okay.

22   A.   I know that my interest rate and payments

23   changed at one point in time with Gate City.  That

24   was kind of awkward, but whatever.

25   Q.   Okay.  Just so -- you weren't listed as

1    having guaranteed it on the Schedule H, so I -- if it

2    turns out you did, you'll want to amend the schedule.

3        A.   If -- if it says I did, then we -- we went

4    through the paperwork and said it, but, I mean, I --

5    this is a lot of stuff to go over, and sometimes I

6    don't -- I mean, I'm not trying to be elusive or

7    anything like that.  It's just I -- I have no problem

8    figuring out exactly if I did or did not.  I'm sure I

9    did.  Gate City is not the type of bank that doesn't

10   do unsecured credit.  Right?  So...

11       Q.   Okay.  And then the Midland State Bank,

12   $220,000, how did that debt arise?

13       A.   I bought two semitrucks with KLC Financial.

14   How it arose is I fell behind on payments.  I asked

15   them to move my missing payments to the back end,

16   because I didn't even know you could do that, and

17   then they told me later on that you could do that,

18   and I should have told them right away that I was

19   dealing with financial trouble, can I wire them

20   $19,000 today or they're going to, you know, have

21   problems with me or something in the business.

22            And then they say that I owe 220, is what

23   you're saying, and I wrote that down in the schedule

24   as well.  I'm not saying I didn't.  I went over it, I

25   signed it, attested to all the information there, but

```
1    that -- that's an interesting situation.  They

2    actually sold assets.  They didn't notify me of the

3    sale.  So they sold a truck for $10,000 and $12,000,

4    and I did not -- I can't -- I cannot believe it.

5    It's unfathomable, you know?  It -- it's crazy.  But

6    that's how that arose.

7         Q.    Okay.  And Parkview Advance --

8         A.    How would you not notify somebody?

9         Q.    And Parkview --

10        A.    You said Parkview Advance?

11        Q.    Yes.

12        A.    I don't know if I owe them any money.  Does

13   it say a dollar amount?

14        Q.    50,000.

15        A.    That's what they're saying I owe them.

16   That's going to be a merchant cash advance, unsecured

17   as well.

18        Q.    Okay.  Is that the same 2021/2022 period?

19        A.    Yeah.  Maybe it's closer to 2020, but I

20   would really believe not, but yeah.

21        Q.    And the Pinnacle Business Funding, LLC, is

22   that a similar type of loan?

23        A.    It's a merchant cash bloodsucking loan as

24   well, yeah.

25        Q.    Same period --
```

1        A.    Same timeframe, 2021 -- 2021/2022.  I mean,

2    I might be off three -- three to six months in there.

3    It might be overlapping into 2020 or -- I -- I -- I

4    very doubt it's overlapping into 2023 because I've

5    been ignoring phone calls and predatory lenders for

6    well over 2023, and those people keep calling me

7    right now even.  They're nasty, but...

8        Q.    Okay.  And then River Advance, is that a

9    similar merchant credit loan?

10        A.    Yeah.  I thought you already mentioned that,

11    but, yes, ma'am.  Maybe River Advance, maybe it's

12    River Capital Partners.  I believe they have two

13    different names, but yeah.

14        Q.    Okay.  This is the same as the secured

15    creditor, that same River?  I think --

16        A.    No.  There's no -- there's no secured

17    creditor with any River company.  Those are, again,

18    predatory people.

19        Q.    Okay.  And The Avanza Group, LLC, is this

20    another -- is this a duplicate of the one on

21    Schedule D as well?

22        A.    I would believe so.  It's a -- it's a --

23    it's a -- it's a predatory lender, yes, ma'am.

24        Q.    Okay.  And then the Yuker Towing has a

25    $27,000 claim.  What does the Debtor owe them money

1    for?

2         A.    For towing.  And, I guess, according to

3    everybody out there, it says it's more than that, but

4    I was -- I was only able to get that dollar figure

5    from an email.  You know, I was having to get you

6    guys the actual quote and numbers and -- you know, I

7    got that from an email.  It might be more than that.

8         Q.    Okay.  Are there any debts listed on

9    Schedule F where the money went to any entity other

10   than Stark Energy?

11        A.    On what schedule?  Sorry.

12        Q.    I guess listed on --

13        A.    Oh, okay.  You're saying on the -- on the --

14   on these debts.  No.  All the money went to Stark

15   Energy.  No, didn't go to any other entity.  No,

16   ma'am.

17        Q.    Okay.  And looking at --

18        A.    Are you still there?  Sorry.

19        Q.    -- codebtors, there was an entity called

20   South Metro Remodel and Home Repair that guaranteed

21   the Parkview debt.  What is this entity?  How did

22   they come to guarantee the debt?

23        A.    That's not even true.  That's -- that --

24   they didn't guarantee anything.  See, those predatory

25   lenders, what they do is they search the Internet,

1    and they search the Internet and they see if a guy

2    like myself owns a company in any other state, any

3    other community -- and my dad has the same name as

4    me, my father.

5        Q.    Okay.

6        A.    He's like 67, 67 years old, and he owned

7    Southwest Remodel and Home Repair business in the

8    year of like -- I don't know.  It's irrelevant.

9    Right?  The early 2000s.  And so they just list that

10   because they're predatory lenders, so...

11       Q.    Okay.  So you don't think that's a real

12   guarantee, then?

13       A.    I would really laugh if they called my

14   father.  My father's an asshole.  Excuse my language.

15   I've seen him four times in 20 years, ma'am.  I think

16   I earned that right.  And all four times, I paid to

17   see him, so...

18       Q.    Okay.  And the business in 2024 -- I'm going

19   to the Statement of Financial Affairs.  Would you say

20   it's doing as well as 2023 or better, or how would

21   you characterize the Debtor's business so far for

22   2024 compared to 2023?

23       A.    I think we're getting better.  I think we

24   are getting better than 2023.  I think we're going to

25   get a lot better here soon after the election year,

1    and I think we're better now because of the problem

2    with the United States government and when they --

3    they give you money for road construction projects,

4    such as delay, and a lot of projects were put off for

5    many years, and now they're starting to kick off, you

6    know?  So that's, again, why I'm trying to get my

7    assets back from Gate City.

8            Because the two side dumps I was able to put

9    out for -- your projections you're looking for.  I

10   had a phone call, I had a long conversation with two

11   customers, and both customers said somewhere in the

12   area of, like, a ridiculous amount, like 220 grand

13   for three months' worth of my time.  And I was like:

14   Wow, I could really use that.  I could pay my

15   creditors.  I could pay people.  This would be great.

16   Oh, wait.  I don't have my side dumps, so...

17       Q.   Okay.  Is the business seasonal?  Are there

18   times, I guess, when you can be on the road?  Can you

19   operate year-round, or does it -- you have to lighten

20   up in the winter, or how does that work?

21       A.   It could lighten up in the winter, it could,

22   but it doesn't have to.  I think we can work and

23   focus our efforts in the winter months to haul water,

24   to hydrovac, to utilize our side dumps to haul drill

25   cuttings, because side dumps can be used for

1    aggregate and drill cutting.  So, I mean, where

2    there's a will, there's a way.  Right?

3        Q.    Sure.  And do you understand that the Debtor

4    cannot pay any of its professionals, like an attorney

5    or an accountant, unless the Court approves the

6    payment?

7        A.    Yes.  That's why I've been begging to use my

8    CPA firm.

9        Q.    Okay.  And do you understand that the Debtor

10   cannot make or receive any new loans without Court

11   approval?

12       A.    Yes, ma'am.  I have not, I mean, even

13   attempted or even thought of a loan.  I'm just

14   thinking about working, going to jobs.

15       Q.    Okay.  And do you understand the Debtor

16   cannot use -- pay any of -- of your personal expenses

17   beyond your salary or business expenses?

18       A.    Oh, yes.  I'm very aware.  That's why I have

19   the DIP account, ma'am.

20       Q.    And in the past year has the Debtor sold,

21   transferred, or concealed any of its property other

22   than sales in its ordinary business from any

23   creditors?

24       A.    You're saying in the last year?

25       Q.    Correct.

1       A.    No.   I have not sold or concealed or done

2    any of that stuff.

3       Q.    Okay.  I'm just --

4       A.    I -- I thought about selling equipment, but

5    I never -- I never sold anything.  I -- I -- you

6    know, I thought about -- like, asked people if they

7    were -- if they were interested in buying something,

8    you know, but -- everybody said that they were, but,

9    you know, when the world comes around and they say,

10   Oh, you've got the money, and then they don't have

11   the money, you know?  So -- but I haven't sold

12   anything, no.

13      Q.    And does the Debtor have to maintain any

14   specific licenses to operate?

15      A.    A waste hauling permit.

16      Q.    I'm sorry.  Could you repeat that?

17      A.    A waste hauling permit.

18      Q.    Okay.  Any others?

19      A.    When I work on the reservation, I'll have to

20   maintain a TERO, TERO license.

21            I mean, in the future, when I get into

22   hauling TENORMs -- I'm not doing that currently, but

23   if I have to and I get a chance to make the money

24   from doing the job, I'll do it, but not right now,

25   not currently.

1        Q.    Okay.   Does the Debtor have any active TERO
2    licenses right now?
3        A.    TERO, you said.   Right?
4        Q.    Yes.
5        A.    Have any active what?
6        Q.    Permits for working on reservations.
7        A.    Not currently, no.   I have a preferential
8    partnership agreement, but I don't have a TERO
9    license, because I was in the process of getting a
10   contract with an oil company that works exclusively
11   on the oil -- on the reservations, but I just -- you
12   know, I focus where the money is now, and the money
13   is working in the aggregate and getting the hydrovac
14   out, getting my equipment back, getting my tankers
15   out.
16       Q.    Okay.   And then I guess yesterday we were
17   going to hold this meeting, and then you had your
18   criminal -- a hearing on your criminal matter.   What
19   happened at that hearing?   What's the status of the
20   criminal --
21       A.    They -- they -- they -- they -- they dropped
22   the charge or whatever.   They dropped the case.
23   They -- they dropped the case, and they're -- that
24   was with Regions Bank, so...
25       Q.    Okay.   Okay.   Are there any criminal

1    proceedings, other ones, pending right now?

2         A.   I don't have any dates of any trial or

3    anything like that.  I don't have anything.  I have

4    two open charges, but I don't have any --

5    respectfully, I mean, I -- I know I'm supposed to

6    answer all your questions truthfully and stuff, but

7    I'm not trying to be painted out as a bad person.

8    I'm not a bad person, so...

9              But I don't have any convictions.  I don't

10   have any scheduled court appearances.  I had a court

11   lawyer guy that, you know, said just -- we're just

12   going to go through the motion, and they don't --

13   they don't -- and there's no -- there's nothing new

14   at this point.

15        Q.   Okay.  I'm going to go through the U.S. --

16        A.   There's nothing new.  There's no --

17   there's -- sorry.  What?

18        Q.   I'm going to go through the U.S. Trustee's

19   requirements on the record just to make sure that the

20   Debtor understands them.

21             And do you understand that the Debtor has a

22   fiduciary duty to keep all of its assets insured

23   while the case is in 11?

24        A.   Yep.

25        Q.   Okay.  And do you understand that if your

1   insurance expires, the United States Trustee will

2   move to dismiss or convert the case?

3       A.   Yeah, that's understood.  Yeah.

4       Q.   Okay.  And then we do have the proof of

5   insurance now through January of 2025, so hopefully

6   the case will be confirmed by then, and that will

7   take care of it, but if the insurance does expire

8   during the case, we would need new proof of insurance

9   immediately.

10      A.   Oh, that's no problem.  I understand.  I

11  need the same thing to maintain my MSA.

12      Q.   Okay.  And do you understand that each month

13  the Debtor must submit an operating report to the

14  U.S. Trustee's Office and file that report with the

15  Court?

16      A.   I've got to do monthly reports.  Right?

17  That's what you're talking about.  Right?

18      Q.   Correct.

19      A.   Yeah.  Yeah.  Yes, ma'am.  I'm going to be

20  submitting my first report this evening.

21      Q.   Okay.  And they come -- do you understand

22  that the reports will come due on the 21st day after

23  the end of each month?

24      A.   I didn't know -- I thought it was the 20th,

25  but one day earlier is better.

1      Q.    Yeah.  That will be on time.

2            And do you understand the U.S. Trustee's

3      Office will move to convert or dismiss the case if

4      the reports are not timely submitted and reasonably

5      cured?

6      A.    I -- yeah, I understand that.  I'm

7      listening, yeah.

8      Q.    Okay.

9      A.    I know what I'm supposed to do.

10     Q.    And you understand that by filing a

11     Subchapter V case, a Subchapter V Trustee was

12     appointed?

13     A.    Yeah.  There's a Mr. Kapusta, I think.

14     Correct?

15     Q.    Correct.  And do you understand that the

16     Debtor must cooperate with Mr. Kapusta?

17     A.    Yeah.  I want to cooperate with you people.

18     You're my team; so, yeah, get this thing confirmed

19     and do a good job.

20     Q.    Okay.  And do you understand that the Debtor

21     would be liable for any fees of Mr. Kapusta that the

22     Bankruptcy Court approves?

23     A.    Yeah, I understand that.  That's why -- yep.

24     I understand that, yep.  Fully.  Yep.  I've got to

25     pay fees to Mr. Kapusta.

1          MS. WENCIL:  Okay.  And then my next

2    question Mr. Ahlgren can answer, and that's whether

3    the Debtor's on schedule to file their plan within

4    the 90-day statutory period or if he expects any

5    extensions.

6          ROBERT FETTIG:  I think we can do that

7    90-day thing.

8          UNIDENTIFIED SPEAKER:  I don't --

9          MR. AHLGREN:  Oh, I'm sorry.  I was on mute.

10         Yes.  I -- I -- I believe that we will be

11   able to file a claim within the required time

12   periods.

13         MS. WENCIL:  Okay.  Thank you.

14         And then I'm going to open it up to other

15   questions right now as I go down the list.

16         Mr. Kapusta, do you have any questions for

17   the Debtor?

18         MR. KAPUSTA:  I have no questions for the

19   Debtor.  Thank you.

20         MS. WENCIL:  Okay.  Thank you.

21         And then next, Mr. Westby, do you have

22   questions for the Debtor?

23         MR. WESTBY:  Yeah.  One.

24

25                          / / /

```
1                        EXAMINATION
2     BY MR. WESTBY:
3          Q.    Rob, this is Randy Westby with Keller
4     Paving.  We did that cleanup for you in 2002 -- or
5     2022.  Excuse me.
6          A.    Yeah.
7          Q.    We were under the impression that -- that
8     you were going to get a reinsurance -- insurance on
9     that.  Did you not?
10         A.    No.  I don't think we were under that -- you
11    were under that impression, but I didn't state that.
12    I'm sorry that you were under that impression, but I
13    think that's incorrect.  I talked to Mr. Dean, and he
14    said to just take care of it on my own, so...
15         Q.    Okay.  So there was no insurance filed --
16    claim filed?
17         A.    No, there wasn't any insurance claim filed,
18    and -- and Mr. Dean was aware of that.  You guys have
19    been made aware of that.  And he said he was going to
20    work with me, but then I ended up going into
21    bankruptcy, so...
22         Q.    I understand.  We received one $1,000
23    payment from you, I believe, so...
24         A.    Well --
25         Q.    You have -- Stark Energy owns some real
```

1    property.  Is that correct?

2         A.    Does Stark Energy what?

3         Q.    A shop?

4         A.    Yeah.  I own my shop --

5         Q.    Do you own any real --

6         A.    -- yes, that's correct.

7         Q.    Okay.  So our -- our claim would -- secured

8    would be -- would then be attached to that real

9    property.  Is that correct?

10        A.   (No audible response.)

11        Q.    You don't know that, Rob.  Okay.

12        A.    I -- I doubt that that would be correct

13   because you guys did unsecured work on a handshake

14   deal looking out for me, and I don't know if I'm

15   talking to anybody with Keller Paving or a lawyer for

16   Keller Paving.

17             Is Erik available?  Erik, are you on the

18   phone?

19             MR. AHLGREN:  I am.  Yes, I'm on the phone.

20             ROBERT FETTIG:  Okay.  So if Stark Energy

21   did a spill cleanup and it was a verbalized agreement

22   and it was a handshake deal that I was going to take

23   care of it on my own -- and Mr. Dean is a great dude,

24   and I wanted to take care of it on my own, but right

25   now, just like the lady stated, I can't pay any

1    past-due debt, and if I pay any past-due debt, I'm in

2    trouble.  I'm making -- I'd be making the worst move

3    of my life.  So, no, there's no -- there's no secured

4    claim to cleaning up something -- I'm -- I'm going to

5    be -- I'm just going to be quiet, man.  There's --

6    there's no way.

7         MR. WESTBY:  Mr. Alrich [sic], we -- we

8    received a judgment in District Court, and --

9         MR. AHLGREN:  Okay.

10         MR. WESTBY:  (Indiscernible) North Central,

11    and so I'm assuming that judgment will attach to any

12    real estate that Mr. (indiscernible).  Is that

13    correct?

14         MR. AHLGREN:  Do you know what?  If you've

15    got a judgment, you may very well be -- be correct,

16    but I don't know whether you have a judgment.

17         MR. WESTBY:  I -- I do have it in front of

18    me, as I said to the Court.

19         That's my only question.

20         MR. AHLGREN:  Okay.

21         MS. WENCIL:  Thank you.

22         And then Mr. -- was it Kostelecky?

23         (No audible response.)

24         MS. WENCIL:  Have no questions.  Okay.

25         Ms. Stanley, do you have questions?

```
 1              MS. STANLEY:  Yes, I do.

 2                          EXAMINATION

 3    BY MS. STANLEY:

 4        Q.    Mr. Fettig, at the hearing --

 5        A.    Yeah.

 6        Q.    -- last week, I believe -- I believe you

 7    testified there were several pieces of equipment that

 8    were free and clear of liens.  Can you tell me what

 9    they were again?

10        A.    I have a 2005 Kenworth T800.  I have a 2007

11    International.  I have a 2011 Peterbilt.  I have a

12    2010 -- not '10 -- 2007 F-150 and '10, I think.  I

13    mean, there's a -- there's a trailer --

14              (Simultaneous, indiscernible crosstalk.)

15        A.    Sorry.

16        Q.    (BY MS. STANLEY)  Sorry.  Can you stop for a

17    second?  Can you point them out to me on your

18    schedules?

19        A.    No, I can't point them out to you on the

20    schedule, ma'am.  I can't --

21        Q.    Why not?

22        A.    -- point them out on the schedule.

23              I'm sorry.  What?

24        Q.    Why can't you point out which ones on the --

25    on your schedules are unsecured?
```

1      A.    I -- I -- because.  I'm in the truck right

2   now, and I'm working, and I'm listening to you and

3   all the questions answered, and I can't point exactly

4   to what's there, but I've given you the year, model,

5   make.  I mean, I -- you can ask me a question.  I can

6   confirm if that's that.  I mean, I'm definitely doing

7   everything I can, but I'm also working --

8      Q.    Did you --

9            (Simultaneous, indiscernible crosstalk.)

10     Q.    (BY MS. STANLEY)  Did you at the hearing

11  indicate there was a belly dump that was unsecured?

12     A.    No, I did not indicate that a belly dump was

13  unsecured.  I indicated that I have a dump trailer

14  that's unsecured.

15     Q.    A dump trailer.  What year was that?

16     A.    That's a -- that's a Trail King.  It's not a

17  Trail King.  It's a load pit -- load trailer thing.

18  Load Trail.  I don't know the year, ma'am.  It's

19  black.

20     Q.    Did Stark Energy have a 2015 Great Dane

21  53-foot reefer trailer?

22     A.    I -- it may or may not have a 2015 Great

23  Dane reefer trailer with a loan on it, Stark Energy.

24  I don't know.  Is it listed on the schedules?

25     Q.    Hang on.  How about -- no, it's not.  That's

1    why I'm asking, because there's a --

2         A.    Okay.  So -- so -- so clarification --

3              (Simultaneous, indiscernible crosstalk.)

4         Q.    (BY MS. STANLEY)  Number was RT001.

5         A.    Okay.

6         Q.    The unit number.

7         A.    Okay.  To clear the air, you don't like me,

8    and I'm okay with that, but I'm going to keep

9    professionalism here.

10             I don't know what you're trying to get at,

11   but everything that I have that's in Stark Energy's

12   name is listed, and that trailer I think you're

13   talking about is an ice trailer that Kevin actually

14   allowed me to use as collateral one time, but I

15   actually paid the loan off.  He did it for a short

16   time when I was --

17        Q.    Okay.  But I'm asking --

18        A.    -- dealing with financial hardship.

19        Q.    What happened to the trailer?  Do you still

20   have it?  Was it sold?

21        A.    Is it free and clear?

22        Q.    What happened to it?  Do you still have it?

23   Is it sold?  It's not listed on the schedules.

24        A.    The trailer that you're talking about is in

25   my possession, yes, and it's not, to my knowledge --

1    if you're even remotely correct in saying it's under

2    Stark Energy's name, to my knowledge, I don't believe

3    it's in Stark Energy's name.  I don't know at what

4    year or time it may have changed or if it even did

5    change, but I have no problem correcting anything.

6    I'm trying to do everything else of the Court's.

7           So if you can tell me the number again, I

8    can make a mental note, like I've made on all these

9    other notes, and I can get that information to Erik.

10          It's RT what?

11   Q.    001.

12   A.    Okay.  RT001.  I can go ahead and -- and

13   what notes are you working from?  Are you working

14   from that short-term capital loan from Gate City?

15   Correct, or no?

16   Q.    No.  So where --

17   A.    Because I --

18         (Simultaneous, indiscernible crosstalk.)

19   Q.    (BY MS. STANLEY)  Where -- you said this is

20   in your possession.  Where is it?

21   A.    Florida, ma'am.

22   Q.    You -- you said it's in your possession.

23   Where is it?

24   A.    It's in Florida, ma'am.  It's in Florida.

25   Q.    What's it doing in Florida?

```
1        A.    Well, right now I currently am not running

2    over-the-road trucks because the over-the-road

3    trucking market is dead, and what it's doing in

4    Florida is -- I don't know if it's the exact trailer

5    that a driver left a load of supplements at the truck

6    stop, and I had to fly there to go get the truck and

7    make the delivery and park it to fly back up to

8    Sidney, Montana, to work for Stark Energy and Kraken

9    Oil & Gas.  But, I mean, it's there because I -- I

10   left it there, and it's -- it's protected, and it's

11   safe.  I mean, I don't -- it's at a yard.

12        Q.    Do you have an address for where it is?  I

13   mean, I'm pretty sure last time you testified that

14   none of Stark Energy's equipment was being stored

15   elsewhere.

16        A.    Yes.  Ma'am, I'm not looking to get tripped

17   up.  I'm not trying to be tripped up.  I'm

18   not talking (indiscernible) --

19        Q.    No, but I'm asking you to answer the

20   question where the assets are.

21        A.    Again, I've listed the assets on my schedule

22   with my lawyer with the addresses of where they're

23   at, so, I mean, I've done everything I'm supposed

24   to --

25        Q.    Nothing has an address.
```

1       A.    Yeah, I -- I did, too.  I -- he asked, Where

2    are the assets at?  And I communicated with my

3    lawyer, Erik.  My lawyer.  Yep.

4       Q.    Okay.  So where --

5             (Simultaneous, indiscernible crosstalk.)

6       Q.    (BY MS. STANLEY)  Where in Florida would

7    this one be?

8       A.    Jacksonville, Florida, ma'am.  It's even in

9    your name.  I didn't transfer the title, ma'am, or

10   anything like that.  I can get all the facts you're

11   requiring for RT001, and I can work on that tonight.

12   I can see if the title's even in Stark Energy's name.

13   And I don't know what information you're working

14   from.

15      Q.    What --

16      A.    I don't know if you're working from that

17   loan that -- that -- Kevin gave me a loan on

18   equipment that was free and clear --

19      Q.    Can you -- can I ask my next question?  The

20   next question --

21      A.    Sure.  Go ahead.

22      Q.    -- is talking about a miscellaneous trailer,

23   a 20- -- 2010 Hallmark enclosed trailer.

24      A.    That's not even anything remotely to do with

25   Stark Energy.  That's a trailer that I bought when I

1    was working on the workover rig, and I've used it in

2    my own personal use, and I don't know why it's listed

3    on there, and I'm sorry for the confusion, but I was

4    listing everything when I was doing my thing because

5    I've got -- I'm not going to hide anything or be

6    disrespectful.

7        Q.   So you're saying that this is not a Stark

8    Energy piece of property?

9        A.   That truck -- that trailer was bought prior

10   to Stark Energy even starting.  No, it has nothing to

11   do with Stark Energy.

12       Q.   The tractor, the S210, 2007 International

13   9000 -- 9900 -- I'm sorry.  I can get that number

14   right -- 9900i Eagle, your schedules say this is

15   missing.  Is this missing?

16       A.   I'm still looking for it.  I think it's

17   somewhere in the vicinity of -- of Dickinson.  I

18   don't know.  I've asked --

19       Q.   What makes you think it's in the vicinity of

20   Dickinson?

21       A.   Well, because I -- I've been looking for my

22   assets, and I've been driving around, and someone --

23   someone said that, you know, they saw it at a truck

24   stop, like a -- what is it called? -- a Tiger Truck

25   Stop, so I'm supposed to go there and look.  I've

1    been asking friends and family to start looking for a

2    2007 International.

3          The other day when I was hauling rock --

4    because I was hauling rock, and I'm training the one

5    driver that said he wanted to take the job after we

6    did an interview, and then he didn't show up.  I

7    wasn't able to get out of the pit in time to chase

8    down a truck that I think was pulling the 2007

9    Reitnouer that I haven't been able to find as well

10   and you guys haven't been able to find.  Like I told

11   you or the nice Trustee lady there, that I've been

12   looking for my assets in my off time that are missing

13   still.

14       Q.    Okay.  So when was the last time you recall

15   seeing it?

16       A.    What?  The 2007 or the 2000- --

17       Q.    Yes, the 2007.

18       A.    The trailer or truck?

19       Q.    The 2007 International --

20       A.    I -- I don't recall.  It -- it was -- I was

21   literally out in the field chasing work.  I -- I

22   don't know when it -- when it left my shop.  I don't

23   know.  I'm frustrated to holy whatever.  I know

24   that --

25       Q.    Did you authorize --

1          A.    (Indiscernible.)

2          Q.    -- Yuker Towing to hold this piece of

3    property, the S210, as collateral at any point?

4          A.    On the direction of my counsel, I'm going to

5    agree to plead the Fifth and not answer that question

6    because I feel anything I say can be used against me.

7    Whether I say one thing or another, you're just going

8    to say it the wrong way, so I plead the Fifth.  Thank

9    you.

10         Q.    Okay.  For the S205, which I believe is a

11   2014 Kenworth T800, your schedules also indicate that

12   one is missing.  Do you know, when was the last time

13   you saw that one?

14         A.    I think 3/16, 3/15, 3/17, in there.  I went

15   to my shop to go get some parts.  I thought -- in the

16   back of my head, I said:  You know what?  When I left

17   the shop, was that truck not parked there?  I better

18   go back and look.  And, sure enough, it wasn't there.

19              So I called the Stark County Sheriff's

20   Office and argued with them and asked them why they

21   took a truck from my shop that wasn't, like, you

22   know, free and clear, you know?  Where's it at, you

23   know?  Who came and took it, you know?  I'm supposed

24   to call you guys --

25         Q.    So is this the --

1          A.    -- if I notice anything.

2          Q.    Is this -- is this the piece of -- one that

3    you indicated earlier that a police report had been

4    filed on?

5          A.    That's correct.

6          Q.    That's 205?

7          A.    That's 205.  Yes, ma'am.

8          Q.    Okay.  Do you know who R & R Auto

9    Farm & Electric is?

10         A.    Yeah.  They're -- yeah.  Yes, ma'am, I know

11   who that is.  Owned by Rodney.  It's over by my

12   house.  Yep.

13         Q.    Any idea -- did -- did you sell this

14   equipment to that entity, S205?

15         A.    R & R Farms?  No, I did not sell it to him.

16   Never.  Why?  Is that whose got it?  Did you get

17   better investigation than me?  Because I'd like it

18   back immediately.  I could put it to work tomorrow or

19   today.  If the last four of the VIN number are 2043?

20   I've been asking a lot of people about that.  So

21   you're saying R & R Farm & Electric had it towed,

22   the 2- -- at -- S205 (indiscernible) --

23         Q.    You can talk to your attorney about this,

24   but your testimony is you didn't sell or you -- you

25   just don't have any idea where it is?

1       A.    Yeah.  I'm very sure, very, very, very sure.

2    I filed a police report about that because I was

3    clear as day.  I wasn't foggy.  I wasn't preoccupied.

4    I went and picked up my parts at my shop.  I went

5    back to the job site.  I even turned around and was

6    late for the job because of that.

7       Q.    Okay.  And you're indicating that was like

8    March --

9       A.    It was March --

10      Q.    -- 15th, 16th, 17th?

11      A.    -- 15th, 16th, 17th, somewhere in there.

12   Yes.  Yes.

13      Q.    And March 15th was the day that, if you

14   will, the raid on Yuker Towing occurred.  Was it

15   right around that time, coincidentally the same day?

16      A.    If that's -- that's what got me worried.  I

17   said that -- I said that's what got me worried,

18   because I called -- I called Stark County Sheriff's

19   Office, and I asked them.  I said:  Did you guys take

20   my -- my truck from my shop that was free and clear?

21   Because somebody called me and said that you guys

22   found a bunch of my stuff, and I called the Stark

23   County Sheriff's Office and asked the guy.  Well,

24   where is my stuff at?  Because you said you found it.

25   People in the community say you found it, and you

```
 1   don't call me?  I want to know where my stuff's at.

 2   What's going on?

 3            And he said you can talk -- you've got to

 4   get an attorney.  I don't know what to tell you.

 5            I was like:  Are you serious, dude?  This is

 6   crazy.

 7       Q.   Okay.  The '22 -- 2022 Dodge Ram, is

 8   Allied -- I mean, is there a lienholder on that

 9   property?

10       A.   Yeah, but what does that have to do with

11   Gate City?

12       Q.   I'm asking you --

13            (Simultaneous, indiscernible crosstalk.)

14       A.   -- don't even represent them.

15       Q.   (BY MS. STANLEY)  I'm -- at a meeting of

16   creditors, I'm typically able to ask about the

17   Debtor's assets, so...

18       A.   Yeah, well, I'd ask --

19            (Simultaneous, indiscernible crosstalk.)

20       A.   -- keep it in your scope.  I'd ask you to

21   keep it in your scope unless you're hired from them,

22   because you have a personal vendetta against me, and

23   I'm getting sick of it.  I'm not a bad person, and

24   stop trying to paint me out as one.  I'm working with

25   everybody --
```

1    Q.    (BY MS. STANLEY)  Is there --

2    A.    -- and doing everything I'm supposed to do.

3    (Indiscernible.)

4         MS. WENCIL:  Mr. Fettig?  Mr. Fettig?  This

5    is -- this is Ms. Wencil.  I don't think we want to

6    make accusations.  Just please answer the question,

7    and if you don't know, you can say you don't know, or

8    you can defer the question, and we can all move on

9    here today.  Thank you.

10        ROBERT FETTIG:  Thank you.

11        MS. WENCIL:  And please resume the

12   questions.

13   Q.    (BY MS. STANLEY)  Is there a secured lender

14   for the 2022 Dodge Ram?

15   A.    To my knowledge, yes, there is, ma'am.

16   Q.    And who is that?

17   A.    It's listed on the schedule.  They filed

18   even a claim, Allied Financial.

19   Q.    Okay.  I think that they're listed as an

20   unsecured creditor.

21   A.    Well, that's in the wrong category, then,

22   ma'am.  Allied Financial is -- or not -- Ally.  Ally.

23   The sole purpose of your situation right now, you're

24   trying to get me to say something that's incorrect.

25   Ally Financial, I financed the Dodge Ram with it.

1    Okay?

2         Q.    Okay.  Thank you.

3         A.    Ally Financial, 2022 Dodge Ram.

4         Q.    Thank you.

5              I understand that one of the -- I -- does --

6    I guess I already asked about that.  That's the

7    reefer trailer.

8              One of the Great Dane trailers that Stark

9    Financial [sic] had was repossessed.  Is that

10   correct?

11        A.    That's incorrect, to my knowledge, unless

12   you've got better news than me.  But you just found a

13   piece of equipment that you won't even tell me where

14   it's at, and it could be beneficial to your

15   creditors, so I don't even understand the reason why

16   you're asking questions.  You don't want anything to

17   do with it if it's anything positive.

18        Q.    I'm sorry.  That was -- I meant the Trail

19   King.  I apologize.  The RT001 2015 Trail King, was

20   that repossessed by --

21        A.    What about it?

22        Q.    Was it repossessed by Alliance Funding?

23        A.    Yeah.  That's when they stole my drilling

24   rig, too.

25        Q.    Okay.  Is there another Trail King, a 2014

1    one, that Stark Energy had?

2        A.    There is two trailers; there's an RGN,

3    the -- it's two parts.

4              (Simultaneous, indiscernible crosstalk.)

5        Q.    (BY MS. STANLEY)   Is that what you think?

6        A.    Yep.  Yep.  There's two parts to it, and

7    they advertise that they took it from my shop and

8    sold it at Ritchie Brothers' auction.

9        Q.    What about a 2018 Volvo VNL 780?

10       A.    To my knowledge, I have that financed, yeah.

11   But, again, relevance.  I mean, you're not

12   representing them.

13       Q.    Is that listed on the -- do you know if

14   that's listed on your schedules?

15       A.    I'm sure it is, ma'am.  And if it's not, it

16   will be corrected.  I am a human.

17       Q.    So did you have two Volvos?  You had a 2017

18   and a 2018?

19       A.    I have -- I -- I don't know how to answer

20   that question, ma'am.  I own two different companies.

21   We've already established that.  So that could be

22   owned by a different company, but again, relevance.

23             Maybe I should just plead the Fifth to all

24   your questions, because you're really not asking

25   anything of pertinence.

1                    (Indiscernible background voice.)

2          Q.    (BY MS. STANLEY)  So is your response to

3    that you're going to plead the Fifth, or you don't

4    know the answer to that question (indiscernible) --

5          A.    I don't know the answer to that question.

6          Q.    Okay.  What about a 2015 Ford F-350?

7          A.    A '20 what?

8          Q.    2015 Ford F-350.

9          A.    A 2015?

10         Q.    Yes.

11         A.    Yeah.  I own that free and clear.  We

12   already talked about that when we were in court the

13   other day, and it's my name that's associated with

14   it.  It has nothing to do with Gate City.  I bought

15   that when I worked on a workover rig.  It's got

16   434,000 miles because I take care of my equipment.  I

17   don't beat it up.

18         Q.    And you're saying that you think that's in

19   your name; it's not in Stark Energy's name?

20         A.    I'm not saying.  I'm saying unequivocally,

21   on the record, everything that I'm saying today is

22   that.  I'll double down on it.  That's in my name.

23                And to keep my composure and be

24   professional, if you start to ask me questions that

25   annoy me, I'm just going to plead the Fifth, because

```
1    this is getting us nowhere.
2              You already are aware of the 2015 F-350.
3    You were made aware of it at court.
4              MS. WENCIL:  Mr. Fettig --
5         Q.   (BY MS. STANLEY)  What about a --
6              MS. WENCIL:  Mr. Fettig, this is Ms. Wencil
7    again.  Please just answer the questions.
8    Ms. Stanley is just doing her job.  And this is going
9    on the record for the Court, and so I think if you
10   show some patience in just answering the questions,
11   it will go all smoother, and we can all --
12             ROBERT FETTIG:  I'm sorry.
13             MS. WENCIL:  Yeah.  We can --
14             ROBERT FETTIG:  No problem.
15             MS. WENCIL:  Okay.
16             ROBERT FETTIG:  I'm sorry, ma'am.  Thank
17   you, ma'am.
18             MS. WENCIL:  Yeah.  We can all get done here
19   more quickly, because I understand you're getting
20   tired as well because we've been on for quite a
21   while, but just be calm, and we -- and you can get
22   through this, and just answer the questions.  Thank
23   you.
24        Q.   (BY MS. STANLEY)  What about a 2013 Ford
25   F-150?  Does Stark Energy have -- own that, a vehicle
```

1    like that?

2         A.    No, ma'am.  Stark Energy doesn't own a 2013

3    F-150.

4         Q.    What about a 2004 skid-steer?

5         A.    It's at the shop, ma'am.  I put it on my

6    schedule.  I financed that with Falcon Leasing, and I

7    paid them in full.

8         Q.    So you believe that's on the schedules?

9         A.    I know it's on the schedules.  That's how

10   you know about it.

11        Q.    Do you have your schedules with you in the

12   truck?

13        A.    Again, ma'am, like I said, I don't have it

14   in front of me because I'm driving a truck and trying

15   to earn money, but I'm very factually knowing that

16   it's on the schedule because I listed it on there,

17   and it's free and clear.  You have a schedule in

18   front of you.  What does it say for the dollar

19   amount?

20        Q.    It doesn't say anything, Mr. Fettig.  I

21   don't see it on the schedules, so that's why I was

22   asking.

23        A.    Well, it's on the schedule.

24        Q.    What about a Lincoln Electric welder?  A

25   Lincoln Electric -- there's like two of them.

1          A.     There's nothing on the schedule for that.

2     They're not owned by Stark Energy, and if they are,

3     they were misrepresented.

4          Q.     Okay.  So there's three different welders

5     from Lincoln Electric for 2019.  These are not Stark

6     Energy (indiscernible) --

7          A.     (Indiscernible) 2019?

8          Q.     Yes.

9          A.     I would have to look at that, ma'am.  I'm

10    getting confused here.

11         Q.     I don't know what this is, a 2016 Snap-on

12    tool air plus?

13         A.     I -- I -- I don't know what that is, ma'am.

14    That's a piece of -- that's a tool of mine.

15              And now I know where you're -- what

16    you're pulling off of.  You're pulling off of

17    something that Gate City has listed for a loan

18    agreement of some sort, I believe, that I gave to

19    Greg Ellwein, I think, some -- he said:  List

20    everything that's in the shop.  He asked me to do

21    that.  Your -- your bank business manager said:  List

22    everything that's in the shop, whether Stark Energy

23    owns it or you own it (indiscernible) --

24         Q.     Well, Mr. Fettig, before you get too far

25    down that road, I can tell you that I didn't get this

1    from Gate City, so --

2        A.    I'm just letting you know.

3        Q.    What about a -- what about a low-lift

4    transmission jack?  Is that a Stark Energy property?

5        A.    It -- it could very well be.  I -- I don't

6    know.  And if it's not listed on the schedules, I'll

7    make sure it's corrected.  I don't know.  I've got to

8    look at that.

9        Q.    What about a clutch handler?

10       A.    That's another tool of some sort.  Again, I

11   don't know.  I would have to look at the -- at the

12   schedule and check out.

13       Q.    What about an engine hoist?

14       A.    An engine hoist?  I added an engine hoist.

15   I pulled the motor out of the truck, but that thing

16   was stolen by me -- stolen by one of my employees.

17       Q.    When was that?

18       A.    I -- 2023, probably.  Some -- yep, it's not

19   there anymore, so...

20       Q.    What about an air -- Quincy air compressor?

21       A.    I -- it could be on the schedule.  I don't

22   know.

23       Q.    Is that Stark Energy's equipment, though?

24       A.    I -- it very well could be, or it could be

25   mine.  It could be my personal one that I use for the

1    shop.  I -- I don't know.  I have tools, too.

2         Q.    Okay.  What about a 15-inch Evolution field

3    cutting chop saw?  Is that Stark Energy's property or

4    yours?  Or --

5         A.    I -- I would have to look.  I'd have to

6    look.  I -- I know where my Stihl chop saw is.  It's

7    at the shop.  Because I'm at -- I just left the shop

8    a little bit ago because I had to change a -- a

9    light, but...

10             I guess maybe you should refer to your --

11    the communication you're reading from, and it maybe

12    says my lawyer, so if there's anything missing on my

13    schedule I can get corrected.  I'd appreciate that.

14        Q.    So that would be you don't know if that's

15    yours or Stark Energy's?

16        A.    Yeah.  Because I've had a lot of my own

17    personal money go into this business, and I'm

18    probably going to be the one that loses the most if I

19    don't make this case, so, yes, ma'am.

20        Q.    What about a DeWalt -- I don't know what

21    this is -- D28715?  Do you know what that is

22    referring to?

23        A.    No, I do not recall.  I don't know what

24    you're speaking from.  A DeWalt what?  If you

25    probably put it in Google, it will probably tell you

1    what it is.

2        Q.    You're probably right.  I was wondering if

3    you knew what it was.

4            Mr. Fettig, are you friends with Andy Yuker?

5        A.    Relevance?  He works in the same industry I

6    work in, but, I mean, to that effect, I mean, I again

7    refer to my lawyer and would refer to pleading the

8    Fifth because, again, you're trying to ask a loaded

9    question, and I have a pending criminal investigation

10   that they actually said in the open courtroom that

11   there's no evidence, so it's probably going to get

12   dismissed.

13       Q.    So was that a you're not going to answer

14   that question?

15       A.    Yeah.  I'm pleading the Fifth, ma'am.  And

16   for furthermore, if you have one more question, I'm

17   just going to plead the Fifth, because I'm trying to

18   be as truthful as possible, but you're not being

19   forthright.  I'm trying to be helpful, but you're not

20   being forthright.

21           MS. STANLEY:  Mr. Ahlgren, what would you

22   like to do?  I mean, we have had discussions on a

23   2004 Exam, and I don't want to hold all these other

24   people here, but I -- I do have a bunch of questions

25   regarding how this collateral obviously wound up at

1    Yuker Towing.

2         MR. AHLGREN:  Well, I don't think he's going

3    to answer any of those questions.

4         ROBERT FETTIG:  On the grounds -- on the

5    grounds that I feel that any answer I may give you

6    may self-incriminate myself, I think is the technical

7    term, I'm pleading the Fifth to any and all questions

8    you have in regards to that because I don't want any

9    issues anywhere going forward.  It's all false

10   accusations, has nothing to do with Gate City.

11        Q.   (BY MS. STANLEY)  So you previously filed

12   sort of an affidavit in this bankruptcy case that

13   said something about bad actors that allegedly seized

14   equipment.  Who are the bad actors?

15        A.   Well, the first bad actor is a repre- -- you

16   represent them.  It's Gate City Bank.  I went ahead

17   and communicated even with you, through their back

18   office, and you said that you were going to accept my

19   payment to bring my shop current, so I was trying to

20   show an act of good faith, and I said:  Once I get

21   this current, maybe I can start working on getting

22   some of my previous loans current if we can negotiate

23   on putting payments on the back end, whatever --

24        Q.   Mr. Fettig, the question was bad actors that

25   seized collateral.

1        A.    Did you seize collateral, and did you take

2   collateral, and are you refusing to give it back to

3   me so I can earn money to pay my creditors?

4           MR. AHLGREN:  This is -- this is -- this is

5   getting to be, I think, unproductive.

6           I think there are other creditors here, as

7   you said, Ms. Stanley.  You've got the ability to ask

8   for a 2004 Exam.  I'm going to ask that we move on to

9   other creditors.  It's, of course, up to Ms. Wencil,

10  but we've already gone on for an hour and a half, and

11  this isn't the time for a 2004 Exam.  You can ask for

12  one, and that may be the appropriate way to move.

13          MS. STANLEY:  Two more questions.

14      Q.    (BY MS. STANLEY)  Mr. Yuker [sic], what is

15  your cell phone number?

16      A.    I plead the Fifth.

17          MR. AHLGREN:  You know what, Ms. Stanley?

18  You can -- you can contact the Debtor through me.  I

19  don't think you need to contact him, and -- or

20  we'll --

21          MS. STANLEY:  No, I'm not intending that --

22          MR. AHLGREN:  (Indiscernible.)

23          MS. STANLEY:  -- I'm just -- Mr. Ahlgren,

24  there have been requests for copies of text messages

25  and stuff, which have not been provided.

1            ROBERT FETTIG:  I -- I provided those.

2            MS. STANLEY:  Not -- certainly not for the

3    relevant timeframe.

4            And, also, for Ms. Delene Fettig.  So if

5    those are not going to be turned over, it would be

6    helpful to get those -- that information for subpoena

7    purposes.

8            MR. AHLGREN:  Ms. Stanley, we've asked you

9    for information; you've asked us for information.

10   Those information requests can be handled outside of

11   this.

12        Q.   (BY MS. STANLEY)  One more quick question

13   on -- you did have a bunch of references to all these

14   predatory lenders, so -- and that's a -- the funds

15   were taken out in the 2021/2022 timeframe.  Is that

16   correct?

17        A.   Correct.

18        Q.   So if -- if Stark Energy got $2 million from

19   SBA in that same timeframe, why did it have to keep

20   taking out predatory lender loans?

21        A.   Ma'am, do you own a business?

22        Q.   I'm not here to answer questions --

23        MR. AHLGREN:  Rob, Rob --

24        Q.   (BY MS. STANLEY)  -- (indiscernible) --

25        A.   I plead the Fifth.  I plead the Fifth.

1  That's what I'm going to do going forward.  I'm going

2  to be very professional.  I plead the Fifth.  Thank

3  you.

4        MS. STANLEY:  Apparently, we are going to

5  have to move on.

6        Thank you for your time today, Ms. Wencil.

7        MS. WENCIL:  Thank you.

8        And please be aware, Mr. Fettig, of being --

9  only using the Fifth, because the Court can make an

10  inference when you plead the Fifth about not being

11  able to answer questions; but, of course, you do have

12  to take it when it does implicate a possible criminal

13  matter, but that will conclude those questions.

14        ROBERT FETTIG:  Okay.  Well, I'm sorry, but

15  it's just she's badgering me about something that has

16  no relevance.

17        MS. WENCIL:  I don't think --

18        ROBERT FETTIG:  No relevance.

19        MS. WENCIL:  I don't think you have the

20  basis to make that determination, but we're going to

21  move on.

22        Does any other creditor have questions here

23  today?

24        (No audible response.)

25        MS. WENCIL:  Okay.  Hearing none, then I'm

1   going to conclude the meeting.

2            Thank you, everyone, for showing up.

3            MR. AHLGREN:  Thank you.

4            UNIDENTIFIED SPEAKER:  Thank you.

5            MR. AHLGREN:  Bye-bye.

6            UNIDENTIFIED SPEAKER:  Have a good day.

7   Bye.

8   (End of recording.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I hereby certify that I transcribed the

3     preceding forty-four (44) through one hundred

4     twenty-seven (127) pages from an audio recording

5     provided to me by the Vogel Law Firm to the best of

6     my ability;

7          That I was not present at the time said

8     recording was prepared;

9          That I have broken the transcript into separate

10    conversations to the best of my ability;

11         That I am not a relative or employee or counsel

12    of any of the parties or a relative or employee of

13    such attorney or counsel;

14         That I am not financially interested in the

15    action and have no contract with the parties,

16    attorneys, or persons with an interest in the action

17    that would affect my impartiality.

18

19

20                         __/s/ Carolyn Taylor Pekas_____
                           Carolyn Taylor Pekas, RPR
21                         PO Box 886
                           Fargo, ND 58107
22

23

24    Dated this 26th day of June, 2024.

25